# Exhibit 46, Part 6 of 6

Denne grafiske fremstilling understøttes af tabel 7.1, side 15, i samme SIR-rapport:

Tabel 7.1 omfatter indtægter (udbytteskat), refusioner samt antallet af ansøgninger vedrørende refusion pr. år fra 2005 til juni 2015.

| | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 Jan - juni |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Indtægter i mia. kr. | 6,69 | 9,36 | 9,94 | 11,1 | 8,06 | 6,36 | 9,65 | 8,71 | 11,69 | 13,2 | 18,51 |
| Refusion i mia. kr. | 1,18 | 1,88 | 1,07 | 0,75 | 0,68 | 0,75 | 1,12 | 1,45 | 2,79 | 6,06 | 8,73 |
| Antal ansøgninger | 16.617 | 18.618 | 15.687 | 16.655 | 21.284 | 21.451 | 24.292 | 30.765 | 33.861 | 41.764 | 34.850 |

Tabel 7.1.

Lidt mere aktuelle tal fremlægges i rapporten fra den tværministerielle arbejdsgruppe 2016/2017. Også disse viser, at der ikke blev udbetalt mere i refusioner, end der var modtaget fra de danske selskaber. Fra denne rapport stammer nedenstående skema, der viser Danmark nettoindtægter fra udbytteskat på aktier:

**Tabel 2.1. Indtægter fra kildeskatten på udbytter**

| Mia. kr. (løbende priser) | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Bruttoindtægter fra udbytteskat | 6,7 | 9,4 | 10,0 | 11,1 | 8,1 | 6,4 | 9,7 | 8,7 | 11,7 | 13,2 | 22,2 |
| Modregnet i selskabsskat[1)] | -1,2 | -1,6 | -1,8 | -2,1 | -0,8 | -0,6 | -0,9 | -1,1 | -1,6 | -1,7 | -3,6 |
| Refusioner[2)] | -1,2 | -1,9 | -1,1 | -0,8 | -0,8 | -0,7 | -1,1 | -1,5 | -2,8 | -6,1 | -10,9 |
| *Heraf økonomisk kriminalitet* | *0,0* | *0,0* | *0,0* | *0,0* | *0,0* | *0,0* | *0,0* | *-0,1* | *-0,7* | *-3,8* | *-7,8* |
| Nettoindtægter fra udbytteskat[3)] | 4,3 | 5,9 | 7,0 | 8,3 | 6,5 | 5,1 | 7,6 | 6,2 | 7,9 | 9,3 | 15,5 |

Det bestrides således principielt, at SKAT skulle have udbetalt mere i refusion, end der blev indbetalt.

Det eneste, der kan ses ud fra de fremlagte statistikker, er, at antallet af refusioner er steget betragteligt. Men at sælge aktierne inden udbyttedatoen til en aktionær, der er refusionsberettiget, er jo også netop er motivationen for sælgeren af aktierne – og det faktum, der bringer markedet for derivater (forwards og futures) ud af balance med spotmarkedet. Statistikken viser således blot, at investorer, der interesserer sig for udbyttearbitrage, fra 2014 for alvor henvendte sig til det danske aktiemarked.

Skattestyrelsen lader i det sammenfattende indlæg i førersagerne af den 9. august 2019 således også til at opgive denne helt åbenbare falske påstand om for meget udbetalt udbytterefusion, idet det igennem samtlige tidligere indlæg fremførte argument nu opgives.

**8.2 Summen af refusioner pr. udloddende selskab**

Skattestyrelsen henviser i det sammenfattende indlæg i afsnit 2.1 nu kun til samtlige refusioner foretaget i henhold til TRYG A/S. Skattestyrelsen ønsker at afvise pensionsplanernes retskrav på refusion, med den begrundelse at der i alt er ansøgt om refusion for ca. kr. 151 mio. TRGY A/S havde for det på-

gældende skatteår (2015) dog kun indeholdt ca. kr. 123 mio. i udbytteskat. Ud af de kr. 151 mio. havde amerikanske pensionsplaner modtaget kr. 136 mio.

Hertil bemærker Skattestyrelsen i afsnit 2.1, side 6, at

> *"der har været søgt - og udbetalt – langt mere i refusion, end der har være indeholdt. Det si-ger sig selv, at der aldrig kan være krav på refusion af mere, end der har været indeholdt".*

Skattestyrelsen er dog ikke i stand til at dokumentere, hvem der konkret ikke skulle være berettiget til refusion. En pensionsplans krav på refusion kan ikke nægtes, med henvisning til at en anden modtager af refusion eventuelt ikke har været berettiget til at modtage denne.

Ved at citere dette eksempel har Skattestyrelsen valgt (frivilligt eller tilfældigt) at dokumentere, at ud-bytteskattesystemet lider under en systemisk fejlfunktion, og at der ikke er tale om svindel. Skatty-relsen har ingen forklaring på, hvorfor der er udbetalt ca. kr. 151 mio. i refusion, mens der kun er ind-betalt ca. kr. 136 mio. af Tryg A/S.

Selvom Skattestyrelsen hævder, at alle ansøgninger fra kunder i Solo-gruppen, som beløber sig til kr. 136 mio., var svindel, hvilket klart bestrides, så er der stadig en difference på kr. 15 mio., der er udbe-talt mere end indbetalt (forskellen mellem kr. 136 mio. og kr. 151 mio.). Der må derfor helt klart være en anden forklaring på uoverensstemmelserne. Den mest nærliggende er, at der ikke er udbetalt for meget, men snarere indbetalt for lidt udbytteskat.

Hvis den retmæssige ejer af en aktie på udbyttedatoen ikke identificeres korrekt, beregnes den udbyt-teskat, som skal indbetales, også forkert.

### 8.3 Fejlfunktioner ved administration af udbytteskat

Selvom det ikke er pensionsplanens opgave at analysere det danske udbytteskattesystem og forklare, hvordan det kan ske, at der udbetales mere i udbytterefusion for et bestemt selskab, end dette selskab har indbetalt i udbytteskat, skal vi alligevel gerne komme med vores bud på de mest indlysende forkla-ringer på dette misforhold:

1   Bankordningen – regnearksløsningen – har ført til, at der blev udbetalt udbytterefusion til bankerne uden dokumentation for ejerskab af aktierne henholdsvis modtagelse af udbytte. Da betalingerne til bankerne ikke blev registreret af SKATs egen "3-S"-platform – se Bech-Bruun-rapporten, side 92 ff., samt SIR-rapporten af den 24. september 2015, pkt. 11.4 – kunne bankernes ansøgninger føre til, at der blev udbetalt refusion for samme aktie flere gange. En via bankordningen og en anden via blanket-ordningen. Bankordningen blev stoppet i 2015, da man blev klar over problemerne, dog kun med den officielle forklaring, at der manglende retlig hjemmel for løsningen. Faktum var imidlertid, at bankerne havde modtaget refusioner af indeholdt udbytteskat uden tilstrækkelig dokumentation for retmæssigt ejerskab af aktierne. En undersøgelse af bankordningen er derfor med rette nu også sat i gang af skat-teministeren.

2   Sælger en aktionær på udbyttedatoen sine aktier til en køber med en anden skattestatus, og afvikles handlen med en længere frist end den af VP Securities anvendte (dvs. nu længere end T+3), vil VP Securities anvende den forkerte skatteprocent ved beregningen af udbytteskatten. Er sælger fx fritaget for skat, og er dette registreret ved VP Securities, beregnes der ikke udbytteskat af det udbytte (jf. Skattestyrelsens bilag AO), som umiddelbart sendes til sælgeren af aktierne (fordi han stadig er regi-streret som ejer på "record day"). Idet køberen af aktien ikke kan vide, at sælgeren er registreret som skattefri ved VP Securities, forventer køberen kun at modtage et nettoudbytte. Det er kun nettoudbyt-ter, der cirkulerer under "market claims"-processen mellem de forskellige custodians og subcustodians.

Køberen (pensionsplanen), der modtager et nettoudbytte, er berettiget til refusion, da han var den retmæssige ejer af aktien på udbyttedatoen. VP Securities har dog ikke beregnet de 27 pct. udbytteskat. Dem er sælgeren af aktien løbet med.

3    Udbytteskatten beregnes på baggrund af registreringerne hos VP Securities. VP Securities kender dog ikke de retmæssige ejere af danske aktier. Den retmæssige ejer kan bl.a. i tilfælde af aktieudlån være en anden end en helt anden skattestatus end den registrerede civilretlige ejer.

4    Fejlene i den måde, hvorpå skattemyndighederne har administreret refusion af indeholdt udbytteskat, er endnu mere åbenlyse i tilfældet med short selling. Hovedproblemet med short selling, der udløses af aktieudlån gennemført af banker, formueforvaltere og ikke mindst hedge fonde, er, at det fører til en stigning af aktiernes "free-float" – dvs. aktier, der er til rådighed på markedet – udover 100 pct. af alle aktier udstedt af et selskab gennem VP Securities, og at dette gør det muligt, at der er mere end én retmæssig ejer af en og samme aktie.

Dette er, efter vores opfattelse, de mest indlysende forklaringer på, hvorfor der kunne være udbetalt mere i refusion af udbytteskat, end de beløb de danske skattemyndigheder har modtaget fra selskaberne, hvis denne påstand af Skattestyrelsen skulle være korrekt.

Eksemplet, som Skattestyrelsen ønsker at anvende som dokumentation for at nægte pensionsplanerne udbytterefusion, bekræfter blot, at et system til administration af udbytteskat, der er baseret på registreringerne ved VP Securities, lider under alvorlige mangler. De retmæssige ejere, der er berettiget til refusion, kan ikke identificeres ved disse registreringer.

Som påvist ovenfor er det i henhold til gældende ret ejeren af aktierne, der har ret til udbytterefusion, hvis han er den retmæssige ejer af aktierne på udbyttedatoen og har modtaget nettoudbyttet. Den retmæssige ejer af aktierne har ingen pligt til at undersøge eller dokumentere, om andre retmæssige ejere ligeledes anmoder om refusion. Dette er tillige også ganske umuligt for en ejer af en aktie (eller for nogen som helst anden person).

Som allerede påvist ovenfor kan der være flere retmæssige ejere af danske aktier end svarende til det antal aktier, som et dansk selskab har udstedt.

Skatteministeriet har til trods for den meget klare "Early Warning" af 2015 ikke løst problemet omkring aktielån og short selling, men i det mindste erkender ministeriet i statusnotatet af den 26. juni 2016, at Danmark simpelthen ikke har et system eller regler til at identificere den retmæssige ejer af danske aktier (side 6).

## 9 PENSIONSPLANENS FINANSIELLE TRANSAKTIONER

### 9.1 Finansiering af aktiekøb

Pensionsplanen har med rammeaftalerne om aktieudlån (GMSLA'er) samt de fremlagte e-mails, hvorved de enkelte aktielån trækkes under GMSLA'en, dokumenteret, at den rådede over de nødvendige finansielle midler til at betale for aktierne, i det øjeblik udlånet foretoges. Dermed kunne pensionsplanen betale for aktierne på leveringsdatoen.

Et ejendomsforbehold, der gjorde, at ejerskabet til aktierne først gik over til pensionsplanen (jf. kapitalmarkedslovens § 188, stk. 1), var ikke gjort gældende af sælger ved indgåelsen af købekontrakten. Pensionsplanen blev således allerede inden betaling af aktierne civilretlige ejere af aktierne. Dette ejerskab blev efterfølgende sikret ved registreringen hos dennes custodian. Denne sikringsakt medførte, at pensionsplanen kunne modtage det udbytte, som i henhold til købelovens § 19, stk, 1, tilkommer pensionsplanen som køber af aktierne.

Skattestyrelsen har rejst tvivl vedrørende spørgsmålet om, hvorvidt en aktielåntager ville stille et beløb til sikkerhed, som svarer til aktiernes markedsværdi dagen før aktielånet, dvs. før ex-datoen.

At det er normal kutyme, at aktielåntager skal stille et større beløb i kontant sikker- hed end markeds-værdien på lånedatoen, har pensionsplanen dokumenteret ved at fremlægge dokumentation for, hvor meget eksempelvis Nordnet forlanger i garantistillelse.

HJÆLP

Aktier som kan shortes



Læs mere om
shorthandel

# Aktier som kan shortes

Valuta DKK ▼

Hvis du vil shorte aktier som ikke findes med
pa listen over dagen, kan du kontakte
Nordnets mæglere pa telefon 70 20 66 85.

| Navn | Kortnavn | Sikkerhedskrav |
|------|----------|----------------|
| A.P. Møller - Mærsk A A/S | MAERSK A | 125o |
| A.P. Møller - Mærsk B A/S | MAERSK B | 125o |
| ALK-Abell6 B A/S | ALK B | 150o |
| Alm. Brand A/S | ALMB | 140o |
| Ambu A/S | AMBU B | 150o |
| Bavarian Nordic A/S | BAVA | 160o |
| Carlsberg B A/S | CARL B | 115o |
| Chr. Hansen Holding A/S | CHR | 125o |
| Coloplast B A/S | COLO B | 120o |
| DFDS A/S | DFDS | 130o |
| DSV A/S | DSV | 115o |
| Danske Bank A/S | DANSKE | 120o |
| FLSmidth & Co. A/S | FLS | 125o |
| GN Store Nord A/S | GN | 120o |
| Genmab A/S | GEN | 170o |
| H. Lundbeck A/S | LUN | 130o |
| ISS A/S | ISS | 120o |
| Jyske Bank A/S | JYSK | 130o |
| Matas A/S | MATAS | 125o |
| Nordea Bank Abp | NDA DK | 120o |

https://www.nordnet.dk/mux/page/blankningin1.html                    17.02.2019

Skattestyrelsen forsøger i styrelsens sammenfattende indlæg af den 9. august 2019 under pkt. 8.12, side 74, at fordreje rollerne i et aktieudlån ved at påstå, at det er aktielångivers egenkapital, der spiller

en rolle for, hvilket beløb der skal stil- les i kontant sikkerhed for et aktieudlån. Det er det naturligvis ikke. Formålet med den kontante sikkerhedsstillelse er at sikre et eventuelt dækningskøb, hvis låntageren ikke leverer aktierne tilbage.

Skattestyrelsen undlader i sin beskrivelse af Nordnet at nævne, at det ikke er bankens kapitalstyrke, der er afgørende for, hvor meget kontant sikkerhed de kan forlange af deres kunder. Faktum er, at når Nordnet låner aktier ud til deres kunder, så er banken selv nødt til at låne aktierne andetsteds. Nordnet må herved stille sikkerhed, i samme størrelsesorden som banken selv forlanger af sine kunder, hvis banken vil arbejde konkurrencedygtigt i markedet.

Der hvor låntagers og långivers kapitalstyrke kommer til udtryk, er i de løbende forhandlinger om renten, som pensionsplanen skal betale for den kontante sikkerhedsstillelse, og lånegebyret, som låntager skal betale for at låne aktierne. Jo stærkere aktielåntagers kapitalstyrke er i forhold til aktielångiveren (pensionsplanen), des bedre kan aktielångiver påtvinge en højere rente og et lavere aktielånsgebyr. Det samlede resultat af renten, der skal betales på de kontante midler, og gebyret, der skal betales for aktielånet, betegnes i branchen som "rebate".

For så vidt angår konsekvenserne af et eventuelt prisfald på aktiemarkedet, henvises til standardbetingelserne under GMSLA, der allerede forudser, hvordan parterne skal håndtere dette.

**9.2 Muligheden for at gennemføre de omhandlede finansielle transaktioner**

Skattestyrelsen mener, det skulle ligne en kabale at få alle tre transaktioner til at finde sted samtidig, nemlig at (1) finde en aktiesælger, der vil sælge til pensionsplanen, (2) finde en aktielåntager, der skulle bruge aktierne og var villig til at stille købsprisen som kontant sikkerhed for aktielånet, og (3) finde en forward counterpart, der kunne bære et eventuelt kurstab på aktierne.

Skattestyrelsen forsøger, at få det til at fremstå som en umulighed. Det er dog ingenlunde tilfældet.

I modsætning til hvad Skattestyrelsen påstår, drejer det sig her ikke om tilfældigheder, men om <u>ganske normale transaktioner på internationale finansmarkeder</u>. Her indgås aftaler med brokere til at formidle køb og salg af aktier samt derivater og rammeaftaler med mellemmænd i aktielån (stock loan intermediaries), længe inden en eneste transaktion afvikles. Alle de enkelte transaktioner er således tilrettelagt, længe inden de gennemføres. Finansindustrien adskiller sig på dette punkt fra enhver anden form for industri. Overalt skal alle bestanddele af det, der skal produceres (biler, huse, brød eller strukturerede finansprodukter som udbyttearbitrage) planlægges og koordineres i forvejen, for at alt er til stede på rette tidspunkt i maskineriet. Mangler blot en enkelt bestanddel, fungerer slutproduktet ikke.

Hvad angår udfordringen at finde en sælger, der vil sælge til en pensionsplan, er svaret ganske enkelt: Sælgeren til pensionsplanen var ikke den tidligere ejer af aktien, men pensionsplanens fondsmægler, der gennemførte transaktionerne som ejermatching-handler. Det vil sige, at han selv solgte aktierne til pensionsplanen. Aktierne skaffede han fra en anden fondsmægler, der selv skaffede dem fra den oprindelige aktionær. Det er på denne måde, at ejermatching-handler foregår.

Pensionsplanens fondsmægler vidste, at pensionsplanen havde indgået en rammeaftale om udlån af aktieposter, og at pensionsplanen derfor havde en konstant mellemmand (stock loan intermediary), hvis eneste opgave var at fremskaffe aktieudlån. Mægleren vidste derfor, at pensionsplanen allerede inden købet af aktierne ville kontakte mellemmanden til aktieudlån for at høre, om han kunne formidle et udlån mod den nødvendige kontante sikkerhed, hvis pensionsplanen ville købe aktierne.

Fondsmægleren modtog desuden accept fra pensionsplanens clearing-agent, om at handlen ville gennemgå clearing og afvikling. Clearing-agenten overtog derved risikoen for, at betaling skulle ske ved levering af aktien. Denne risiko kunne clearing-agenten i sin egenskab af prime broker overtage, idet clearing-agenten selv ville modtage aktierne, hvis pensionsplanen ikke kunne betale.

At finde en sælger er derfor absolut ingen udfordring i praksis, når alle forretningsforbindelser først er etableret.

Som det fremgår af de som bilag 78 fremlagte e-mails, lykkedes det trods al forberedelse heller ikke altid alle pensionsplaner i hvert eneste tilfælde at placere en ordre til køb af aktier. Dette kan teoretisk skyldes, at der ikke var et tilsvarende udbud af aktier på markedet, eller at clearing-agenten ikke havde givet sit tilsagn om at ville indestå for afviklingen af handlen. Hvilket af de to scenarier, der konkret var tilfældet, spiller for så vidt ingen rolle. Faktum er dog, at pensionsplanerne netop ikke altid fik "kabalen til at gå op", sådan som det igen fuldstændig udokumenteret påstås af Skattestyrelsen.

Det samme gælder for udfordringen at finde en forward counterpart. En forward formidles også af mæglere. Den ultimative modpart til forward-kontrakten kan  have mange forskellige grunde til at indgå kontrakten. En af dem kan være at spekulere i, hvor meget aktiekursen vil falde, når udbyttet udloddes. En anden kan være, at forward-modparten vil sikre sig kursen, som han kan købe aktierne tilbage fra markedet til, efter at han oprindeligt har solgt sine aktier til markedet før udlodningen af udbyttet. Det kan herved dreje sig om en ren spekulationsforretning, eller som nævnt ovenfor en udlænding, der ville miste de 27 pct. udbytteskat, hvis han ejede aktien på udbyttedatoen.

Endelig er der aktielåntageren, hvis motivation allerede er beskrevet udførligt i dette indlæg. Også aktielåntageren findes gennem professionelle stock loan intermediaries. Den på forhånd indgåede GMSLA-rammeaftale sikrer pensionsplanen, at aktierne kan lånes ud, når der opstår behov herfor. En kort samtale med mellemmanden inden aktiekøbet sikrer pensionsplanen, at det konkrete udlån kan foretages i rette tid til at betale for aktierne.

At finde alle disse modparter er ganske rigtigt ikke noget, der gøres på kort tid. Derfor tager kontoåbningsproceduren hos de forskellige professionelle aktører også så lang tid. Alle kontrakter skal på plads, inden handlen kan begynde.

Det bedste bevis for, at dette er muligt i den virkelige verden og forholder sig netop som beskrevet i vores indlæg, er, at alle handels- og transaktionsrapporterne blev indleveret til de respetive ansvarlige (tilsyns-)myndigheder i London (FCA og LSE). Dette understøttes yderligere af den omfangsrige dokumentation for transaktionerne (custody statements = kontoudskrifter, elektroniske depotregistreringer, handelsnotaer fra fondsmæglerne, custodians reviderede årsregnskaber osv.).

Det bemærkes videre, at den følgende statistik fra Finanstilsynet over omsætningen af danske aktier, som er blevet fremlagt i sagerne, bekræfter, at det i virke- lighedens verden forholder sig som anført:

**Figur 2.3. Omsætningen af aktier i udvalgte selskaber - 2015**

Figur A. Novozymes B - 2015

Figur B. TDC - 2015

Anm.: Den angivne udbyttedato er den første dag, hvor aktien handles uden udbytteret (den såkaldte x-dag - dagen efter generalforsamlingsdagen. Selve udbyttet udbetales først til aktionærerne et par dage senere. Figurerne er baseret på MiFID data, der har til formål at undersøge markedsmisbrugssager. Det betyder, at der for en transaktion godt kan være 1, 2, 3, 4 eller i enkelte tilfælde flere MiFID indberetninger. Den angivne omsætning er dermed ikke nødvendigvis fuldstændig retvisende. Uanset om der er risiko for flere indberetninger baseret på samme transaktion, så kan det dog ikke forklare de store udsving omkring udbyttedatoerne.
Kilde: Finanstilsynet

Det faktum, at der er et dagligt handelsomfang af danske aktier på mere end kr. 100 billioner, betyder netop, at utallige investorer hver eneste dag handler aktier i de samme selskaber på det samme tidspunkt. Mange investorer vælger netop at handle en bestemt aktie, når udbetalingen af et udbytte står for døren. Alt dette er ikke noget tegn på svindel.

Havde der virkelig været reelle tegn på svindel i sagerne, måtte der også fra anklagemyndighedens side foreligge mistanke, af en styrke der ville føre til sigtelse af pensionsplanerne eller deres trustees. Retten i Lyngby har ved kendelse af den 18. marts 2019 tilkendegivet, at dette hverken er tilfældet for Do-ston Bradley eller nogen af de af ham forvaltede pensionsplaner (bl.a. prøvesagen for Pegasus Fox 23 LLC Solo 401K Plan). Kendelsen fremlægges som bilag 92.

På linje hermed har de engelske anklagemyndigheder i november 2019 også besluttet at indstille deres egne efterforskninger i sagsforløbet. De vil kun yde Danmark den i henhold til internationale aftaler på-krævede assistance, jf. Justitsministeriets meddelelse til Folketingets retsudvalg citeret i artikel af den 16. november 2019, som her fremlægges som bilag 93. Endvidere fremlægges som bilag 94 skrivelse fra de engelske anklagemyndigheder, hvoraf det fremgår, at de ikke længere af egen drift fortsætter undersøgelserne mod tidligere ansatte i Solo-gruppen.

Til trods herfor påstår Skattestyrelsen fortsat, at pensionsplanernes arbitrageforretninger

> "alene fungerer som bogføringsmæssige posteringer uden virkelige handler"
> (sammenfattende indlæg af den 9. august 2019, side 28)

Det forholder sig dog således, at al handel med dematerialiserede aktier i dag kun manifesterer sig i form at elektroniske, bogføringsmæssige registreringer, da der ikke længere eksisterer nogen dokumenter i papirform, der overdrages. Pensionsplanerne afgav elektroniske ordrer til deres mæglere, ligesom enhver anden kunde ville gøre det til sin mægler. Mægleren matchede elektronisk pensionsplanernes købsordrer med salgsordrer i henhold til gældende regler og under overvågning af det britiske FCA. Efter matchingen af ordrerne blev der elektronisk givet clearing-instruktioner til clearing- og settlement-agenten. Såvel instruktioner til clearing og settlement som også til selve gennemførelsen heraf sker i dag altid elektronisk, da dematerialiserede aktier slet ikke kan cleares, afvikles og opbevares i nogen anden form end elektronisk.

En aktiehandel manifesterer sig i dag således kun elektronisk og er reel, når disse elektroniske posteringer er baseret på virkelige transaktioner, der i dag ligeledes er elektroniske. Handlerne, der blev gennemført af pensionsplanerne via de britiske mæglere og clearing- og settlement-agenter, adskiller sig dermed på ingen vis fra handler, der gennemføres ved enhver anden dansk bank. Også her gennemføres alt helt elektronisk ved bogføringsmæssige posteringer.

Købet af en e-bog er i dag heller ikke andet end bogføringsmæssige posteringer og elektroniske transaktioner. Ikke desto mindre er såvel købene af de dematerialiserede aktier, som pensionsplanerne foretog, lige så virkelige som ethvert onlinekøb af en e-bog.

**9.3 Registreringer i VP Securities er uden betydning**

**9.3.1 Betydningen af en registrering ved VP Securities**

Skattestyrelsen har gentagne gange igennem samtlige indlæg argumenteret for, at *"Pensionsplanerne ikke var ejere af de i sagen omhandlede aktier."* Om skattestyrelsen hermed mener civilretligt eller skatteretligt ejerskab, undgås det konsekvent at konkretisere, og i stedet insisteres på et juridisk ukendt begreb om "faktisk" ejerskab.

Skattestyrelsen hævder, at pensionsplanen ikke var "ejer" af aktierne, fordi den ikke købte nogen aktier. Det lader til, at Skattestyrelsen herved henviser til, at pensionsplanen ikke skulle være de civilretlige ejere af aktierne og dermed ikke den skattemæssige ejere, blot fordi de ikke kan findes i VP Securities' register.

Skattestyrelsen indrømmer endeligi førersagerne i indlægget af den 9. maj 2019, afsnit 4.10, og i det sammenfattende indlæg af den 9. august 2019, afsnit 8.11, at en registrering ved VP Securities ikke er nødvendig for at være ejer af en aktie. Ellers ville Skattestyrelsen ikke have trukket sig tilbage til et udsagn om, at

> *"Data fra VP Securities skal indgå i bevisvurderingen".*

Det er herved klart, at registreringer ved VP Securities blot er et af flere mulige beviser for ejerskab. Skattestyrelsen lader endelig til at erkende, at omnibus depoter gør det umuligt for VP Securities at bekræfte, at en person IKKE er aktionær. VP Securities kan kun bekræfte, at en person er aktionær, når og hvis en sådan person har et depot hos VP Securities.

Skattestyrelsen mener i styrelsens sammenfattende indlæg af den 9. august 2019, afsnit 8.11, at det skulle være

> *"relevant, om pensionsplanerne eller deres custodians har haft depoter i VP*
> *Securities – eller om de kan vise, gennem hvilke sub-custodians de efter sigende*
> *har ejet aktier."*

At en eksisterende registrering ved VP Securities entydigt efterviser civilretligt ejerskab, har pensions-planerne aldrig sat spørgsmålstegn ved. Det er jo netop formålet med registreringen af ejerskabet ved en custodian, at ejerskabet opnår beskyttelse mod ekstinktion. Men beskyttelse er netop ikke ensbety-dende med "eksistens eller manglende eksistens". Ejerskab kan meget vel bestå uden denne beskyt-telse.

Skattestyrelsen kan under gældende EU-lovgivning dog ikke diskriminere andre custodians i forhold til VP Securities. Det ville være et klart brud på grundlæggende regler om kapitalens fri bevægelighed og garantien omkring fri tjenesteydelser inden for EU. Skattestyrelsen kan derfor ikke forlange af aktionæ-rer, der har deres depot hos en udenlandsk custodian, at fremlægge en kæde af custodians og subcu-stodians helt op til VP Securities som eneste accepterede bevis for ejerskab. Ingen aktionær i et selskab har adgang til disse sub-custody-kæder. Disse kæder kan allerhøjest Skattestyrelsen som del af den of-fentlige forvaltning med statsmagtens tvangsmidler fremtvinge fra de forskellige custodians i kæden af custodians. Dette har Skattestyrelsen dog ikke gjort. Det må i den foreliggende sag komme Skattesty-relsen til skade under officialmaksimen.

Registreringen af ejerskab af aktier ved en hvilken som helt autoriseret og kontrolleret CSD (custodian) i EU skal have den samme bevisværdi. Skattestyrelsen kan ikke gøre engelske custodians til andenrangs sammenlignet med den danske CSD VP Securities.

Som Skattestyrelsen helt rigtigt har bemærket, har pensionsplanerne mange steder anført, at VP Securities ikke har et retvisende ejerregister, og at aktiehandler ikke nødvendigvis gennemføres ved le-vering af aktier mellem custodians, idet handler først afvikles ved overførsler af aktier internt (bogfø-ringsmæssigt) hos hver enkelt custodian.

Dette faktum, som følger af EU-lovgivningens liberalisering af kapitalmarkederne, forsøger Skattesty-relsen af udrydde ved den simple påstand:

> *"Sådanne anbringender kan ikke føre til, at pensionsplanerne skal have medhold i*
> *deres klage".*

Skattestyrelsen fremkommer ikke med nogen juridisk begrundelse for, hvorfor Landsskatteretten skulle se bort fra gældende regler i EU for handel med værdipapirer, blot fordi resultatet medfører, at hver-ken VP Securities kan bruges som eneste retsgyldige kilde til at dokumentere ejerskab af danske aktier, eller at dokumentationen af kæder af custodians og penge henholdsvis aktier ikke er et praktisk muligt bevis for ejerskab under EU-reguleringerne.

Skattestyrelsen nægter simpelthen at acceptere faktum i sagen, at ejerskab er et juridisk begreb, og at erhvervelsen heraf er bestemt af juridiske regler. Juridiske regler, som til dels er danske og til dels er europæiske og endda internationale (Den Haag-konventioner).

### 9.3.2 Dokumentation for at Solo-gruppen har besiddet aktier

Skattestyrelsen forlanger i førersagerne det sammenfattende indlæg af den 9. august 2019, afsnit 5.1, side 31, at der skal fremlægges dokumentation for at Solo- gruppen har "besiddet" de aktier, som pensionsplanerne har ejet, og som Solo- gruppen hat attesteret ejerskab til.

Den af Skattestyrelsen forlangte kæde af custodians og sub-custodians kan ingen klient i nogen som helst bank fremlægge. Derfor heller ikke pensionsplanerne. Idet det er teknisk umuligt for en hvilken som helst kunde hos de internationale custodians, der hænger bag en lang kæde af sub-custodians, anerkender allerede Europa-Parlamentets og Rådets direktiv 98/26/EF at den 19. maj 1998 om endelig afregning i betalingssystemer og værdipapirafregningssystemer (Settlement Finality-direktivet) også endeligheden (og dermed den retligt bindende virkning) af en registrering af en værdipapirafvikling gennemført ved en autoriseret clearing- agent og opbevaringen af værdipapirerne hos en custodian. En registrering hos den CSD, hvor aktierne oprindeligt blev udgivet, eller dokumentationen af en kæde af custodians forlanger direktivet ikke, for at ejerskabet anerkendes, selv i forhold til tredjemand. Direktivets overvejelsesgrund nr. 11 fastslår derimod udtrykkeligt, at:

> "overførselsordrer og netting af sådanne ordrer bør have retsvirkning i alle medlemsstaters retssystemer og være bindende for tredjeparter".

Artikel 3 fastlår videre, at:

> "Overførselsordrer og netting har retsvirkning og er bindende for tredjeparter, selv i tilfælde af insolvensbehandling mod en deltager, såfremt overførselsordrerne var indgået i systemet in- den tidspunktet for insolvensbehandlingens indledning"

Skattestyrelsens krav om en ejerskabskæde er således i direkte strid med EU-lovgivningen. Finality-direktivet ligestiller settlement hos enhver autoriseret og kontrolleret clearing-agent og custodian med afregningen af en værdipapirhandel hos den CSD, hvor aktierne blev udgivet.

### 9.3.3 Skrivelser fra SØIK og VP Securities

Skattestyrelsen anfører i førersagerne i det sammenfattende indlæg af den 9. august 2019, at man efter henvendelse til SØIK den 23. november 2017 fik oplyst, at SØIK på daværende tidspunkt ikke kunne bekræfte, at pensionsplanerne havde modtaget udbytte fra de danske aktier.

Dette er da også ganske naturligt. Det kan som nævnt ovenfor ingen bekræfte.

Det bemærkelsesværdige er herved, at SØIK netop ikke skriver, at de kan udelukke, at pensionsplanerne har modtaget udbytte. For det kan nemlig heller ingen.

Det samme gælder SØIKs udtalelse vedr. ejerskab af danske aktier. SØIK udelukker ikke, at pensionsplanerne har været ejere af aktierne. De kan kun sige, de ikke kan bekræfte det. Det er desværre helt naturligt, når man ikke har udsøgt computersystemerne fra Solo-gruppen. At SØIK ikke har gjort det, fremgår netop af det faktum, at SØIK har anmodet VP Securities om at bekræfte, om pensionsplanerne har ejet de danske aktier. Havde man undersøgt computerne, kunne man selv havde udtalt sig og var ikke nødt til at henvende sig til VP Securities.

Men VP Securities ved jo netop intet om aktionærer, der har deres aktier hos subcustodians i hele verden. Derfor bekræfter VP Securities i bilag N heller ikke positivt, at de kan udelukke pensionsplanernes

ejerskab. I VP Securities' skrivelse af den 13. august 2019 henleder VP således også udtrykkeligt opmærksomheden på, at de ikke har ført depoter registreret i pensionsplanernes navne, men at aktierne kan have ligget i omnibusdepoter.

Lige så misvisende er den som bilag AO den 17. august 2019 eftersendte skrivelse fra VP Securities af den 13. august 2019. Kammeradvokaten har i henhold til denne skrivelse anmodet VP Securities om at bekræfte størrelsen på beregninger af bruttoudbytte tildelt depoter registreret i VP Securities. Kammeradvokaten har til dette formål oplyst VP Securities om størrelsen af diverse bruttoudbyttebeløb, som pensionsplanerne har oplyst ved tilbagesøgning af skat i relation til udbyttebetalinger fra forskellige børsnoterede selskaber. VP Securities blev anmodet om at redegøre for, hvorvidt beløbene stemmer overens med fordelingen af bruttoudbytte til depoter i VP Securities, hvor der er tilbageholdt 27 pct. i skat.

Allerede spørgsmålet er formuleret misvisende. Som anført ovenfor ville VP Securities ikke have tilbageholdt 27 pct. i udbytteskat, på de aktier som pensionsplanerne købte, hvis de pågældende aktier på record day var i et depot for en person med en anden skattestatus end de 27 pct. Var sælger tilmed en af de i VP Securities-skrivelsen nævnte skattefritagne aktionærer, er der slet ikke indbetalt udbytteskat af de udbytter, som pensionsplanerne modtog gennem market claim-processen. En sådan fejl kan udelukkende tilskrives det danske udbytteskattesystem.

Spørgsmålet til VP Securities dokumenterer også Skattestyrelsens komplette uvidenhed om market claim-processen og virkningen af short selling på udbyttedatoen, der introducerer yderligere udbytter i depotkæden, end dem der oprindeligt stammede fra selskabet selv.

Skattestyrelsen dokumenterer med bilag AO således ikke andet end fejlfunktionen af systemet til administration af udbytteskat.

Skattestyrelsen skulle hellere have spurgt VP Securities, om en registrering af ejerskab erhvervet ved matching af en købs- og salgsordre, som derefter afvikles ved en autoriseret clearing-agent og registreres på en konto hos en udenlandsk custodian, er dokumentation for en reel afviklet aktiehandel. Dette spørgsmål stiller Skattestyrelsen naturligvis ikke, da VP Securities ville bekræfte dette. VP Securities kunne ved denne lejlighed ligeledes have bekræftet, at det af Skattestyrelsen på side 32 forlangte "kontoudtog" ikke er andet end fremlagte custody statements, og at et sådant ikke viser stigningen og faldet i antal aktier samt opgørelse af kursgevinst – eller -tab. Et custody statement viser aktiebeholdningen – aktiernes navn, antallet og prisen, der handles til. Custody statements viser ligeledes, om der er tale om køb eller salg. Endelig viser de fremlagte custody statements datoen for hver enkelt transaktion.

Custody statement opfylder alt, hvad et kontoudtog fra en depotkonto skal vise. Og mere er der heller ikke brug for. Opgørelsen af en gevinst eller et tab kan Skattestyrelsen selv regne sig frem til ved at tage købsprisen og salgsprisen for den respektive aktiepost. Det er det, vi har gjort i de fremlagte udarbejdede opstillinger, som Skattestyrelsen ikke ønsker at acceptere, jf. styrelsens sammenfattende indlæg af den 9. august 2019, afsnit 5.3, side 33. Hvis styrelsen ikke vil det, må de desværre selv gøre sig umagen og regne sig frem til gevinster og tab. Det viser et kontoudtog nu engang ikke.

### 9.4 Pensionsplanen modtog udbytte

Da pensionsplanen købte aktierne, samme dag som det blev besluttet at udlodde et udbytte, var pensionsplanen endnu ikke registreret som ejer af aktierne på record day. Udbyttet blev derfor umiddelbart, i første omgang henført til sælgers custodian.

Da handler på generalforsamlingsdatoen dog markeres som "cum ex" i clearing-systemerne, sørger clearing-agenterne og custodians for at udbyttet fra selskabet tages fra sælger, så snart køber er blevet registreret som ny ejer af aktien. Udbyttet føres under "market claim"-processen automatisk videre til køberen. Da køberen kun kan identificeres ved sin konto hos sin custodian, ledes udbyttet videre til køberens kontantkonto hos custodian.

Det, som pensionsplanen modtog, var dermed selve udbyttet fra det danske selskab, selvom køberen ikke var registreret som ejer på record day.

Som allerede nævnt ovenfor kan hverken pensionsplanen eller nogen andre udelukke, at der blandt de kroner, som pensionsplanen modtog gennem kæden af custodians, befandt sig enkelte kroner, som stammede fra en short seller og dermed egentlig var en kompensationsbetaling. Som skitsen i afsnit 3.3.2.2.1 viser, blandes de kroner og ører der stammer fra en short seller dog uigenkaldeligt med de kroner og ører, der stammer fra selskabet selv. Ingen i kæden af cstodians kan adskille det samlede beløb modtaget fra sin egen custodian i de enkelte delsummer bestående at reelt udbytte og kompensationsbetaling.

Pensionsplanen må derfor med god tro formode, at samtlige kroner og ører, den modtog, alle stammede fra danske selskaber. Pensionsplanen har dog ingen adgang til sin custodians konto og kan derfor naturligvis ikke dokumentere, om custodian har modtaget udbyttet eller en kompensationsbetaling fra en short seller, sådan som Skattestyrelsen forlanger det i det sammenfattende indlæg af den 9. august 2019, side 31.

Pensionsplanerne kan pga. beslaglæggelsen af samtlige dokumenter hos deres custodians kun henvise til Sanjay Shahs processkrift til High Court i London, der ligeledes er indgivet på vegne af de enkelte custodians.

Som det fremgår af side 18 og 19 i dette processkrift, havde Solo-gruppen omnibuskonti hos finansinstitutter, der blandt andet havde deres depoter hos Danske Bank. Danske Bank har selv et omnibusdepot hos VP Securities. Om de øvrige depotbanker, som Solo-gruppen anvendte, ligeledes havde en konto hos VP Securities, ved selv Sanjay Shah ikke, da han åbenbart ikke var direktør for de fire custodians i Solo-gruppen.

Da hverken pensionsplanen eller dennes custodians kan vide, hvor stor en del af det nettoudbytte, der blev modtaget til pensionsplanen, i realiteten oprindeligt kom fra danske selskaber, og hvor stor en del der kom fra short sellere, er det af Skattestyrelsen opstillede krav (i det sammenfattende indlæg af den 9. august 2019, side 31) om dokumentation for modtagelsen af udbyttet urealistisk. Ingen kan dokumentere, hvor meget udbytte og hvor meget kompensationsbetaling de har modtaget.

**9.5 Der var indeholdt kildeskat af pensionsplanens udbytteudbetaling**

Idet de danske selskaber har pligt til at indeholde udbytteskat, og pensionsplanen lige så lidt som nogen anden kan skelne mellem kroner, der oprindelig stammer fra en kompensationsbetaling, og kroner, der stammer fra selskabet selv, kan pensionsplanen med rette gå ud fra, at selskaberne i Danmark har opfyldt deres pligt til at indbetale udbytteskatten.

Denne opfattelse støttes netop også af det faktum, at pensionsplanen kun modtog et nettoudbytte.

Ex tuto bemærkes det, at det er <u>uden</u> betydning for aktionærens krav på refusion, om det udbyttebetalende selskab har undladt at indbetale den udbytteskat, som det burde.

Det kommer således ikke pensionsplanen til skade eller hindrer dennes ret til udbytterefusion, at det udbyttebetalende selskab i strid med sine forpligtelser har undladt indbetale den indeholdte udbytteskat.

Det er efter kildeskattelovens § 69, stk. 1 en betingelse for refusionen af udbytteskatter til udbyttemodtager, at det udbyttebetalende selskab har indeholdt den udbytteskat, der søges refunderet.

Som det fremgår af bestemmelsens 1. stykke, er det en betingelse, at der *"efter §§ 65-65 D er indeholdt kildeskat, som overstiger den endelige skat efter en dobbeltbeskatningsoverenskomst[..]"*.

Som det følger af det ovenfor citerede, er det en betingelse for refusion af udbytteskatter, at det udbyttebetalende selskab har indeholdt udbytteskatten af det omhandlede udbytte.

Såfremt de udbyttebetalende selskaber har indeholdt, men ikke indbetalt udbytteskatten, som de burde, følger det af retspraksis vedrørende manglende afregning af indeholdte, men ikke indbetalte udbytteskatter, at udbyttemodtager i udgangspunktet ikke hæfter for den manglende indbetaling af udbytteskatten.

Der kan i den forbindelse henvises til praksis vedrørende nulstilling af udbytteskatter, jf. Højesterets dom af den 26. maj 1981, der er offentliggjort i U 1981.473H, og Højesterets dom af 22. marts 2013, der er offentliggjort i SKM2013.294.HR. Om baggrunden for nulstillingsinstituttet skal endvidere henvises til det af anførte af Signe Wesenberg-Lund og Winnie Smidt Pålsson i TfS 2011.618, og artiklen offentliggjort i TfS 2011.170.

I forlængelse af ovennævnte skal det fremhæves, at det efter praksis er en betingelse for en sådan hæftelse for ikke-indbetalte udbytteskatter, at udbyttemodtager er særligt nært knyttet til det udbyttebetalende selskab, jf. hertil Den Juridiske Vejledning 2019-2, afsnit A.D.6 (Nulstilling og erstatningsansvar).

I nærværende sag er der intet grundlag for at nægte pensionsplanen refusion af de i sagen omhandlede udbytteskatter, og derved reelt stille pensionsplanen som om, at de hæftede for de udbyttebetalende selskabers manglende indbetaling af udbytteskatter.

Som det fremgår af ovennævnte praksis, er der således ingen hjemmel til at lade pensionsplanen hæfte for en manglende indbetaling af udbytteskatter.

Det skal i den forbindelse fremhæves, at den omhandlede pensionsplan ikke havde nogen særlig tilknytning til de udbyttebetalende selskaber, der alle er store, børsnoterede selskaber.

Pensionsplanen har selvsagt ikke haft nogen indflydelse – hverken direkte eller indirekte – på de udbyttebetalende selskabers beslutninger om indbetaling af udbytteskatter.

Derfor ville det også være aldeles uhjemlet, om man i nærværende sag nægtede pensionsplanen refusion af de i sagen omhandlede udbytteskatter med henvisning til, at de udbyttebetalende selskaber ikke har indbetalt de udbytteskatter, som de burde.

**9.6 Pensionsplanen modtog refusionen**

Pensionsplanen havde engageret et professionelt "tax reclaim"-firma (tax agent) til at verificere, at samtlige forudsætninger for at få udbetalt refusion fra Danmark var opfyldt og behørigt dokumenteret.

Eftersom den engagerede tax agent ikke kun var ansvarlig for anmodningen om refusionen, men også for overvågningen heraf, skulle refusionen udbetales fra SKAT til tax agenten. Tax agenten informerede pensionsplanen om modtagelsen on den respektive refusion og overførte samtlige refusionsbeløb til Solo Capitals kontantkonto. Dette skete med frigørende virkning over for pensionsplanen, idet pensionsplanen havde sin konto hos Solo-gruppen. I Solo-gruppen blev modtagelsen af hvert refusionsbeløb bogført på hver pensionsplans konto, ligesom alle andre transaktioner (køb og salg af aktier, modtagelse og tilbagebetaling af den kontante sikkerhedsstillelse samt betalingerne under forward-kontrakterne). Dette var Solo-gruppen forpligtet til i sin egenskab af custodian.

Ligesom udbyttet faldt også refusionen under TTC-klausulen, uden gæld til custodian var pensionsplanen dog fri til at råde over den modtagne refusion.

Ved modtagelse af refusionen blev det likviditetsmæssige tab, som pensionsplanen havde lidt, da den købte aktierne inklusive bruttoudbyttet, men kun modtog et nettoudbytte, udlignet. Den gevinst, som pensionsplanen havde realiseret ved aktiehandlen eller forwardtransaktionen manifesterede sig nu også i en tilsvarende likviditet. Pensionsplanen havde netop lukket samtlige positioner, da den hidtil realiserede gevinst efterhånden kun svarede til refusionsbeløbet. Gevinsten af aktiehandlen kunne derved dække tabet på udbytteskatten, hvis pensionsplanen mod al forventning ikke skulle modtage refusion. I det øjeblik refusionen modtoges, skulle gevinsten fra aktiehandlen eller forwardtransaktionen ikke længere dække dette likviditetsmæssige tab og viste sig bogholderimæssigt som en gevinst. En gevinst, der havde samme størrelse som refusionen. Gevinsten var dog ikke refusionen.

Den realiserede gevinst, der var til stede som likviditet efter refusionen, brugte pensionsplanen på at betale diverse serviceydelser. At der skulle betales regninger for tjenesteydelser der var blevet ydet, begrænsede dog ikke pensionsplanen i dens rådighedsbeføjelse over gevinsten, der svarede til refusionsbeløbet. Pensionsplanen bar ansvaret for, hvem der blev betalt hvornår og hvor meget. Det lå inden for pensionsplanernes egne rådighedsbeføjelser at betale for modtagne ydelser eller ej (misligholde kontrakterne med tjenesteyderne).

Desuden var der intet til hinder for, at pensionsplanen kunne trække gevinsten svarende til refusionsbeløbet ud fra Solo-gruppen. Ville pensionsplanen fx skifte til en anden custodian, stod det pensionsplanen frit for at lade samtlige aktiver inklusive gevinsten overføre til en anden custodian/bank.

Pensionsplanen nåede dog ikke at trække gevinsten ud til en anden bank, inden Solo-gruppens forretningsaktivitet blev stoppet i sommeren 2015. Da Solo-gruppen ikke kunne drive forretning uden sine servere, måtte virksomheden melde betalingsstandsning og PwC blev udnævnt som administrator. Samtlige midler, der befandt sig på Solo-gruppens konti, kom under administration hos PwC, der til dato ikke har udbetalt pensionsplanen dennes andel af pengemidlerne.

Det er dog en rådighedsberøvelse over pengemidlerne, som først PWC med urette har påført pensionsplanen. Indtil da var pensionsplanen ubegrænset i sin rådighedsbeføjelserne over pengemidlerne.

**9.7 Sikkerhed i henhold til custody agreement**

Det fremgår af punkt 5.1 i det i førersagerne fremlagte custody agreement, jf. bilag 21, at pensionsplanen ved indgåelsen af aftalen straks skulle overføre et beløb til pensionsplanens konto hos custodians (minimum cash balance) til sikkerhed for pensionsplanens forpligtelser.

Denne forpligtelse blev ikke forudset i alle udgaver at de custody agreements, der blev anvendt. De custody agreements, om Solo Capital startede med at bruge, forudså ikke denne betingelse.

Under hensyntagen til at MIFID II inden længe _ville_ træde i kraft, blev dette krav om det minimumsdepot indført. Det skulle sikre, at alle klienter kunne betragtes som (semi-)professionelle. Introduktionen af et minimumsdepot blev over for pensionsplanerne ikke begrundet med, at der skulle være risici forbundet med handlerne i udbyttearbitrage. Risikoen forbundet med udbyttearbitrage er i virkeligheden også meget begrænset, idet der, samme dag som aktierne erhverves, indgås en forward hedge. Pensionsplanen – og dennes custodian – sikrer sig ved forward hedgen, at aktierne kan sælges til en bestemt pris. Den pris, som forwarden fastholder.

De fire custodians behøvede ikke at håndhæve en forudbetaling af et bestemt minimumsdepot, da de som specialister i udbyttearbitrage vidste, hvordan de kunne håndtere risici ved at realisere alle transaktionerne (aktiekøb, forward hedge og aktielån) samtidig.

Custodian løb i realiteten også kun en (begrænset) finansiel risiko, indtil nettoudbyttet fra aktierne blev modtaget og dermed stod som sikkerhedsstillelse i henhold til custody agreement og TTC-klausulen.

Idet pengene befinder sig hos Solo Capital under TTC-klausulen, er disse ikke længere en bestanddel af pensionsplanens egne formue, som skal indrapporteres til IRS. "Tilte Transfer" betyder netop, at ejerskabet til de kontante pengemidler er overdraget til Solo Capital. Pensionsplanen har dermed ikke brudt nogen rapporteringspligt i USA, sådan som Skattestyrelsen i styrelsens sammenfattende indlæg i førersagerne på side 46 gerne vil have det til at fremstå.

Når og hvis en pensionsplan skiftede custodian (indenfor Solo-gruppen) fra det ene år til det andet, blev minimumsdepotet stående hos Solo Capital som moderselskab, og de nye custody statements viste en "opening cash balance" på kr. 0. Dette faktum har Skattestyrelsen også selv konstateret, idet det påstås, at "pengene forsvinder":

> "En tilsyneladende undtagelse til det manglende overskud er Jump Group (SANST j.nr. 18-0004756, bilag 10, s. 2), hvis konto hos Old Park Lane i 2014 blev krediteret cash payment/receipts for 927.100,27 kr. og debiteret 19.952,02 USD. Det er udokumenteret, hvad disse poster dækker over. Ved udgangen af 2014 var disse beløb tilsyneladende på kontoen hos Old Park Lane. Beløbene forsvinder dog fra 2014 til 2015, hvor Jump Group anvendte en anden Shah-custodian, nemlig Solo Capital".

**9.8 "Fiktive transaktioner"**

Skattestyrelsen henviser gentagne gange til, at påstanden om fiktiv aktivitet er et resultat af undersøgelser af registreringerne hos VP Securities. Pensionsplanen har utallige gange benægtet, at VP Securities skulle være en egnet kilde til dokumentation af retmæssigt ejerskab af danske aktier, herunder til at identificere en fiktiv eller en reel aktivitet.

Pensionsplanerne repræsenteret i førersagerne har anmodet en engelsk sagkyndig – Simon Bird – om at undersøge, om aktiviteten hos Solo-selskaberne kunne være "fiktiv". Den sagkyndige konkluderer i sin rapport – der her fremlægges som bilag 95, at påstanden om "fiktiv" aktivitet ikke er holdbar. Han fremhæver desuden, at hans undersøgelser vedrørende begrebet "fiktiv aktivitet" viser, at dette ikke er et juridisk entydigt defineret begreb.

Skattestyrelsen påstår uden nogen dokumentation, at pensionsplanen ikke blev ejer af aktierne. Det må påhvile Skattestyrelsen at dokumentere denne påstand om et negativt faktum (intet ejerskab), eftersom pensionsplanen har fremlagt ikke kun den oprindeligt krævede dokumentation for ejerskab, men sidenhen også alle de nu forlangte dokumenter til støtte for en refusionsanmodning, som overho-

ved kan fremlægges. Pensionsplanen har som det eneste ikke fremlagt dokumentation for ejerskabs-kæder og pengestrømmen, som ingen aktionær, der holder sine aktier i et omnibusdepot, kan fremlægge. Pensionsplanen har løftet bevisbyrden for flere år siden. Der skal i den forbindelse tillige henvises til det ovenfor anførte om bevisbyrde i disse sager.

### 9.8.1 Definition "fiktiv transaktion"

### 9.8.1.1 Fiktiv Handel

Skattestyrelsen påstår i styrelsens sammenfattende indlæg af den 9. august 2019, side 5, 12, 50, 52, 54 og 70, ligesom i alle styrelsens tidligere indlæg, at de af pensionsplanerne gennemførte aktietransaktioner skulle være fiktive – og ikke have ført til, at pensionsplanerne faktisk blev ejere af de omhandlede aktier.

Mens Skattestyrelsens indlæg i Danmark ikke leverer mange indicier for, hvad der menes med "fiktive transaktioner" og "faktiske ejere", leverer Skattestyrelsens indlæg i andre lande under de civile erstatningssager flere indikationer for, hvad Skattestyrelsens egentlige anbringende kan være.

Skattestyrelsen lader til at benægte transaktionernes realitet ved at tage udgangspunkt i, at pensionsplanerne må have købt de store aktieposter af short sellere, som aldrig leverede aktier til pensionsplanernes depoter hvorfor pensionsplanerne ikke kan have modtaget et udbytte (i form af en market claim) og derfor ikke var refusionsberettigede.

Dette udgangspunkt støttes på følgende forudsætninger:

1   Pensionsplanerne købte aktier af short sellere
2   Aktierne blev aldrig leveret til pensionsplanerne
3   Pensionsplanerne modtog ikke noget udbytte (nogen market claim).

### 9.8.1.1.1 Køb af short sellere

Som det fremgår mere udførligt af det ovenstående afsnit (vedrørende short selling), er der ingen køber, der ved, om han køber af en short seller eller en long owner. Pensionsplanen har ingen kontakt til den ultimative sælger. Desuden sammenblandes samtlige aktier solgt af alle brokerens kunder uigenkaldeligt hos brokeren, således at det ikke kan spores, hvilken "aktie" der kom fra hvilken sælger. Dematerialiserede aktier er genusvarer, der ikke kan identificeres og spores individuelt. Endelig medfører ejermatchinghandlerne gennemført af brokerne, at pensionsplanerne altid køber af en long owner. Ingen af brokerne solgte aktierne short. De var ikke market makere.

### 9.8.1.1.2 Levering af aktierne købt af short sellere

Selv hvis enkelte af de aktier, som pensionsplanerne købte, ultimativt skulle have stammet fra en eller flere short sellere, blev samtlige aktier leveret til pensionsplanernes depotkonto i Solo-gruppen. Senest på leveringstidspunktet er der kun én civilretlig ejer af aktierne tilbage.

Skatteretligt er pensionsplanerne ligeledes at betragte som de retmæssige ejere af aktierne, for pensionsplanerne vidste ikke, om – og i givet fald – hvilke af de købte aktier, short selleren havde lånt for at kunne levere.

Ved leveringen til pensionsplanerne ender desuden aktielångivers retmæssige ejerskab (og ret til refusion), og pensionsplanerne bliver de eneste retmæssige ejer af aktierne.

### 9.8.1.1.3 Modtagelse af udbytte (market claim)

Idet pensionsplanerne modtog aktierne på deres depot og også var de sidste købere af aktierne på ud-byttedatoen (generalforsamlingsdatoen), modtog pensionsplanerne også udbyttet fra selskaberne. Om det udbytte, pensionsplanerne modtog, var en kompensationsbetaling fra en short seller, eller udbyt-tet, der oprindeligt blev udbetalt af selskabet selv, kan ingen se. Mindst af alt pensionsplanerne selv. Det kan derfor heller ikke forlanges af pensionsplanerne at eftervise, at de beløb, de modtog, ikke var kompensationsbetalinger, men derimod oprindeligt udbytte fra de danske selskaber.

### 9.8.1.2    Fiktive aftaler

Skattestyrelsens teori om fiktive transaktioner kan også fortolkes således, at styrelsen mener, at pen-sionsplanerne enten slet ikke afgav nogen ordrer til at købe aktier, eller, hvis disse blev afgivet, så var de ikke rettet mod et køb af aktier, men rettet mod at lade det se ud, som om pensionsplanen havde til hensigt at købe aktier.

Med en sådan definition ville Skattestyrelsen orientere sig efter det i Tyskland definerede begreb "Scheingeschäft". I den europæiske database eur-lex.europa.eu og på Europa-Parlamentets hjem-meside, europarl.europa.eu oversættes det tyske "Scheingeschäft" netop til "fiktive transaktioner", "fi-dusoperationer", "fantom-operationer" eller "formodede forhold", der ikke tager udgangspunkt i fakti-ske forhold (ikke er resultatet af de pågældende parters faktiske hensigter).

Taget i betragtning, at Tyskland efter utallige års erfaring med undersøgelserne af udbyttearbitrage el-ler cum ex-trading, må betragtes som førende i Europa, må formodes, at Skattestyrelsen lader sig influ-ere af de tyske myndigheders sprogbrug.

Skattestyrelsen støder herved ikke kun på det problem, at tysk lovgivning adskiller sig væsentligt fra dansk lovgivning, hvad angår forudsætningerne for at erhverve ejerskab til aktier (jf. ovenfor). Skat-testyrelsen lader sig også lede af de tyske påstande om, at cum ex transaktionerne skulle være såkaldte "Scheingeschäfte", uden at et tilsvarende begreb findes i dansk sprogbrug og langt mindre er juridisk defineret.

Under tysk lovgivning er "Scheingeschäft" både defineret i skatteretten (§ 41 Abs. 2 AO), og i civilretten § 117 BGB (jf. BFH BStBl 1985, 33; 2004, 622; Klein, AO, 13. udgave S. 42 Nr. 42). I henhold hertil er der tale om et **"Scheingeschäft"**, når de kontraherende parter ved fælles overenskomst kun får det til at se ud, som om der foreligger en retshandel, men at parterne samstemmende ikke har til hensigt at lade de med retshandlen almindeligvis forbundne retlige virkninger indtræde (BGH NJW 1982, 569; 2002, 1963). Dette især på baggrund af, at de er enige om ikke at ville, det som de erklærer, og at erklærin-gerne kun afgives for foregive, at det man erklærer, svarer til ens virkelige hensigt.  (BFH BStBl 1997, 655; BFH/NV 1988,151; 2007, 2233).

I de omhandlede sager forholder det sig dog således, at der ikke foreligger nogen ydre omstændighe-der (indicier), der tyder på et forbehold fra pensionsplanernes side om ikke at ønske de med aftalerne (købekontrakterne, forwardkontrakterne og aktieudlånene) forbundne retlige virkninger. Tværtimod. Pensionsplanerne ville netop opnå ejerskab til aktierne og således opfylde betingelserne i dobbeltbe-skatningsoverenskomsten med Danmark. Pensionsplanerne og de respektive kontraktuelle modparter ønskede samtlige retsvirkninger, der er forbundet med de indgåede aftaler. Disse retlige virkninger blev også realiseret, idet aktieposterne blev registreret på pensionsplanernes depotkonti.

Når en person afgiver en hensigtserklæring, der er forbundet med bestemte retsvirkninger, og perso-nen både har til hensigt at lade disse retsvirkninger indtræde og også muligheden herfor, kan der ikke

være tale om fiktive handlinger eller aftaler. Er <u>viljen</u> til, at retsvirkningerne skal indtræde, til stede, og har personen <u>muligheden</u> for at kunne sørge for, at retsvirkningerne indtræder, så er aftalen vedrørende disse retsvirkninger også endelige og bindende og medfører de retsvirkninger, som aftalen havde til hensigt.

**9.8.2 Handel organiseret af Solo**

Skattestyrelsens påstand om fiktiv handel arrangeret og styret af en clearing-agent (Solo) stiller realiterne og reglerne for aktiehandel på hovedet, idet:

- Fondsmægleren modtager en ordre (instruktioner) fra sin kunde (pensionsplanen)
- Fondsmægleren sender instruktioner til clearing og afviklingsagenten om clearing af handlen
- Clearing og afviklingsagenten er en simpel modtager af instruktioner fra fondsmægleren og kan derved ikke arrangere, foranledige eller styre transaktionen. Clearing og custody kommer til sidst i kæden af tjenesteydelser.

Skattestyrelsens påstande omkring interne bogføringer og en manglende strøm af aktier og penge er uholdbare, eftersom disse påstande henviser til post-trade-processen (dvs. clearing og afvikling), der først finder sted, efter at køber er blevet ejer af aktierne. Ejerskabet overdrages ved den endelige og bindende aftale om købet. Clearing og afvikling er således principielt uden betydning for opnåelse af ejerskab til aktierne, da der er tale om processer, der fører til en registrering af det allerede opnåede ejerskab ved en custodian.

I denne forbindelse skal det bemærkes, at virksomheden, der udelukkende er ansvarlig for clearing og afvikling, i henhold til artikel 37, stk. 3, i CSD-forordningen  er pålagt følgende forbud: "*Overtræk på værdipapirer, debetsaldi og værdipapiroprettelse er [...] ikke tilladt i et værdipapirafviklingssystem, som drives af en CSD*". Dette gælder i henhold til kapitalmarkedslovens § 192, pkt. 2, også for en investor-CSD som selskaberne i Solo-gruppen. Det er derfor umuligt, at en reguleret og kontrolleret britisk investor-CSD kan have krediteret danske aktier på kontoen for en pensionsplan uden at have debiteret samme på en anden depotkonto. Det ville det regelmæssige tilsyn med virksomheden under FCA-reguleringerne have opdaget og forhindret.

Selv hvis den løbende kontrol af Solo-gruppen gennem FCA ikke havde afsløret manglende dækning af transaktionerne på kontiene, ville den grundige undersøgelse af Solo-gruppens servere efter 2015 af både FCA, de britiske anklagemyndigheder og SØIK have fremgbragt dokumentation herfor og ført til tilsvarende strafferetlige skridt.

De indsendte trade- og transaction reports, som blev modtaget hos henholdsvis FCA (de britiske tilsynsmyndigheder) og LSE (børsen i London), dokumenterer yderligere, at brokerne, clearing-agenterne og custodians ikke blot foretog "interne bogføringer". Registreringerne af aktietransaktionerne i elektronisk form blev rapporteret til de ansvarlige myndigheder, sådan som det er forudsat i den relevante lovgivning.

Clearing-agenten og custodian har i modsætning til det af Skattestyrelsen anførte afviklet den ved den uafhængige broker indgåede købekontrakt og derved sikret det allerede af pensionsplanen erhvervede ejerskab til aktierne. Solo-gruppen foretog ingen fiktive transaktioner, men sørgede for, at det overskydende antal ejere af danske akter, som eventuelt kunne være opstået ved køb af aktier fra short sellere, blev bragt tilbage til det antal aktier, som var udstedt af de danske selskaber.

### 9.8.3 Fiktive aktier – short selling

Som forklaret ovenfor i afsnit 7, fører short selling til, at der er flere civilretlige ejere af danske aktier, fra det tidspunkt hvor købekontrakten indgås, til det tidspunkt hvor aktierne leveres under afvikling af handlen.

Kan Skattestyrelsen ikke godkende konceptet med flere ejere af samme aktier, kommer Skattestyrelsen nødvendigvis til den konklusion, at der må være flere aktier i omløb end udstedt af selskaberne.

Disse aktier er dog langt fra fiktive, som Skattestyrelsen påstår i det sammenfattende indlæg af den 9. august 2019, side 21. De er reelle, de handles, og de giver krav på registrering på køberens depotkonto samt krav på udbytte (såfremt køberen er den sidste køber på udbyttedatoen). De adskiller sig hverken i realiteten, faktisk eller retligt fra aktier udstedt af selskaberne selv. De lider kun under en enkelt mangel: De er (endnu) ikke beskyttet over for tredjeparter, da de endnu ikke er registreret på en depotkonto. Denne mangel lider aktier udstedt af selskaberne dog også selv under i perioden mellem salget at aktierne (foretaget af en long owner) og registreringen af overdragelsen af ejerskabet på depotkontoen.

Aktier solgt ved short selling kan heller ikke i realiteten skelnes fra aktierne solgt af en long owner sel-ler. Den eneste, der kan se forskellen på aktierne, er short sellerens custodian og clearing-agent, der kan se, at short selleren ikke har aktien på salgstidspunktet, og clearing-agenten derfor indestår for, at den solgte aktie også leveres. Den aktie, som custodian bogfører på køberens konto, er dog altid en ægte aktie udstedt af selskabet. Det overskydende antal aktier, der befinder sig i handlen, kan ikke re-gistreres på en depotkonto.

Short selling kan dog medføre, at der er mere end en retmæssig ejer af aktierne, idet aktielångiver ikke kan vide, om aktielåntager sælger aktierne til en tredjepart køber, der handler i god tro og dermed ikke ved, at aktierne, han køber, kun er lånt. I mange tilfælde ved den retmæssige ejer slet ikke, at hans ak-tie er lånt ud, idet mange banker i deres almene forretningsbetingelser har (havde) betinget sig retten til at låne aktierne ud eller endog sælge dem til tredjemand, uden at depotindehaveren informeres. I det tilfælde er det banken, der kompenserer sin kunde for udbyttet, der modtages. De aktier, som kø-beren modtager på sin depotkonto, er også i dette tilfælde aktier udstedt af selskabet selv. Andre aktier kan selv ikke registreres på en depotkonto.

I det øjeblik hvor pensionsplanens aktiekøb alle blev afviklet, og aktierne var registreret på dens konto, var det uden tvivl ægte aktier udstedt af de danske selskaber som pensionsplanen ejede.

### 9.9 Skattestyrelsens fejlagtige antagelser om processen

Skattestyrelsen beskriver i det sammenfattende indlæg af den 9. august 2019 i afsnit 5.4, side 34-35, hvordan styrelsen mener, forløbet til køb af aktier skulle være, og gengiver herved – igen fejlagtig – hvad pensionsplanerne i førersagerne tidligere har skrevet.

Skattestyrelsen påstår således:

> *Pensionsplanen gør gældende (5. indlæg, side 12, punkt 3 og afsnit I.1.1.7), at der er blevet afgivet en købsordre til custodian/clearing agent, der er en del af Solo-gruppen. Der er ikke fremlagt dokumentation for disse købsordrer. Når custodian har godkendt ordren, er ordren blevet placeret hos en executing broker.*

Dette citat er forkert.

Pensionsplanen har aldrig påstået, at købsordren afgives til custodian/clearing- agenten. Købsordren afgives naturligvis til brokeren. Clearing-agenten informeres blot om, at ordren er afgivet, således at clearing-agenten kan give forhåndstilsagn om at afvikle handlen, hvis den matches. Når clearing-agenten har givet sit tilsagn om afvikling, matcher brokeren ordren, som han allerede har fra pensionsplanen.

Handelsnotaen dokumenterer rent faktisk, at handlen er blevet matchet, og da ingen kan forhindre afviklingen, efter matching er foregået, er en broker confirmation samtidig også en bekræftelse af afviklingen ("gennemførelsen", som Skattestyrelsen ønsker at kalde det). Derfor indeholder en broker confirmation også informationer omkring settlement date.

På side 35 fortsætter Skattestyrelsen med en forkert beskrivelse af, hvordan en handel foregår:

> 1. *"Pensionsplanen afgiver en ordre (f.eks. om køb) – evt. efter godkendelse fra custodian*
> 2. *Brokeren matcher pensionsplanen med en med- kontrahent (f.eks en sælger)*
> 3. *Brokeren laver en handelsnota (broker confirmation)*
> 4. *Handlen gennemføres 8settlement) i overensstemmelse med aftalen"*

Dette er ikke korrekt.

Brokeren matcher ikke en pensionsplan med en medkontrahent. Det, der bliver matchet, er de respektive ordrer.

Skulle Skattestyrelsen have ment, at det var ordrerne, der blev matchet, og blot have glemt at skrive ordet "ordre" må vi hermed konstatere, at skrivefejl også sker for Skattestyrelsen selv. Når det sker for Skattestyrelsen selv i et indlæg på "kun" 76 sider, er det så meget desto mere naturligt, at der også på tusindvis af sider af broker confirmations sker skrivefejl.

Skattestyrelsen fortsætter på side 35:

> *"Hvis det hele var foregået pænt og ordentligt, burde handlen blive gennemført (settlement) ud fra de vilkår, der er angivet i handelsnotaen (medmindre der sker en fejl ved gennemførslen). Med andre ord burde handelsnotaen (ved rigtige aktiehandler) være bestemmende for handlens vilkår."*

Den grundlæggende fejltagelse, som Skattestyrelsen begår her, er, at settlement ikke sker på baggrund af en handelsnota (broker confirmation), men på baggrund af en egen, separat elektronisk "settlement instruction" der går ud fra handelsplatformen, hvor ordrerne blev matchet. Det er fuldkommen ligegyldigt, hvad der står på en broker confirmation for settlement af en handel. Clearing-agenten ser ikke nogen broker confirmation. Den er sendt som dokumentation fra brokeren til kunden (pensionsplanerne).

Det af Skattestyrelsen konstruerede eksempel, hvor "man bestiller en togbillet til Århus, sætter sig på et tog til Malmø og alligevel bliver kørt til Århus", er lige så forkert som resten af Skattestyrelsens påstande omkring handelsnotaerne (broker confirmations). En broker confirmation er hverken at sammenligne med en togbillet eller at sammenligne med at stige på det forkerte tog. Vil man absolut sammenligne et aktiekøb med en togrejse, kan en broker confirmation højest sammenlignes med en håndskrevet kvittering, man har modtaget for togbilletten til Århus. Man stiger dog stadig på det rigtige tog og har også den rigtige billet.

**9.10 Aktiekøb blev gennemført**

Skattestyrelsens påstand, om at det ikke er dokumenteret, at der for pensionsplanens aktiehandler er sket settlement, dvs. at aktiehandlerne er gennemført, ved at parternes ydelser (aktier og penge) blev udvekslet, er forkert.

Dokumentationen for settlement er de fremlagte custody statements.

Det kan udelukkes, at sælger ikke har været berettiget til at sælge de aktier, som pensionsplanen købte, og at der dermed kunne foreligge vanhjemmel, idet pensionsplanen i realiteten modtog aktierne på sin depotkonti. Dette er netop, hvad custody statement viser.

Skattestyrelsen fremhæver i styrelsens sammenfattende indlæg af den 9. august 2019 under punkt 5.5 på side 42, at

> "der er intet, som viser, at der på noget tidspunkt har været aktier i et depot tilhørende pensionsplanernes custodian".

Dette er en simpel udokumenteret påstand fra Skattestyrelsen.

Pensionsplanernes custodian har ikke haft en egen omnibuskonto hos VP Securities. Af samme grund bekræfter VP Securities således også, at de ikke kan bekræfte, at pensionsplanerne har været ejere af danske aktier.

VP Securities bekræfter dog _ikke_, at de kan udelukke, at pensionsplanerne har været ejere af de danske aktier. Dette netop pga. omnibuskonti og afviklingen af aktiehandler under anvendelsen af netting.

VP Securities har ganske vist bekræftet, at pensionsplanernes custodians ikke selv havde nogen konto hos VP Securities. Dette betyder dog ikke automatisk. at de pågældende custodians ikke havde nogen aktier i depot. Om de havde aktier i depot, kan kun bekræftes af de fire custodians selv, for kun de ved med sikkerhed, hvor de havde deres respektive depotkonti – hos hvilken subcustodian.

Hvis SØIK ikke havde fundet noget aktiedepot for de fire custodians på computerne, der blev beslaglagt i 2015, må det formodes, at SØIK havde dokumenteret dette over for Skattestyrelsen. En sådan dokumentation kan på ingen måde komme de strafferetlige efterforskninger til skade.

Det faktum, at en sådan bekræftelse ikke foreligger, må fortolkes således, at SØIK rent faktisk har fundet alle nødvendige aktiedepoter.

Et custody statement og et dividend credit advice (DCA) er ikke blot som påstået af Skattestyrelsen "ord på papir". Det er derimod dokumenter, der udstedes som følge af en uigenkaldelig proces, der sættes i gang, når en købsordre matches med en salgsordre. De elektroniske handelsplatforme giver så et automatisk signal til afvikling, og resultatet af afviklingen er et custody settlement og CDA, når udbyttet modtages. Under det britiske Finanstilsyns kontrol kan der ikke etableres handelssystemer, der ikke reelt handler med aktier. De påkrævede "trade reports" og "transactions reports" til myndighederne i London ville have afsløret enhver "fiktiv aktivitet".

Der foreligger absolut ingen grund til at formode, at dokumentationen blot skulle være ord på papir og det hele en "skrivebordsøvelse" – som påstået i Skattestyrelsens sammenfattende indlæg i afsnit 6, side 47. For hvis det virkelig var som påstået af Skattestyrelsen, så må man for alvor stille sig det spørgsmål, hvorfor Solo Capital-gruppen/Sanjay Shah overhovedet gjorde sig den umage at onboarde

så mange kunder. Hvis Solo Capital blot trykkede falske papirer, ville der ikke være brug for nogen pensionsplaner.

At Skattestyrelsen også er af denne mening, dokumenteres ved det faktum, at det fra juni 2015 og indtil de civile stævninger i sagen i sommeren 2018 konstant blev benægtet, at pensionsplanerne overhovedet eksisterede. Skatteministeren og SKAT talte offentligt om "fiktive pensionsplaner".

Med de civile stævninger måtte Skattestyrelsen nødvendigvis indrømme eksistensen af pensionsplanerne, men trækker sig nu tilbage på lige så uholdbare påstande om "fiktive handler" eller "fiktive aktier".

### 9.11 Længere settlement-periode end VP Securities

Indledningsvis skal pensionsplanernes repræsentanter gøre opmærksom på, at forvirringerne, der i førersagerne er opstået undervejs, omkring hvilken settlementperiode der blev anvendt, udelukkende skyldes repræsentanternes egne manglende sagsoplysning, på tidspunkterne hvor de enkelte indlæg skulle fremsendes til Skatteankestyrelsen.

Som Skattestyrelsen rigtigt påpeger, og som beskrevet ovenfor i afsnit 2, blev OTC-handlerne generelt afviklet med en dags længere frist, end VP Securities – og andre nationale CSD'er – bruger.

En længere afviklingsfrist betyder dog ikke, at en handel ikke er "markedskonform". Og endnu mindre er det et bevis for svindel.

Det eneste, som en længere afviklingsfrist medfører, er, at der opstår den internationalt anerkendte og velfungerende "market claim": Udbyttet sendes videre fra sælgers custodian til købers custodian, når aktiehandlen, der er markeret "cum ex", afvikles i depotsystemerne. Ingen af de internationale værdipapirafviklingssystemer har problemer med at afvikle aktiehandler med en hvilken som helst afviklingsfrist. Var det anderledes, ville lovgiver – ikke mindst fra EU's side – have indført en lovpligtig afviklingsfrist.

At en sådan lovpligtig afviklingsfrist ikke eksisterer, betyder netop, at parterne frit kan aftale afviklingsfristen. Det er der intet svigagtigt eller risikabelt ved.

Hvis man tjekker de store clearing-agenters hjemmesider (fx Euroclear: [ttps://www.luxcsd.com/luxcsd-en/products-and-services/market-coverage/europe-t2s/belgium/settlement-services-belgium-euro-clear-belgium-- 1279750](ttps://www.luxcsd.com/luxcsd-en/products-and-services/market-coverage/europe-t2s/belgium/settlement-services-belgium-euro-clear-belgium--1279750) eller Clearstream [https://www.clearstream.com/re-source/blob/1316782/08a424c5b61fe77d19385e550a56a842/compensation-hand- book-cata-en-data.pdf](https://www.clearstream.com/re-source/blob/1316782/08a424c5b61fe77d19385e550a56a842/compensation-hand-book-cata-en-data.pdf)), ser man, at de har indarbejdet et flagningssystem, der tillader dem at håndtere handler omkring udbyttedatoen korrekt (nemlig markeret "cum ex"), ligegyldigt hvor lang en afviklingsfrist der er aftalt.

Der eksisterer ikke nogen "risiko", som Skattestyrelsen påstår i det sammenfattende indlæg i afsnit 5.6, side 43, for at pensionsplanerne "udnytter tidsplanen" for udlodninger på det danske marked. Alle verdens aktiemarkeder opererer med lange afviklingsfrister og håndterer dette ved at overføre udbyttet som en "market claim" til køberen. Alle custodians kan håndtere dette.

Selv Også VP Securities kender market claim claim-processen og kan håndtere den. En bedre sagsoplysning fra Skattestyrelsens side, ved at informere orientere sig hos VP Securities om "market claim-processen, kunne spare os alle for disse uholdbare påstande, der alene stammer fra Skattestyrelsens egne egen uvidenhed om, hvordan aktiemarkedet fungerer.

Problemet, som Skattestyrelsen står overfor, er ikke en afviklingsfrist, der ikke er "markedskonform", men derimod en skattelovgivning, der ikke kan håndtere market claim-processen, når man arbejder med nettoudbytter.

Når udbyttet sendes ud af VP Securities og videre i afviklingssystemet i form af et nettoudbytte, vil dette altid betyde, at market claim-proceduren kan medføre, at udbyttet modtages af en person, der har en helt anden skattestatus, end den som VP Securities lagde til grund, da udbytteskatten blev beregnet.

Der er altså intet galt med en lang afviklingsfrist. Problemet ligger i market claim- proceduren, som Skattestyrelsen ikke kan håndtere. Formodentlig fordi Skattestyrelsen (eller lovgiver) ikke forstår denne proces.

Market claim-processen indeholder heller ingen yderligere risiko for køberen af aktierne, idet udbyttet automatisk sendes videre af de involverede custodians fra sælger til køber. Den af Skattestyrelsen påståede risiko for, at sælger ikke overfører udbyttet til dem, eksisterer slet ikke. Sælger har selv ingen indflydelse på det. Det klarer afviklingssystemerne fuldautomatisk.

Vi anbefaler Skattestyrelsen at forhøre sig hos VP Securities, om hvordan reel aktiehandel foregår i virkelighedens verden, og hvordan den håndteres. Så ville alt det, som "ikke giver nogen mening" (se side 17, 23, 27, 23, 27, 30, 35, 36, 38, 44, 45, 47, 50, 52, 58, 60, 61, 63 og 72) for Skattestyrelsen blive klart og tydeligt. Det er simpelthen for letkøbt at påstå, at finanstransaktioner, der hver dag gennemføres af hundredvis af aktører i hele verden – herunder af verdens største banker – ikke skulle give nogen mening. Naturligvis giver de ikke nogen mening, for den der ikke forstår finanstransaktionerne. Kinesisk giver heller ikke nogen mening, for den der aldrig har lært sproget. Alligevel tales kinesisk af ca 1,1 mia. mennesker. Og ligesådan gennemføres disse transaktioner.

Som dokumentation herfor kan henvises til ESMAs rapport af den 2. juli 2019 (jf. bilag 83), der påviser eksistensen af udbyttearbitrage og den trussel, som disse handler betyder for lande, hvis lovgivning ikke passer til aktiemarkedernes realiteter som skabt af EU's egen harmoniserede lovgivning.

**9.12 Ikke blot en skrivebordsøvelse**

Skattestyrelsen mener i førersagerne at kunne konkludere, at samtlige aktiehandler skulle være en skrivebordsøvelse, blot fordi de har konstateret en vis systematik.

Den konstaterede systematik er i realiteten ikke andet end udtryk for reel udbyttearbitrage.

**9.12.1 Alle pensionsplaner køber til samme dag og til samme pris**

Skattestyrelsen mener, at det er et tegn på svindel, at alle pensionsplaner har købt aktier samme dag og til samme pris, jf. Skattestyrelsens indlæg af den 9. august 2019, afsnit 4.1.

Det er naturligvis ikke rigtigt.

Det er en selvfølge for alle investorer i udbyttearbitrage at købe aktier senest på udbyttedatoen. Det er der bestemt intet påfaldende ved, men det er derimod en indikation for ægte udbyttearbitrage på markedsvilkår. Aktiesælgerne, der ikke har adgang til en dobbeltbeskatningsoverenskomst, sælger først på udbyttedatoen deres aktier.

Som beskrevet ovenfor er det også nødvendigt at handle enorme mængder aktier for overhovedet at realisere en gevinst, når forskellen mellem spot- og forwardprisen er så minimal, som den er i udbytte-arbitrage. Så store mængder aktier kan kun handles OTC for ikke at risikere, at spotprisen bevæger sig, og man risikerer påstande om markedsmanipulation.

At fastsætte OTC-prisen som markedets lukkekurs, som Skattestyrelsen i det sammenfattende indlæg af den 9. august 2019, side 48, rigtigt erkender, er kun logisk, hvis prisen skal være fair for begge parter og ikke risikere at blive underkendt som ikke retvisende. Skattestyrelsen indrømmer således også på side 49, at det ikke er usædvanligt at anvende slutkursen til aktiehandler.

Det er således helt uklart, hvad det er, Skattestyrelsen egentlig vil gøre gældende, når det konstateres, at aktierne er handlet til samme pris, nemlig markedets lukkekurs.

At der i 15 tilfælde ud af ca. 1.400 er anvendt en anden kurs, bekræfter ligeledes, at det ikke er en central organiseret, fiktiv handel.

Det er påfaldende, at Skattestyrelsen på en gang både mener, at både anvendelsen af samme kurs og anvendelsen af forskellige kurser skulle være tegn på svindel. Det kan jo ikke være rigtigt. Det må jo være enten/eller. Skattestyrelsen må bestemme sig for, hvad der nu skal være indikation for svindel: samme pris eller forskellige priser. Det kan umuligt være begge dele.

Dette viser, hvor desperat Skattestyrelsen forsøger at trække hvert eneste aspekt af aktietransaktionerne frem for at påstå, at ligegyldigt hvordan pensionsplanerne havde handlet, så mener Skattestyrelsen, at det er svindel. Dette viser, at Skattestyrelsen på forhånd har besluttet, at der er tale om svindel, – uanset hvordan pensionsplanerne har handlet. Skattestyrelsen er umulig at gøre tilfreds. Skattestyrelsen har besluttet, at pensionsplanerne skal være skyldige, men ved bare ikke i hvad.

Der er således heller ikke noget påfaldende i, at pensionsplanerne, der alle investerede i udbyttearbitrage, har haft sammenfaldende handelsmønstre. Mange af dem har jo haft samme trustees.

Desuden fører automatiseringen af handlerne i 2015 ved introduktionen af algo trading til en harmoniseret handel. Det er der intet mistænkeligt ved.

Skattestyrelsen erkender ganske rigtigt, at det kræver ganske meget arbejde at skaffe sig adgang til at købe aktieposter af så betydelig størrelse. Dette arbejde udføres jo også, måneder inden selve handlen indgås, ved at indgå kontrakter med brokere, der kan skaffe det, de kalder "likviditet", altså aktier nok til at matche handlerne.

At brokerne herved sandsynligvis ligeledes indgår aftaler med short sellere, der ønsker at spekulere på prisudviklingen omkring udbyttedatoen, må pensionsplanerne erkende. Hvor mange, og hvilke aktier købt af pensionsplanere, der i sidste ende så virkelig kom fra short sellere, og hvor mange der kom fra long owners, kan pensionsplanerne ikke vide.

Pensionsplanerne har heller ingen grund til at "lukke aftalen" med sælgerne så hurtigt som muligt for at "fastholde" sælgerne, som Skattestyrelsen påstår i det sammenfattende indlæg, side 49, for sælgers clearing-agent og custodian hæfter for, at aktierne også bliver leveret på settlement-datoen til den aftalte pris. Det er markedsvilkår for al aktiehandel i hele verden, som Skattestyrelsen åbenbart er uvidende om.

**9.12.2 Størrelsen på aktiebesiddelserne**

Pensionsplanerne har aldrig benægtet, at deres aktiehandler var systematiserede. Systematiseret betyder dog ikke svindel eller skrivebordsøvelser, som Skattestyrelsen ønsker at betegne det. "Systematiseret" betyder hverken mere eller mindre end en velorganiseret "trading desk", som den eksisterer i enhver anden bank.

At algo traderen ikke foreslog alle trustees at købe samme antal aktier til samme klient, sker ikke for at "sløre" noget som helst. Det sker for at give alle de involverede aktører (clearing-agenter, custodians, brokere og arrangers etc.) en bedre mulighed for at skelne mellem de forskellige ordrer afgivet på vegne af de forskellige pensionsplaner. Det reducerer risikoen for fejl.

Naturligvis har hver eneste trustee i 2012-2014 selv anvendt lignende teknikker for at sikre, at han ikke forvekslede aktieposterne, der tilhørte de forskellige pensionsplaner.

Da udbyttedatoen udløser købet af aktierne, og dette som ovenfor forklaret sker til samme pris, er de forskellige antal aktier hverken mere eller mindre end et element til at sikre forvaltningen af så store aktieporteføljer for så mange pensionsplaner. Det var jo mere undtagelsen end reglen, at en trustee kun forvaltede en enkelt pensionsplan.

Igen må det konstateres, at Skattestyrelsen fordrejer faktum i sagen, helt efter hvad passer bedst i forhold til styrelsens argumentation: Havde alle pensionsplaner købt samme antal aktier, ville dette også være blevet brugt imod dem.

Skattestyrelsen bemærker i styrelsens sammenfattende indlæg nederst på side 50 - i øvrigt helt udenfor den øvrige systematik i indlægget og uden relation til antallet af aktier, der blev købt af hver pensionsplan:

> *"Det lykkes i alle tilfælde for pensionsplanerne at finde*
>
> - *én sælger,*
>
> - *én køber,*
>
> - *én aktielåntager og*
>
> - *én forward-aftalepart,*
>
> *der vil handle disse helt abnormt store aktieposter til netop de beløb, som pensionsplanen har "ønsket". Det gælder disse meget betydelige aktieposter – og i alle tilfælde.*
>
> *Det betyder, at pensionsplanerne på intet tidspunkt er fejlet med at finde medkontrahenter til de store transaktioner. Og det betyder, at pensionsplanen på intet tidspunkt er blevet nødt til at splitte transaktionen i to eller alene gennemføre transaktionen delvist.*
>
> *Det kan ikke lade sig gøre for bare én pensionsplan. Det kan heller ikke lade sig gøre i så mange tilfælde. Pensionsplanernes påstand er derfor virkelighedsfjern i anden potens."*

Igen et eksempel på, hvor lidt Skattestyrelsen stadig forstår vedrørende udbyttearbitrage, og hvor arrogant de præsenterer deres uvidenhed.

For det første kan Skattestyrelsen kun se ordrer, der er blevet matchet, og hvor pensionsplanerne derfor har erhvervet ejerskab til aktierne. Aktier, pensionsplanerne ikke har købt, giver ikke krav på et udbytte, og lange mindre et krav på refusion. Det er derfor kun naturligligt, at Skattestyrelsen ikke kan se forretninger, der ikke er blevet realiseret.

Pensionsplanerne har på intet tidspunkt påstået, at alle deres købsordrer blev matchet. Som eksempler på købsordrer, der ikke blev matchet, er fremlagt som bilag 78.

Hvad angår Skattestyrelsens gentagne påstand om, at styrelsen ikke mener, det kan lade sig gøre at finde en sælger, en køber til forwarden samt en aktielåntager, så kan kun henvises til ovenstående, hvor det beskrives, hvor mange mellem- mænd der indgås kontrakter med, inden selve handlen starter.

Pensionsplanerne vidste, at ved at blive kunder i Solo-gruppen fik adgang til højt specialiserede brokere, clearing-agenter og custodians, der havde adgang til de nødvendige kontraktuelle modparter, for at transaktionerne kunne lykkes. Det var det, de betalte den høje pris for.

**9.12.3 Næsten ens aktieporteføljer**

At Skattestyrelsen i førersagerne i det sammenfattende indlæg i afsnit 6.3 kan konstatere, at pensionsplanerne har haft næsten ens porteføljer, er en logisk konsekvens af (1) deres strategi var udbyttearbitrage, hvorfor de alle netop købte ak- tier, i selskaber der udloddede et udbytte, og (2) algo traderen, der i 2015 foreslog, hvilke og hvor mange aktier hver pensionsplan skulle købe. Det var computeren programmeret til. Det betyder ikke, at handlerne ikke fandt sted.

De 12 aktier, som der blev købt i 2014, og de to, der blev handlet i 2012, er ligeledes et entydigt udtryk for udbyttearbitrage. Traderen (trustee'en) vælger, hvilke af de aktier, han vil købe, på vegne af pensionsplanerne som netop udlodder udbytte.

Skattestyrelsens konstateringer er ikke dokumentation for en skrivebordsøvelse, med derimod dokumentation for reelle aktiehandler.

**9.12.4    Alle pensionsplanerne har handlet med de samme parter**

Der er ikke mange kommentarer nødvendige til at besvare, hvorfor pensionsplanerne handlede med de samme partnere: Da der er tale om ejermatchinghandler, er sælgerne (og senere køberne) af aktierne altid pensionsplanernes brokere.

Modparten til forwardkontrakten var ligeledes professionelle mellemmænd ligesom aktielåntagerne.

Alle modparterne var ikke de ultimative modparter men professionelle mellemmænd indenfor deres respektive branche.

For at clearing-agenten ville og kunne indestå for den finansielle risiko for en fail (dvs. at den nødvendige kapital ikke ville være til stede til at betale for aktierne på afviklingsdatoen), var det naturligvis en betingelse, at samtlige parter – altså pensionsplanerne og alle mellemmænd til de forskellige transaktioner – var kunder hos Solo-gruppen. Ved at have alle parter som kunder havde Solo-gruppen ikke

brug for så stor en egenkapital under Basel 2-kravene (internationale krav om en minimumskapitalise-ring af finansielle virksomheder).

### 9.12.5    Samme salgstidspunkt

At alle pensionsplaner solgte deres aktier på næsten samme tidspunkt, er heller ikke udtryk for svindel, men derimod dokumentation for realiteten af de enkelte bestanddele af udbyttearbitrage.

Pensionsplanerne købte aktierne på samme tidspunkt og havde dermed næsten de samme finansie-ringsbetingelser – da de afhænger af de aktuelle markedsbetingelser. Det betyder med andre ord, at omkostningerne for finansieringen på samme tidspunkt har absorberet den hidtidige gevinst ved transaktionerne. Udviklingen af markedet er ens for alle pensionsplaner og har derfor samme konse-kvenser for alle pensionsplaner. De når mere eller mindre samtidig et nulresultat af investeringen og må lukke samtlige positioner (se ovenfor).

### 9.12.6 Sanjay Shah kontrollerede pensionsplanernes custodians (Solo- gruppen)

Skattestyrelsen anfører i det sammenfattende indlæg af den 9. august 2019 i af- snit 6.6, side 55, at pensionsplanerne skulle have ændret deres forklaring om de fire custodians.

Det er ikke korrekt. Pensionsplanerne har ikke ændret deres forklaringer, de har tilføjet yderligere in-formationer, som de har modtaget mellem de forskellige indlæg. Pensionsplanerne har – som følge af at Skattestyrelsen nu igennem flere år er kommet med formodninger og beskyldninger mod pensions-planere – været tvunget til at undersøge forbindelserne mellem de anvendte custodians nærmere. For at gennemføre udbyttearbitrage er det for pensionsplanerne fuldkommen irrelevant, hvilket selskab der tilhører hvem, og i hvilken indbyrdes relation de står.

Ved at henvende sig til en ekspert i London (Simon Bird), der har udarbejdet en rapport, jf. bilag 95, har pensionsplanerne i førersagerne fået oplyst, at Solo Capital allerede blev stiftet i 2009 og ikke som på-stået af Skattestyrelsen i 2011. Solo Capital købte herefter de specialiserede firmaer Telesto, Old Park Lane og West Point Derivatives i perioden 2012-2015. Disse virksomheder eksisterede allerede og havde hver især tilladelse fra det engelske finanstilsyn til at arbejde som clearing-agent og custodian. Efter de blev datterselskaber til Solo Capital, havde de deres omnibuskonti hos Solo Capital og ikke længere direkte ved eksterne custodians. De eksterne omnibus-custody accounts for hele gruppen blev i henhold til Simon Bird etableret i Solo Capitals navn.

Dette vidste pensionsplanerne ikke i 2014 og 2015, og de havde heller ikke brug for at vide det.

Det er kendetegnende for samtlige Skattestyrelsens indlæg, at der konstant fremsættes irrelevante op-fordringer og udokumenterede påstande, som pensionsplanerne med stor umage må efterkomme. Når det lykkes, vender Skattestyrelsen til- bage og påstår, at pensionsplanerne modsiger sig selv – med den nye viden de har fremskaffet takket være undersøgelserne foretaget under presset fra Skattestyrelsen. Alternativt hævder Skattestyrelsen, at pensionsplanerne ikke har løftet bevisbyrden eller har undladt at besvare en opfordring, hvis det af Skattestyrelsen forlagte dokument ikke kan fremskaffes – af rent praktiske årsager, eller simpelt- hen fordi det, som Skattestyrelsen forlanger dokumenteret, ikke kan dokumenteres af noget menneske på jorden.

Det er ligeledes påfaldende, at Skattestyrelsen igen forsøger at bringe pensionsplaneres troværdighed og bevisværdien af deres dokumentation i miskredit ved at henvise til efterforskninger foretaget af det danske, engelske og tyske politi. En efterforskning af så mange myndigheder i så mange år uden synligt resultat taler dog ikke ligefrem for Skattestyrelsens formodning om, at der skulle være foregået noget

ulovligt i Sanjay Shahs virksomheder. Havde hans virksomheder ikke afviklet aktietransaktioner, men blot udarbejdet falske dokumenter, må det kunne lægges til grund, at anklagemyndighederne i tre lande efter nu fire års arbejde kunne have påvist dette. Ikke mindst, da de er i besiddelse af al den dokumentation, som pensionsplanerne mangler: computerne, hvor transaktionerne blev registreret.

**9.12.7 Shahs "Univers"**

Skattestyrelsen præsenterer i det sammenfattende indlæg af den 9. august 2019 en lang historie om "Shahs Univers".

Hertil skal først og fremmest bemærkes, at disse sager ikke drejer sig om Sanjay Shah og hans selskaber. Han er part i de civile søgsmål i London og Dubai og forsvarer selv sin sag der. Det er ikke pensionsplanernes opgave at besvare spørgsmål vedrørende ejeren af de selskaber, som de blot var kunder hos.

Det kan de heller ikke, uden at Skattestyrelsen igen ville komme med påstande om, at alle informationer eller rettelser, som pensionsplanerne ville opdrive vedrørende Skattestyrelsens opfundne historier omkring et "Shah univers", ville være dokumentation for, at pensionsplanerne og deres custodians agerede som en sammensvoren "bande".

Pensionsplanerne har dog fra High Court i London indhentet Sanjay Shahs eget 204 siders processkrift af maj 2019, hvori han udførligt tager stilling til samtlige af Skattestyrelsen fremsatte påstande, jf. bilag 85. Yderligere har pensionsplanerne ikke at tilføje til dette omfangsrige dokument.

Så udførligt, som Sanjay Shah beskriver hvert et skridt, som hans selskaber foretog i forbindelse med afviklingen af aktietransaktionerne på vegne af pensionsplanerne, kan pensionsplanerne slet ikke beskrive post-trade-processen. Pensionsplanerne ved kun, at de har givet instruktioner til afvikling, men hvordan denne sker, kan de ikke beskrive. Pensionsplanerne må derfor helt og fuldt forlade sig på beskrivelserne præsenteret af Sanjay Shah i London.

Som det fremgår heraf, var forretningsgangen hos de fire custodians i Solo-gruppen organiseret, så den nøje fulgte de europæiske og engelske love og regler omkring aktiehandel.

Det ses yderligere, at Solo-gruppens forretningsgang svarer til den typiske udbyttearbitrage som beskrevet af ESMA.

Sådan som Sanjay Shah beskriver afviklingen af aktiehandlerne (clearing/settlement, custody) skete denne i fuld overensstemmelse med Unidroits retningslinjer fastlagt i Geneva Securities Convention – som her fremlægges som bilag 96, hvilke er gældende ret – også for Danmark, som har været medlem af Unidroit siden 1940. I henhold til denne konvention kan den elektroniske registrering af ak- tieposter hos en custodian, der dokumenterer ejerskab af aktierne, ikke være falske (jf. artikel 10, 16 og 18). De mest centrale regler i denne konvention findes også i EU's regler, især i CSD-direktivet samt Finality-direktivet, og sikrer således inden for EU retssikkerheden inden for afviklingen af aktiehandler.

**9.12.8 Fortløbende nummerering af Credit Advices på tværs af Solo-grup- pen, som også blev anvendt i 2017**

Skattestyrelsen anfører, at de fire custodians, der tilhører Solo-gruppen har udgivet DCA'er med fortløbende numre. Som Skattestyrelsen korrekt har konstateret, forekommer der ikke nogen dubletter i numrene fra disse fire custodians. Skattestyrelsen har ligeledes konstateret "huller" i nummereringen, som tilsyneladende ikke var benyttet, men som Skattestyrelsen bemærker, må være udstedt til de 34 pensionsplaner, som i februar 2017 indgav anmodning af refusion af udbytteskat.

Dette faktum taler *ikke* for, at Credit Advices er orkestreret fra centralt hold. Det er heller ikke udtryk for manglende realitet eller svindel.

Det er blot dokumentation for, at de fire selskaber, der tilhører samme gruppe af selskaber, brugte det samme "back office" til at udstede DCA'er for de fire selskaber. Det er dokumentation for, at de fire custodians arbejdede sammen med hen- syn til diverse administrative opgaver såsom udstedelse af dokumentation til klienterne. Det er udtryk for arbejdsrationalisering og omkostningsbesparelse.

At der ikke er udstedt nogen dubletter, og at DCA'erne, som Alpine Consultancy fremlagde i 2017, passer ind i "hullerne", som Skattestyrelsen har konstateret, er netop dokumentation for, at de fire custodians må have anvendt samme IT-ser- viceudbyder eller software til at udstede DNA'erne, og at denne software eller IT- serviceudbyder arbejdede fejlfrit. Der blev ikke udgivet DCA'er med samme nummer for de fire custodians (dermed ingen dubletter), og alle numre blev udgivet uden "huller".

Det er logisk, at de i februar 2017 indsendte DCA'er passer ind i nummereringen, da de 34 pensionsplaner må have handlet de danske aktier på samme tidspunkt som de andre pensionsplaner, der tidligere havde indgivet anmodning om refusion – og fået denne bevilliget.

Idet pensionsplanerne netop ikke er del af Solo-gruppen kan de naturligvis ikke fremlægge de af Skattestyrelsen forlangte interne aftaler om at udstede samtlige DCA'er. Kunne pensionsplanerne fremlægge disse interne aftaler, ville Skattestyrelsen netop anvende dette som angivelig dokumentation for pensionsplanernes manglende selvstændighed fra deres custodians.

Der er dog intet underligt i, at den centrale administration udsteder DCA'er på hver af de fire custodians' egne brevpapirer, og at hver custodian har sit eget layout. Det var jo netop selvstændige virksomheder, der havde hvert sit særpræg. De havde absolut ingen grund til at anvende samme layout, og da slet ingen grund til at anvende et fælles navn, når de "bestilte" eller "trak" deres DCA'er ved den centrale administration.

Anvendelsen af en fortløbende nummerering dokumenterer derimod, at der i Solo- gruppen var indbygget en ekstra sikkerhed for, at to pensionsplaner ikke kunne modtage en DCA for den samme aktiepost. Hver eneste aktiepost havde over alle fire virksomheder et eget nummer.

Pensionsplanerne har i øvrigt aldrig påstået, at de fire custodians skulle være fire uafhængige virksomheder. Det er pensionsplanerne selv, der har introduceret begrebet "Solo-gruppen".

**9.12.9 Pensionsplanerne er ikke styret centralt**

Skattestyrelsen påstår i det sammenfattende indlæg, side 61, at pensionsplanerne skulle have påstået, at de alle var *fuldkommen* uafhængige af hinanden.

Det er ikke korrekt.

Pensionsplanerne har aldrig påstået **alle** at være fuldkommen uafhængige af hinanden.

Pensionsplanerne vidste, at de havde kontakt til <u>nogle</u> af de andre pensionsplaner via den samme trustee.

De havde dog og har stadig ikke alle indbyrdes kontakt, og langt mindre har TVC Advokatfirmas klienter kontakt til andre pensionsplaner, der var klienter hos andre brokere, custodians, clearere etc. og ligeledes investerede i udbyttearbitrage. Pensionsplanerne har med overraskelse konstateret, hvor mange

andre amerikanske pensionsplaner der har fulgt samme investeringsstrategi i udbyttearbitrage i dan-
ske aktier, da Skattestyrelsen gik ud og stævnede 470 personer og selskaber i hele verden i forbindelse
med denne aktivitet.

Det faktum, at 110 pensionsplaner alle har engageret den samme advokat, er langt mindre et tegn på
deres manglende indbyrdes uafhængighed – mindst af alt for deres angivelige afhængighed af deres
custodian. TVC Advokatfirma er ikke engageret af pensionsplanernes custodian. TVC Advokatfirma er
engageret af pensionsplanernes trustee. At 110 pensionsplaner finder den samme advokat, er mere et
tegn på, hvor kompleks en sag dette er, og dermed hvor svært det er at finde danske advokater, der
kan forklare udbyttearbitrage. En forretning, som Skattestyrelsen selv og deres advokat til dato helt
åbenlyst stadig ikke forstår.

Desuden gør den offentlige kampagne i samtlige medier det ikke let at finde advokater, der er parate til
at involvere sig i disse sager, hvori det lader til, at pensionsplanerne er "dømt" på forhånd. En fair rets-
sag er med den offentlige stemning imod pensionsplanerne praktisk talt umulig. En sådan sag er der
ikke mange advokater, der er villige til at føre.

Endelig skal bemærkes, at Skattestyrelsens henvisning til, at pensionsplanerne indgiver enslydende
skrifter i klagesagerne (jf. Skattestyrelsens sammenfattende indlæg af den 9. august 2019, side 48) blot
er en logisk konsekvens af, at SKAT selv startede ud med at sende enslydende skrivelser ud til samtlige
pensionsplaner for at informere dem om, at SKAT havde til hensigt at tilbagekalde deres tidligere afgø-
relser, og at selve tilbagekaldelserne af afgørelserne ligeledes var enslydende. SKAT anvendte endog
enslydende skrivelser til samtlige pensionsplaner, uanset hvilken custodian disse havde anvendt. En ad-
vokat vil logisk nok besvare samtlige enslydende skrivelser fra SKAT med enslydende skrivelser.

**9.12.10 Ikke-indleverede ansøgninger om refusion**

Skattestyrelsen anfører i det sammenfattende indlæg af den 9. august 2019 i af- snit 6.11, side 62, at to
pensionsplaner repræsenteret af os (The Sanford Villa Pension Plan, Skatteankestyrelsens j.nr 18-
0004776, samt The Patrick Partners Conglomerate Pension Plan, Skatteankestyrelsens j.nr. 18-
0004361) "tilsyneladende har glemt at søge refusion for udbytteskat" for deres aktiebesiddelser.

Skattestyrelsen mener hertil, at det ikke skulle give

> *"mening, at pensionsplanerne skulle kunne glemme at få udbe- talt så betydelige*
> *beløb, som angiveligt skulle være anvendt til at dække betydelige omkostninger*
> *forbundet med dette set-up, eller som pensionsplanerne under alle omstændighe-*
> *der burde mene at have krav på, hvis de fastholder, at de har krav på de refusio-*
> *ner, som denne sag omhandler."*

Vi kan hertil oplyse, at det på ingen måde drejer sig om en forglemmelse.

Sanford Villa Pension Plan havde blot endnu ikke modtaget sit amerikanske skattecertifikat 6166 i au-
gust 2015, da SKAT stoppede alle refusioner med påstand om angivelig svindel, jf. bilag 97.

Da pensionsplanen havde lukket samtlige positioner i tide til blot at realisere et nulresultat uden refu-
sionen, besluttede pensionsplanen af omdømmemæssige år- sager at undlade at indgive yderligere an-
modninger om refusion. Pressen i Dan- mark var jo allerede på det tidspunkt fyldt med de udokumen-
terede påstande om svindel.

Som skatteministerens pressemøde viser, da enkelte pensionsplaner i 2017 besluttede at anmode om den resterende refusion, som de havde retskrav, på inden disse ville være forældede, var pensionsplanens frygt, omkring den offentlige historie man ville opfinde vedrørende deres anmodninger, velbegrundet. Anmodningerne i 2017 blev stort meldt ud som "yderligere forsøg på svindel". Igen uden nogen form for dokumentation herfor.

Hvad The Patrick Partners Conglomerate Pension Plan angår, så har pensionsplanen ikke glemt at søge om refusion. Denne pensionsplan havde overgivet samtlige dokumenter til Syntax til at anmode om refusion. Syntax har ved e-mail til Roger Lehman (som her fremlægges som bilag 98) bekræftet, at refusionsanmodningen inklusive DCA, jf. bilag 99, blev indsendt til SKAT den 19. maj 2015.

Som beskrevet ovenfor sikrede investeringsstrategien, at en manglende refusion netop ikke ville resultere i et tab, hvis refusionen ikke blev udbetalt. Trustee'en overvågede nøje prisudviklingen og omkostningerne, så han kunne lukke positionerne inden en manglende refusion ville medføre et tab uden refusionen.

De øvrige service providere, der modtog størstedelen af gevinsten, der blev realiseret ved arbitragen, blev honoreret på basis af gevinsten. Denne var 0 uden refusionen. Derfor kunne pensionsplanerne uden problemer overleve, at en refusion ikke blev udbetalt.

**9.13 En udbytteskat kan føre til to refusioner**

Som forklaret tidligere i dette indlæg, kan manglerne i den danske skattelovgivning medføre, at statskassen kun modtager en indbetaling af udbytteskat, men at der er to retmæssige ejere af samme aktie og derfor to modtagere af et nettoudbytte og følgelig to refusionsberettigede.

De tab, som dette ganske rigtigt påfører statskassen, er ikke en følge af eventuelle tvivl om, hvem der er ejeren af en aktie, således som det påstås i styrelsens indlæg af den 9, august 2019, afsnit 8.4, side 69. Der er ingen tvivl om, hvem ejeren er, og at der kan være to ejere af samme aktie som følge af dansk lovgivning og retspraksis.

Disse fejl og mangler er ikke pensionsplanerne ansvar, og de tab, som det påfører staten, må staten også selv bære risikoen for. Det er statens ansvar at lovgive på forsvarlig vis og sørge for at indkræve så meget skat, at det svarer til det beløb, de skal udbetale.

**9.14 Sagen handler om jura**

Skattestyrelsen hævder i det sammenfattende indlæg af den 9. august 2019 i afsnit 8.5, side 69, at denne sag ikke drejer sig om jura.

Det er naturligvis forkert.

Ejerskab er et rent juridisk begreb opfundet og udformet af lovtekster og retspraksis, og hvordan dette erhverves, beskyttes og overdrages, bestemmes alene af juraen. Faktum i sagen kan kun levere indikationer for, om der er erhvervet ejerskab eller ej.

Ved handel med dematerialiserede aktier er faktum dog begrænset til relativt få aspekter, da

- Der ikke eksisterer nogen aktier i papirform, som man kan følge i fysisk form. Dematerialiserede aktier findes kun som elektroniske bogføringsposter eller registreringer

- Betaling af aktierne ikke er nødvendig for at erhverve ejerskab, hvorfor en pengestrøm allerede af den grund ikke kan følges for at eftervise overdragelsen af ejerskab. Desuden kan hverken en penge- eller aktiestrøm følges op gennemclearingsystemerne
- Afvikling af et aktiekøb ikke er nødvendig for at erhverve ejerskab til aktier
- Netting ved afviklingen af aktiehandler gør det umuligt at følge enkelte "aktier" gennem afviklingssystemet
- Dematerialiserede aktier ikke kan identificeres som "enkelte bestemte aktier", hvorfor en køber af "en aktie" aldrig vil modtage netop den bestemte aktie, som han købte af "sin sælger".

Faktum ved handel med dematerialiserede aktier er, at ejerskab overdrages ved en endelig og bindende aftale om køb af aktien, og at eksistensen af en sådan aftale, der tilvejebringes rent elektronisk ved matching af en købs- og en salgsordre, i første linje dokumenteres med den efterfølgende handelsnota, der udstedes, efter handlen også er afviklet.

Udover handelsnotaen dokumenterer et custody statement, at det erhvervede ejerskab desuden har opnået beskyttelse mod tredjemand ved at blive registreret på en depotkonto (den erhvervede rettighed er offentliggjort og dermed beskyttet). Når ejeren af aktien modtager et udbytte, udsteder custodian en dividend credit advice, som er et dokument, der dokumenterer, at ejerskabet er erhvervet, at ejer- skabet er blevet registreret, og at udbyttet er modtaget. Idet en dividend credit advice indeholder samtlige informationer, som SKAT har brug for til at vurdere pensionsplanens retskrav på refusion, var det dette dokument, som SKAT selv forlangte af alle, der ønskede at anmode om refusion.

Idet aktieoverdragelser sker rent elektronisk, kan kun de involverede parter dokumentere, at transaktionen har fundet sted.

Dette er i de foreliggende tilfælde sket.

Blot fordi Skattestyrelsen nu forlanger yderligere informationer og bilag, betyder det ikke, at pensionsplanen ikke havde ejerskab til aktierne, ikke havde modtaget refusion og ikke havde retskrav på refusion.

Pensionsplanen har fremlagt den dokumentation, der kan eksistere for ejerskabet. At en uafhængig tredjepart, der ikke var involveret i aktieoverdragelsen, ikke kan bekræfte ejerskabet, er et faktum, der gælder for samtlige dematerialiserede aktier. Heraf kan man ikke under regler om bevisbyrde konkludere, at pensionsplanen ikke har dokumenteret sit ejerskab til aktierne. Pensionsplanen har fremlagt det, der på juridisk bedste vis dokumenterer ejerskabet til en aktie.

De af pensionsplanen fremførte betragtninger om bona fide-køb og retmæssig ejerskab er altafgørende i denne sag, hvor Skattestyrelsen hovedsageligt begrunder sin tvivl om pensionsplanens ejerskab med betragtninger om for meget udbetalt udbytteskat. SKAT har dog selv i Early Warning af 2015 til Skatteministeriet fremført, at der kan opstå situationer med to retmæssige ejere af samme aktie. Det er kun naturligt, at Skattestyrelsen hellere end gerne ville være uden denne dokumentation, for at Skattestyrelsen godt ved, at det er problemerne omkring aktieudlån, short selling til bona fide-køberen og det dobbelte retmæssige ejerskab i henhold til dansk lovgivning og retspraksis, som denne sag i virkeligheden drejer sig om. Skattestyrelsen ville forståeligt nok gerne være foruden dokumentation for, at styrelsen selv i 2015 gav pensionsplanen ret i argumentationen vedrørende dobbelt retmæssig ejerskab til en aktie. Langt værre for Skattestyrelsen er i denne sammenhæng, at selv hvis man ville følge Skatteministeriets opfattelse – der afviger fra Skattestyrelsens egen, der i 2015 argumenterede for, at der fandtes to retmæssige ejere af samme aktie – og ville antage, at aktielångiveren mister sit retmæssige ejerskab, når aktielåntageren sælger aktien videre til en bona fide-køber, så ville pensionsplanerne være berettiget til refusion. Man ville så i overensstemmelse med Skatteministeriet forhindre to ret-

mæssige ejere af samme aktie, men den, der så ikke var berettiget til refusion, ville i henhold til denne fortolkning være (den ultimative) aktielångiver. Pensionsplanen ville som bona fide-køber være retmæssig ejer og dermed refusionsberettiget.

Uanset hvad Skattestyrelsen mener, så drejer denne sag sig netop om problemerne omkring opnåelse af ejerskab af aktier og afklaringen af de juridiske "gråzoner", som hidtidig retspraksis har efterladt sig, og som SKAT selv tydeligt påpegede i Early Warning af 2015.

Skattestyrelsen bemærker ex tuto, at pensionsplanerne var i ond tro. Dette er netop, hvad hele Skattestyrelsens sag bygger på: Skattestyrelsen har efter den såkaldte "whistleblower" besluttet, at samtlige amerikanske pensionsplaner, der har handlet danske aktier, er rene svindlere, og at de agerede i ond tro, men har ikke andet end udokumenterede påstande at fremføre til støtte herfor.

Skattestyrelsen forsøger ved at vælte bevisbyrden tilbage på pensionsplanerne igen at redde sig ud af sit dilemma, der består i, at styrelsen ikke kan bevise så meget som et enkelt ord af sine uholdbare påstande mod pensionsplanerne. Pensionsplanerne har dog løftet bevisbyrden for retskravet på refusion mere end én gang. Alt omkring handler med dematerialiserede aktier er så vidt som overhovedet muligt dokumenteret. Hvad intet menneske i verden kan dokumentere, kan man heller ikke forlange af pensionsplanerne at dokumentere.

Dokumentation af ejerskab af dematerialiserede aktier, der opbevares i sub-custody, kan ikke eftervises på andre måder, end pensionsplanerne har gjort.

### 9.15 Det er umuligt at svindle med aktiehandler

Pensionsplanen fastholder fortsat, at det under de gældende EU-regler, der i bund og grund baser sig på Unidroits Geneva Securities Convention, jf. bilag 96, ikke er muligt at svindle med registreringen af dematerialiserede aktier. Konventionen fastslår, at den elektroniske registrering af aktieposter hos en custodian, der dokumenterer ejerskab af aktierne, ikke kan være falsk (jf. artikel 10, 16 og 18). De mest centrale regler i denne konvention genfindes i EU's CSD-direktiv samt i Finality-direktivet. Disse to direktiver sikrer i EU retssikkerheden inden for afviklingen af aktiehandler. Der sondres herved ikke mellem registreringer hos den CSD, hvor aktierne oprindeligt blev udstedt ("issuer-CSD"), og registreringer af aktieposterne hos enhver anden custodian ("investor-CSD").

I kommentarerne af Dan Moalem, David Moalem, Peer Schaumburg-Müller og Erik Werlauff til kapitalmarkedsloven af 2018 fastholdes således også til § 3, nr. 34 (side 197), at:

> *"et fondsaktiv anses som registreret i en CSD, både (i) når den pågældende CSD opererer som issuer.CSD og forestår den første registrering af et fondsaktiv, og (ii) når CSD'en agerer som investor-CSD og foretager en teknisk registrering i sine systemer af et papir, der er udstedt af en anden CSD "*

Kapitalmarkedsloven bekræfter derved, at der ikke eksisterer noget legalt grundlag for at diskriminere en registrering af et værdipapir ved en investor-CSD sammenlignet med en registrering ved en national CSD (som VP Securities).

Europa-Kommissionens generaldirektorat "Internal Market and Services" har under "Det Europæiske Økonomiske og Sociale Udvalg" i perioden 5. januar 2010 – 21. januar 2011 gennemført en offentlig konsultation vedrørende lovgivningen til at styrke retssikkerheden omkring ejerskab af værdipapirer (Legislation on Legal Certainty of Securities Holding and Dispositions), jf. bilag 100, som fremlægges her. Som det helt utvetydigt fremgår heraf, beskytter EU-lovgivningen enhver køber af en demateriali-

seret aktie, der får denne registreret på **sin depotkonto**. Han er utvivlsomt den civilretlige ejer af en ak-
tie. Der skelnes ikke mellem beskyttelse opnået ved registrering hos en issuer-CSD og beskyttelse op-
nået ved registrering ved en investor-CSD. De to er ligestillet.

### 9.16 Pensionsplanerne skifter ikke forklaring

Skattestyrelsen påstår i det sammenfattende indlæg af den 9. august 2019, afsnit 8.7, side 70, at pen-
sionsplanerne i førersagerne angiveligt skulle skifte forklaringer.

Det er ikke korrekt.

### 9.16.1 Broker confirmations og custody statements

Pensionsplanerne skifter ikke forklaringer med hensyn til den fremlagte dokumentation, men efter-
kommer med største omhu Skattestyrelsens umættelige krav om flere og flere dokumenter. Dokumen-
terne, som pensionsplanerne har fremlagt, er dem, som i modsætning til de af Skattestyrelsen for-
langte dokumenter – virkelig dokumenterer ejerskab. Det, Skattestyrelsen gerne vil se – som fx bank-
konti hos en anden end Solo-gruppen – dokumenterer på ingen måde ejerskab af danske aktier.

Ejerskab erhverves som hele tiden forklaret af pensionsplanerne ved en elektronisk transaktion. Denne
kommer til udtryk i en handelsnota (broker confirmation), et custody statement og endelig en DCA. Det
har pensionsplanerne fra første dag af konstant bekræftet.

Det er også kendetegnende for Skattestyrelsen at opstille krav om dokumentation, uden at konkreti-
sere, hvad denne dokumentation skulle være, og hvordan den skulle kunne fremlægges af pensionspla-
nerne. Således påstår Skattestyrelsen eksempelvis på side 70, at der måtte eksistere "nogen form for
objektiv dokumentation for modtagelsen af udbyttet". Hvad denne objektive dokumentation skal
være, anfører Skattestyrelsen ikke. Udbyttet modtages jo af alle aktionærer i hele verden netop på en
kontantkonto ved deres custodian. Kom pengene til en konto til en anden bank end custodian, ville
dette tale for, at der netop ikke var tale om et udbytte.

Som allerede fremhævet utallige gange, kan pensionsplanerne som kunder heller ikke fremlægge doku-
mentation for tilgangen af pengene til deres custodian. Den tilgang af penge kan kun custodian doku-
mentere.

Custodian er i de nærværende sager dog afskåret fra at hjælpe sine kunder – pensionsplanerne – med
at fremlægge dokumentation om modtagelse af udbyttet igennem custody kæden, idet alle bilag fra
samtlige custodians er blevet beslaglagt af myndighederne.

Det er ligeledes grundlæggende forkert, når Skattestyrelsen på side 71 angiver, at en handelsnota ikke
betyder, at en handel er blevet gennemført. Handelsnotaen udstedes først af brokeren, når der er givet
instruktioner om afvikling. Instruktionerne til clearing og afvikling sætter en afviklingsproces i gang,
som ingen kan stoppe. Det er derfor, at clearing-agenten hæfter for betalingen af pengene (og levering
af aktien).

At Skattestyrelsen ikke forstår tilstrækkeligt engelsk til at forstå, at et custody statement er et kon-
toudtog (jf. Skattestyrelsens sammenfattende indlæg, side 71) er et beklageligt faktum, ændrer dog in-
tet i forhold til sagens faktum. Et "custody statement" er et kontoudtog over en depotkonto. Hvad end
dette udstedes dagligt, ugentligt, månedligt eller årligt. De viser alle aktiver – aktier, forward, kontrak-
ter samt aktielån, som pensionsplanerne har indgået.

### 9.16.2 Sikkerhedsstillelse

Skattestyrelsen tror i styrelsens sammenfattende indlæg i afsnit 8.8, side 72, at der skulle være en modsigelse mellem udtalelsen om en pantsættelse under GMSLA'erne og overdragelsen af ejerskab til de kontante midler under TTC-klausulen.

Dette er igen ikke tilfældet.

Pensionsplanerne havde både overdraget ejerskabet til deres kontante pengemidler til deres custodian under TTC-klausulen og pantsat deres – øvrige aktiver – under GMSLA'en.

Overdragelsen af ejerskab til sikkerhed for pengemidlerne går forud for en simpel pantsætning. Pantsætningen omfatter netop kun aktiver, der tilhører pensionsplanerne. Pengemidlerne tilhører umiddelbart efter modtagelsen ikke længere pensionsplanerne, da ejerskabet allerede er overdraget til custodian.

En pantsætning giver færre rettigheder over et aktiv end en overdragelse til sikkerhed. Det burde selv Skattestyrelsen vide. Pantgiver er stadig ejer af sit aktiv. Det er ikke tilfældet, når der er tale om en overdragelse af ejerskab til sikkerhed (som det sker under en TTC-klausul).

Skattestyrelsen mener i det sammenfattende indlæg i afsnit 8.8, side 72, i øvrigt, at det ikke giver nogen mening, at refusionerne blev udbetalt til pensionsplanernes agenter, når resultatet af transaktionerne er pantsat.

Skattestyrelsen overser herved, at pensionsplanerne under TTC-klausulen udelukkende har overdraget ejerskabet til kontante pengemidler til custodian. De har ikke overdraget ejerskabet til aktierne og dermed heller ikke kravet på refusion. Custodian kunne derfor slet ikke anmode om refusion. Det var kun pensionsplanerne, der som ejere af aktierne kunne bede tax agenterne om at indsende anmodninger om refusion på pensionsplanernes vegne.

På grund af TTC-klausulen blev pengemidlerne dog indbetalt direkte til custodians henholdsvis subcustodians konto (Old Park Lane, West Point Derivatives og Telesto havde selv deres kontante midler på deres moderselskabs pengekonto.) Dette viser – igen – pensionsplanernes efterfølgende efterforskninger.

### 9.16.3 Pensionsplanernes konti

Skattestyrelsen angiver fejlagtigt, at pensionsplanerne skulle have givet modstridende oplysninger om deres konti.

Det er ikke tilfældet.

Pensionsplanerne har, som rigtigt er, oplyst, at de selv umiddelbart havde deres konti hos deres custodians. Udover disse konti havde de kun en konto i USA til stiftelsen – som her fremlagt som bilag 91.

Pensionsplanerne havde deres danske aktier på en depotkonto hos deres custodian. Var deres umiddelbare custodian ikke Solo Capital, men et af de tre datterselskaber, opbevarede den umiddelbare custodian aktierne på deres omnibuskonto hos Solo Capital. Solo Capital opbevarede igen aktierne på omnibuskonti hos deres custodian. Hvor disse custodians, der opbevarede aktierne for Solo Capital, igen havde deres omnibuskonto kan pensionsplanerne ikke få oplyst.

Hvad angår pengemidlerne, så er det ganske rigtigt, at de indestod på Solo Capitals egen konto i Barclays Bank. De var jo overdraget til sikkerhed til Solo.

Ikke desto mindre blev det naturligvis registreret hos den respektive custodian, hvor mange pengemidler der tilgik hver enkelt pensionsplan (udbytter, salgspris af aktier, forwardsalgspris, refusion etc.), og som blev overdraget til sikkerhed til custodian. Alle custodians i gruppen opbevarede de pengemidler, som pensionsplanerne havde overdraget til sikkerhed til dem, til Solo Capitals bankkonto i Barclays Bank.

Dokumentation for, at custodians bogførte alle pengemidler korrekt på pensionsplanernes konti, er fremlagt som bilag 90.

### 9.16.4    Dokumentation for modtagelse af udbytte

Skattestyrelsen beviser i styrelsens sammenfattende indlæg i afsnit 8.10, side 73, endnu en gang styrelsens manglende forståelse af engelsk. Styrelsen forlanger at se en "udbyttenota" for modtagelsen af udbyttet. Men det er jo de fremlagte Dividend Credit Advices. Derfor forlangte SKAT i sin tid netop også disse dividend credit advices, da Acupay spurte Lisbeth Rømer, hvilke bilag der skulle fremlægges sammen med ansøgningen om refusion, jf. Acupay System LLC's indlæg til Retten i London af den 1. april 2019, som her fremlægges som bilag 102 Lisbeth Rømer lader til at forstå mere engelsk end Skattestyrelsens advokater.

De yderligere forlangte kontoudtog og fonds-/depotudskrifter er ligeledes fremlagt.

En pensionsplan, der har din konto hos Solo Capital (eller en af de tre datterselskaber), kan naturligvis kun fremlægge kontoudskrifter herfra og ikke fra en anden bank.

En kunde i Vendsyssel Bank kan jo heller ikke fremlægge en kontoudskrift fra Nordea for at bevise, at han har aktier, i sit depot der føres i Vendsyssel Bank. Selv ikke hvis Vendsyssel Bank har sin omnibuskonto i Nordea.

### 9.17 Pinsent Masons

Skattestyrelsen påstår i det sammenfattende indlæg af den 9. august 2019 i afsnit 8.13, side 75, at pensionsplanerne i førersagerne forsøger at mudre billedet ved at henvise til, at Skattestyrelsens egen advokat i England rådgav Solo-gruppen.

Det er naturligvis ikke tilfældet.

Den, der forsøger at mudre billedet, er Skattestyrelsen med alle styrelsens udokumenterede påstande omkring Sanjay Shah og hans "univers", som slet ikke er part i disse sager.

Det er heller ikke nogen simpel påstand fra pensionsplanernes side, at Skattestyrelsens egen advokat i London, Pinsent Masons, har rådgivet Solo-gruppen. Det er et faktum, der tydelig fremgår at Sanjay Shahs processkrift til High Court i London (jf. side 52 samt processkriftets appendix 1, nr. 24, side 54 og 55) at ikke mindre end 44 advokater hos Pinsent Masons har rådgivet Solo Capital, som var stiftet med det formål at yde tjenester til udbyttearbitrageindustrien, Sanjay Shahs åbenlyse speciale, når man betragter hans offentligt tilgængelige CV samt hans processkrift. Desuden bekræftes det af utallige pressemeddelelser, som her fremlægges som bilag 103-106 samt af den e-mailkorrespondance, pensionsplanerne har fået udleveret af Pinsent Mason, der her fremlægges som bilag 107. Endelig er pensions-

planerne kommet i besiddelse af fakturaen af den 29. december 2011 fra Pinsent Mason, der frem-
lægge som bilag 108.

Solo Capital havde absolut ingen grund til at hyre og betale 44 advokater hos Pinsent Masons, hvis fir-
maets hensigt blot var at trykke fiktive papirer, for at lade det se ud som om der blev afviklet aktie-
handler. Som det fremgår at Sanjay Shahs processkrift, lod Solo-gruppen sig rådgive om utallige aspek-
ter vedrørende en korrekt forretningsførelse (inklusive corporate government og legal compliance,
clearing, settlement og custody). De i dag så centrale og omtvistede custody agreements stammer lige-
ledes fra Skattestyrelsens egne engelske advokater.

At Solo-gruppens tidligere klienter søger hjælp fra deres kontraktuelle partnere (Solo-gruppen) i kam-
pen mod de uberettigede påstande om svindel, er kun logisk. At Sanjay Shah leverer den dokumenta-
tion, han kan for at understøtte sine klienter, er dokumentation for, at også han er overbevist om at
have gennemført en rigtig og ærlig forretning. Forholdt det sig anderledes, ville han naturligvis ikke un-
derstøtte pensionsplanerne, som han jo i det tilfælde ville have bedraget. For de gav ordre om at købe
aktier.

Der er absolut intet mistillidsvækkende ved, at pensionsplanerne via de respektive advokater søger
kontakt til Sanjay Shah. Hvis nogen forsøger at mudre billedet, er det helt sikkert Skattestyrelsen med
påstande som disse.

## 10 BEVISBYRDE OG FORMALITET

De foreliggende afgørelser fra SKAT er i meget høj grad baseret på en lang række *antagelser og for-
modninger* vedrørende de faktiske forhold, som samlet får SKAT og Skattestyrelsen til at konkludere, at
der skulle være tale om svindel.

Betingelserne for, at der kan ske tilbagekaldelse af de oprindelige afgørelser om udbetaling af refusion
af udbytteskat, er i de foreliggende sager ikke til stede.

Dette er reelt også blevet bekræftet i Skattestyrelsens egne indlæg, der må læses således, at sagerne
rettelig ikke handler om tilbagekaldelse af de oprindelige afgørelser om udbetaling af refusion af ud-
bytteskat, men om hvorvidt disse afgørelser kan annulleres som ulovhjemlede. Skatteankestyrelsen
fremhæver således ligeledes i kontorindstillingen, at SKAT skulle være berettiget til at annullere den
oprindelige afgørelse om udbetaling af refusion.

Der består således enighed om, at SKAT ikke kunne tilbagekalde afgørelserne. Tilbage bliver spørgsmå-
let om, hvorvidt betingelserne for annullation er opfyldt.

Det fastholdes, at det _nu_ er skattemyndighederne, der har bevisbyrden for, at man nu kan annullere de
oprindelige afgørelser om udbetaling af refusion af udbytte- skat, samt at skattemyndighederne ikke
har løftet denne bevisbyrde.

Det skal selvsagt ikke bestrides, at det som udgangspunkt er den skatteyder, der søger om refusion af
udbytteskat, der har bevisbyrden for, at betingelserne for, at der kan ske en sådan udbetaling, er op-
fyldt.

I nærværende sager fører en række faktiske forhold til, at dette udgangspunkt ikke gælder i de forelig-
gende sager, der reelt handler om, hvorvidt der kan ske annullation af de oprindelige afgørelser om ud-
betaling af refusion af udbytteskat.

Det er først nu – flere år efter indgivelsen og SKATs godkendelse af refusionsanmodningerne – at Skattestyrelsen stiller spørgsmålstegn ved validiteten af den dokumentation, som var vedlagt anmodningerne, og som faktisk dokumenterer ejerskabet af aktierne, modtagelsen af nettoudbyttet og dermed også betalingen af udbytteskatten. Det faktum, at SKAT oprindeligt godkendte ansøgningerne om udbetaling af refusion af udbytteskat, har selvsagt bevirket, at de involverede pensionsplaner indrettede sig, i tillid til at de ikke behøvede at fremskaffe yderligere dokumentation for, at de var og er berettigede til at få den ansøgte udbytterefusion. Havde pensionsplanerne, dengang de søgte om udbytterefusion, fået en tilkendegivelse fra SKAT om, at man ønskede yderligere dokumentation, ville de have haft mulighed for at søge denne tilvejebragt, ligesom de havde været opmærksomme på at gemme allerede eksisterende relevante dokumenter. Pensionsplanernes muligheder for at modbevise Skattestyrelsens nye påstande er blevet væsentligt forringet af det lange tidsforløb og det forhold, at SØIK nu har beslaglagt en stor del af sagens dokumenter.

Både SKAT og Skattestyrelsen har videre forsømt at indhente relevante oplysninger hos de mange professionelle udenlandske aktører, der ubestridt har været impliceret i de omhandlede transaktioner. Tilsvarende har SKAT og Skattestyrelsen forsømt at indhente relevante oplysninger hos udenlandske kontrol- og tilsynsmyndigheder.

Forsømmelsen af at indhente relevante oplysninger skal ses i lyset af, at SKAT og Skattestyrelsen via deres kontrolbeføjelser – i modsætning til pensionsplanerne – har reel mulighed for at indhente de af Skattestyrelsen efterspurgte oplysninger.

På baggrund af ovennævnte gøres det helt overordnet gældende, at SKAT kunne og burde have foretaget en mere effektiv undersøgelse af de af Skattestyrelsen nu problematiserede forhold, på det tidspunkt hvor man behandlede de oprindelige ansøgninger, samt at dette har medført, at de involverede pensionsplaner havde en berettiget forventning om, at de ikke skulle fremskaffe yderligere dokumentation.

Det er således SKATs adfærd, der har ført til, at der nu, flere år efter at ansøgningerne om udbetaling af udbytterefusion blev godkendt af SKAT, er opstået tvivl hos skattemyndighederne om, hvorvidt betingelserne for at udbetale denne refusion var opfyldt. Det følger heraf, at skattemyndighederne er nærmest til at bære risikoen for denne tvivl, med den virkning at foreliggende bevistvivl vedrørende faktiske forhold, som burde have været yderligere belyst i forbindelse med de oprindelige ansøgninger om udbytterefusion, skal komme skattemyndighederne til skade.

Som allerede anført har Skattestyrelsen alene baseret sin efterfølgende opfattelse på udokumenterede antagelser om pensionsplanernes manglende ejerskab og udlån af de omhandlede aktier. Skattestyrelsen har således ikke ført noget egentligt bevis for påstanden om manglende ejerskab mv., og påstanden er således aldeles udokumenteret.

Bevistvivlen vedrørende de forhold, som Skattestyrelsen nu efterfølgende har problematiseret, må således tilskrives SKATs manglende oprindelige effektive undersøgelser, hvorfor betingelserne for at annullere de oprindelige afgørelser om ud- betaling af refusion af udbytteskat ikke er opfyldt. Der skal allerede som følge heraf gives pensionsplanerne medhold i de nedlagte påstande.

··· ···

Skattestyrelsen har i sine indlæg anført en lang række af synspunkter vedrørende spørgsmålet om bevisbyrden i nærværende sagskompleks, herunder bevisbyrden i tilfælde af svindel, således som Skattestyrelsen reelt gør gældende, at der foreligger.

Det er imidlertid særdeles vigtigt at holde sig for øje, at Skattestyrelsen selvsagt ikke blot ved hjælp af udokumenterede påstande om svindel, kan vende problematikken således, at pensionsplanerne "sidder med aben" i bevisbyrdemæssig henseende. Der er som anført tale om udokumenterede antagelser om pensionsplanernes manglende ejerskab, og Skattestyrelsen har ikke ført noget egentligt bevis herfor.

Det synes endvidere som om, at Skattestyrelsen reelt ikke ønsker at bidrage til, at der sker en behørig oplysning af sagerne, men at disse skal afgøres på *antagelser*, kombineret med den *kulisse* man hos skattemyndighederne har søgt at skabe siden sensommeren 2015, om at <u>alt</u> blot er udtryk for strafbar svindel.

Det forhold, at der eventuelt måtte være begået noget kriminelt af andre involverede aktører – hvad pensionsplanerne ikke har nogen form for kendskab til – er ikke i sig selv afgørende for, om der nu kan ske annullation af SKATs oprindelige afgørelser om udbetaling af refusion af udbytteskat.

Det er i den forbindelse særdeles vigtigt at være opmærksom på, at nærværende sager udelukkende handler om, hvorvidt de involverede pensionsplaner har retskrav på at beholde den ansøgte refusion af indeholdt udbytteskat som oprindeligt antaget og udbetalt af SKAT.

Det kan ikke opstilles krav til pensionsplanerne om fremlæggelse af yderligere og/eller anden dokumentation end den allerede fremlagte. Som anført ovenfor har pensionsplanerne i sagerne fremlagt omfattende dokumentation, der dokumenterer ejerskabet til aktierne, modtagelsen af nettoudbyttet og dermed betalingen også af udbytteskatten. Samtidig er de af Skattestyrelsen forlangte registreringer ved VP Securities, penge eller aktiestrømme blot indicier, og ikke egentlig dokumentation, for ejerskabet til de omhandlede aktier. Der henvises i den forbindelse til de ovenfor anførte problemer med dokumentationen af ejerskab til dematerialiserede aktier- Såvel Skattestyrelsen som også Skatteankestyrelsen indrømmer selv, at der ikke findes nogen måde, hvorpå man med 100 pct. sikkerhed kan eftervise retmæssig ejerskab af danske aktier, hvilket selvsagt ikke kan lægges pensionsplanerne til last under betragtninger.

**KONKLUSION PÅ ANDEN DEL**

Samtlige aktiehandler var reelle og er dokumenteret, med alle de bilag som i virkelighedens verden dokumenterer en reel aktiehandel og overdragelse af ejerskab til aktier. At skattestyrelsen fremkommer med en ønskeliste af dokumenter, styrelsen gerne ville se, men som ikke er en juridisk gyldig dokumentation for ejerskab af aktier og modtagelse af udbytte, kan ikke medføre, at pensionsplanen ikke har løftet bevisbyrden for sit krav på refusion.

Skattestyrelsens udokumenterede påstande om svindel mod de involverede custodians er ikke tilstrækkeligt til at tilsidesætte den af disse custodians udstedte dokumentation for transaktionerne. Skattestyrelsen forsøger herved at liste sig uden om det faktum, at de britiske tilsynsmyndigheder helt åbenbart ikke har fundet noget bevis for svig hos de fire custodians. Helt ligesom SØIK, der efter fire års efterforskning ikke er kommet frem end så meget som en anklage. Beslutningen taget i november 2019 af de engelske myndigheder om at indstille deres strafferetlige efterforskninger i sagen og overlade dette umulige forehavende til Danmark er yderligere dokumentation for, hvor uhorbare påstandene om svindel i virkelighedens verden er.

At forlange mere dokumentation af en udenlandsk custodian end af VP Securities betyder endelig en uretmæssig diskriminering af engelske custodians, der ikke holder ved EU-Domstolen.

EU har fastsat et regelsæt, (CSD og Finality-direktiverne) der garanterer, at en køber af en dematerialiseret aktie også virkelig bliver ejer heraf og uden tvivl kan dokumentere dette i alle EU-lande ved en udskrift fra sin egen custodian, også kaldet investor-CSD.

Pensionsplanens dokumentation for ejerskab i form af DCA'er og custody statements kan ikke afvises som dokumentation i sagerne.

**DEL 3: SKATTEANKESTYRELSENS INDSTILLING I FØRERSAGERNE – DE GENNEMFØRTE HANDLER HAVDE REALITET**

**11 ANERKENDELSE AF GENNEMFØRELSEN AF AKTIEHAND- LERNE**

Skatteankestyrelsens kontorindstilling i førersagerne underbygger den manglende relevans af Skattestyrelsens synspunkter vedrørende fejl i dokumentationen og rene spekulationer vedrørende sandsynligheden af, hvad der i realiteten er foregået. Skatteankestyrelsen stiller ikke spørgsmålstegn ved, at der er indgået aftaler om køb af aktier, og at disse er gennemført.

Gennemførelsen af investeringsstrategien udbyttearbitrage stilles der lige så lidt spørgsmålstegn ved, som ved alle de enkelte etaper i transaktionen (køb og salg af aktier, indgåelse af forwardkontrakter samt aktieudlånet mod kontant sikkerhedsstillelse).

Skatteankestyrelsen betvivler i førersagerne heller ikke, at pensionsplanerne kunne finansiere aktiekøbene. At pensionsplanerne altovervejende – men ikke udelukkende – var nystiftede, spiller ingen rolle for muligheden for at købe og finansiere aktierne. Aktiekøbene blev betalt ved hjælp af den kontante sikkerhedsstillelse fra en aktielåntager, der blev betalt til pensionsplanerne, samme dag som pensionsplanerne skulle betale for aktierne.

Skatteankestyrelsen fremfører i førersagerne ligeledes ikke en registrering af pensionsplanerne hos VP Securities som en betingelse for ejerskab. Skatteankestyrelsen erkender den begrænsede værdi af registreringerne hos VP Securities, der kun kender enkelte civilretlige aktionærer i de danske C20-selskaber, men langtfra alle (pga. omnibusdepoter), og slet ikke kender de retmæssige ejere af danske aktier. Retmæssigt ejerskab registreres ingen steder.

Skatteankestyrelsen bekræfter i førersagerne udtrykkeligt, at der foreligger dokumentation vedrørende transaktioner omkring køb og salg af aktier, aktieudlån og indgåelse af forwards herunder handelsnotaer, e-mails mv. Skatteankestyrelsen er blot af den opfattelse, at denne dokumentation ikke

> *"er kommet Pensionsplanerne til "kundskab", og af den grund skulle de ikke bevise Pensionsplanens ejerskab til aktierne."*

Dette er dog ikke korrekt. Pensionsplanerne havde fuldt kendskab til samtlige dokumenter, idet de er fremlagt af pensionsplanernes trustees. Pensionsplanerne kan kun handle gennem disse trustees, og deres viden skal tilregnes pensionsplanerne. Som juridiske personer kan de kun have viden om faktum gennem fysiske personer. Disse fysiske personer er deres trustees.

**12 SKATTEANKESTYRELSENS TILSIDESÆTTELSE AF SKATTEMÆSSIGE EJERSKAB I FØRERSAGERNE**

**12.1 Kendskab til transaktionsdokumenterne**

Skatteankestyrelsens virkelige begrundelse for at ville tilsidesætte pensionsplanernes skattemæssigt retmæssige ejerskab af aktierne i førersagerne lader til at være, at pensionsplanerne skulle have haft kendskab til alle de dokumenter, der i realiteten dokumenterer aktietransaktionerne.

Hertil skal bemærkes, at en person også uden kendskab til en retligt bindende aftale kan erhverve rettigheder (og pligter) gennem en sådan aftale. Det er tilstrækkeligt, at personen har givet fuldmagt til den handlende person, og at denne har kendskab til dokumenterne.

I de foreliggende sager handlede altovervejende pensionsplanens egen trustee. Ordren til køb og salg af aktier blev afgivet af trustee'en pr. e-mail, forward hedgen blev solgt pr. e-mail, handelsnotaerne blev sendt til trustee'en pr. e-mail – og efterfølgende til pensionsplanens trustee i hard copy sammen med fakturaen. Aktieudlånet baseret på GMSLA blev indgået pr. e-mail sendt og modtaget af trustee'en.

Trustee'en er ikke kun i besiddelse af en fuldmagt fra pensionsplanen til at handle på dennes vegne. Trustee'en er pensionsplanens eget handlende organ. Når en pensionsplan vil indgå en retsakt, kan dette kun ske ved en handling af trustee'en.

Hvis Skatteankestyrelsen med "pensionsplanen" mener pensionsplanens begunstigede, må hertil bemærkes, at de begunstigede personer af en given pensionsordning – der ikke er selvforvaltet – aldrig har kendskab til de enkelte retsakter, ved hvilke pensionsordningen erhverver og sælger aktiver, der tilkommer de begunstigede under pensionsordningen. Når fx Danica eller Nordea investerer midlerne i en dansk pensionsordning for deres begunstigede forsikringstagere, sender de ikke hver gang forsikringstagerne kopier af transaktionsdokumenterne. Danica og Nordea erhverver alligevel aktier på vegne af deres pensionsforsikrede personer.

Der er ingen grund til at betragte en amerikansk solo 401K-pensionsplan anderledes end Danica eller Nordea, når der forvaltes pensionsmidler.

**12.2 Dokumentation**

Skatteankestyrelsen anbefaler i førersagerne at tilsidesætte pensionsplanernes retskrav på refusion, under henvisning til at det ikke skulle være tilstrækkeligt dokumenteret, at pensionsplanerne (a) har været ejere af de omhandlede aktier, (b) har modtaget udbytte af aktierne, eller (c) har modtaget udbytterefusion.

**12.2.1 Dokumentation for ejerskab af aktierne**

Idet al handel med dematerialiserede aktier foregår papirløst, er dokumentationen heraf et grundlæggende problem. For aktionærer, der har et eget depot ved VP Securities, er det relativt let at dokumentere ejerskab. De fleste udenlandske aktionærer har dog ikke et eget depot ved VP Securities. De opbevarer deres aktier i udenlandske banker, der arbejder med omnibuskonti i lange kæder af subcustodians.

Handles der med aktier mellem kunder hos en og samme custodian, ses dette hverken hos VP Securities eller hos den næste custodian i kæden af subcustodians. Køb og salg af aktier udligner hinanden under "netting proceduren". Det eksterne spor af en sådan handel hos den samme custodian begræn-

ser sig til de to rapporter, der udstedes af handels- og afviklingssystemerne: "trade reports", der sendes til børsen (her LSE) og "transaction reports", der sendes til finanstilsynet (her FCA i London).

Oversiger antallet af aktier, der købes eller sælges inden for en enkelt custodian, vil et spor af afviklingsprocessen føre til den næste custodian i kæden af subcustodians, hvor netting af samtlige transaktioner igen kan medføre, at ingen aktier overføres til eller fra denne custodians omnibuskonto.

Brugen af omnibuskonti i kæderne af subcustodians og anvendelsen af netting sletter således de eksterne spor af afviklingen af aktietransaktionerne.

Dette gælder såvel for sporet af aktier, der afvikles igennem systemerne, som også for pengestrømmene til betaling af aktierne.

At spore aktiehandlerne ved penge- og aktiestrømme er således ikke muligt.

Aktiehandler kan udelukkende dokumenteres af de involverede brokere og custodians. En ekstern tredjepart kan ikke eftervise en handel med dematerialiserede aktier.

Det kan derfor ikke forlanges af pensionsplanerne at fremlægge en sådan dokumentation. Dokumentationen for aktiehandlerne, der kan forlanges, er den af samtlige myndigheder forlangte dokumentation for en aktiehandel: en handelsnota, et custody statement og endelig en DCA, når der er modtaget udbytte.

Disse dokumenter er fremlagt i samtlige sager, i det omfang de stadig er til rådighed. Idet SKAT i 2014 og 2015 dog kun forlangte en DCA som dokumentation for ejerskabet af aktierne og modtagelsen af udbyttet, har pensionsplanerne ikke i samtlige tilfælde opbevaret yderligere dokumentation for ejerskabet af aktier og modtagelse af udbytte.

Alle øvrige processer sker rent elektronisk og efterlader ingen "spor", der kan dokumenteres i papirform.

Det er derfor ikke kun urimeligt, men også urealistisk at ville forlange en anden dokumentation fra pensionsplanerne end de fremlagte handelsnotaer, custody statements og DCA'er.

Man kan heller ikke underkende værdien af de fremlagte dokumenter, med den simple påstand at de stammer fra selskaber, der direkte eller indirekte er forbundet med Sanjay Shah.

For det første er der efter fire års (formodentlig og forhåbentlig) intensiv efterforskning af det såkaldte sagskompleks gennem SØIK, til dato stadig ingen anklage rejst mod Sanjay Shah, jf. også Justitsministerens svar af 2017 og 2018, der her fremlægges som bilag 109 og 110. De britiske anklagemyndigheder, der siden 2015 også har undersøgt sagen, har ligeledes ikke fremlagt nogen form for indicier for uretmæssig handling. Briterne har endog opgivet en arrest, de havde over Sanjay Shahs aktiver, i november 2018, jf. Crown Court i Londons ophævelse af restriktioner på Sanjay Shahs aktiver af den 10. december 2018, der fremlægges som bilag 111. Dette gør man ikke, hvis der foreligger holdbare indicier for strafbare handlinger. Alle påstande mod Sanjay Shah og hans selskaber er således fuldstændig udokumenterede.

For det andet lader påstanden mod Sanjay Shah netop til at lyde på, at hans selskaber skulle have udstedt falske dokumenter. Uden at bevise denne påstand argumenterer Skattestyrelsen således i ring for at diskvalificere den foreliggende og eneste mulige retsgyldige dokumentation for aktiehandlen. Et virkeligt bevis for, at dokumentation, der stammer fra Sanjay Shahs selskaber, skulle være falsk, frem-

lægger Skattestyrelsen ikke. Skattestyrelsen argumenterer udelukkende med, at transaktionerne skulle være "urealistiske" (15 gange i det sammenfattende indlæg), "utroværdige" (fire gange), "uden realitet" (seks gange), "usandsynlige" (15 gange), "umulige" (10 gange), "fiktive" (11 gange), "ikke have noget forretningsmæssigt rationale" (seks gange). Disse påstande leverer intet grundlag for, hvad der skulle være "falsk" ved den af Solo-gruppen udstedte dokumentation. Det ene- ste, disse påstande viser, er, at Skattestyrelsen øjensynligt ikke forstår aktielån og short selling og ikke har nogen erfaring med aktiehandel i så betydelig omfang, som det sker ved margin trading, udbyttearbitrage og algoritmisk handel.

**12.2.2 Dokumentation for modtagelse af udbyttet**

Enhver aktionær modtager udbyttet på sine aktier på en konto hos sin custodian, idet pengene kun kan finde sin vej fra selskabet til aktionæren gennem kæden af custodians og subcustodians.

Købes en aktie så kort før ex datoen, at køberen endnu ikke er registreret hos sin custodian som aktionær, når udbyttet først frem til sælgerens custodian. Senest når aktien bookes ud fra sælgers konto, ser dennes custodian salgsdatoen og ved dermed, at udbyttet i virkeligheden tilhørte køberen (jf. købelovens § 19). Sælgers custodian trækker derfor automatisk udbyttet fra sælger og overfører det til køberens custodian, for at denne kan kreditere beløbet på køberens konto. Denne proces kaldes "market claim-processen".

Market claim-processen kan kun gennemføres af de involverede custodians, da kun de kan se, at udbyttet skal føres videre til køberen, der endnu ikke var registreret på record day.

Optræder der en short seller på udbyttedatoen, fører short salget til, at der på udbyttedatoen er flere ejere af danske aktier, end svarende til antallet af aktier udstedt af selskabet. Short selleren er derfor nødt til at betale en kompensationsbetaling ind i systemet af custodians og subcustodians, idet køberen af en aktie ikke kan se, om den ultimative sælger er en long owner eller en short seller. Alle købere af aktier har dog ret til nettoudbyttet, der cirkulerer i systemet.

Det er derfor muligt at pengene, der når frem til køberen af aktierne under market claim-processen, i virkeligheden – helt eller delvist – oprindeligt stammer fra en short seller og er en kompensationsbetaling. Uanset hvad den oprindelige kilde til betalingen er, kan den dog kun nå frem til aktionæren via dennes custodian, da kun han ved, at aktionæren ejer aktierne.

Idet nettoudbyttet fra selskaberne sammenblandes uigenkaldeligt med nettokompensationsbetalingerne fra short sellerne allerede hos den første custodian i kæden, er det umuligt at identificere, hvad det er, hver enkelt aktionær modtager under market claim-processen.

Den eneste, der kan dokumentere, at aktionæren har modtaget et udbytte (eller en kompensationsbetaling, der ikke kan skelnes herfra), er den enkelte aktionærs egen custodian.

Den lovpligtige dokumentation for modtagelsen af et udbytte er en DCA. Af denne grund forlangte SKAT også oprindeligt en DCA.

Som der fremgår af ESMAs rapport af den 2. juli 2019, er dokumentationen for modtagelsen af et udbyttet en DCA. Denne skal udstedes af custodian, når der krediteres et nettoudbytte på en aktionærs konto. Dette, uafhængigt af om kilden til betalingen er selskabet selv eller en short seller – idet ingen i virkelighedens verden kan skelne et reelt nettoudbytte fra en netto-kompensationsbetaling.

Skattestyrelsens ønske om af følge en pengestrøm fra selskabet til enhver aktionær er – som ESMA dokumenterer det – ren utopi.

Ud over selve DCA'en kan en aktionær naturligvis også ved et kontoudtog vise, at han har modtaget et udbytte. Dette kontoudtog stammer dog ligeledes fra custodian.

Så længe Skattestyrelsen under udokumenterede påstande om svig begået af Solo-gruppen nægter at godkende dokumentation modtaget fra Solo-gruppen, kan der ikke eksistere nogen dokumentation for modtagelsen af udbytte. Skattestyrelsen kan ikke pålægge pensionsplanerne at fremlægge dokumentation, der ikke kan eksistere.

### 12.2.3 Dokumentation for modtagelse af udbytterefusion

Det bestrides ikke af Skattestyrelsen, at SKAT har udbetalt refusion.

Det bestrides øjensynlig heller ikke af Skattestyrelsen, at pensionsplanerne har modtaget udbytterefusionen, for hvorfor skulle SKAT ellers i juni 2018 have stævnet samtlige pensionsplaner i USA og England? Skattestyrelsen bekræfter i samtlige stævninger, at pensionsplanerne har modtaget refusion fra SKAT.

Modtagelsen af refusionen, som SKAT udbetalte, er også en logisk konsekvens af anmodningen om refusion, som var korrekt dokumenteret, med alt som SKAT forlangte.

Som det fremgår af anmodningerne om refusion, udbetalte SKAT umiddelbart refusionen til agenterne (Acupay, Goal Taxback etc.). Herfra blev refusionen overført til pensionsplanernes konto hos deres cuotodian, hvor midlerne var overdraget til sikkerhed under TTC-klausulen i custody agreement. Pengestrømmen, der viser tilgangen til pensionsplanerne, er derfor en overførsel fra agenterne til custodian henholdsvis Solo Capital, som var kontoførende for de øvrige selskaber i Solo- gruppen. Pensionsplanerne kunne via deres onlinetilgang til deres konto se, at refusionsbeløbene blev krediteret deres kontantkonto hos deres custodian. Når pensionsplanerne skulle betale gebyrer for de modtagne servicedelser, skete dette via anvisning til custodian, der så tog pengene ud af Solo Capitals kontantkonto i Barclays Bank.

Kontoudskrifterne fra Barclays Bank er kun Solo Capitals administrator (PwC) samt SØIK og det engelske NCA i besiddelse af.

Pensionsplanerne så intet behov for at fremstille et screen print af bogføringen af modtagelsen af udbytterefusionen på deres konto.

### 12.3 Ikke grundlag for at anfægte realiteten

I Skattestyrelsens sammenfattende indlæg af den 9. august 2019 har styrelsen i førersagerne som anført anfægtet den civilretlige realitet af de i sagen omtvistede transaktioner.

For det tilfælde at pensionsplanerne skulle få medhold i det civilretlige, synes Skattestyrelsen endvidere også at anfægte den skatteretlige realitet af de omhandlede transaktioner.

Dertil kommer, at Skatteankestyrelsen i kontorindstillingen har anført, at de omhandlede aktietransaktioner i realiteten ikke har passeret pensionsplanernes økonomi, således at der efter Skatteankestyrelsens opfattelse alene er tale om tomme bogføringer hos custodians uden skatteretlig realitet.

**12.3.1    Civilretten styrer vurderingen af det skatteretlige ejerskab**

Som anført ovenfor skal det lægges til grund, at de omhandlede aktietransaktioner civilretligt var gyldige.

Det gøres herefter gældende, at transaktionerne, herunder de omtvistede køb og salg af aktier, aktie-udlån og indgåelse af forwards også havde den fornødne skatteretlige realitet.

Således var pensionsplanerne også de skatteretlige ejere af det udbytte, der blev udbetalt til pensions-planerne, og som de bagvedliggende selskaber har indeholdt udbytteskatter af. Som følge heraf tilkommer de omhandlede refusioner af udbytteskatter også pensionsplanerne.

Der er således ikke grundlag for i skattemæssig henseende at anfægte de civilretligt gyldige handler mellem pensionsplanerne og de eventuelle short sellers, der kan have optrådt som ultimative sælgere.

Der skal i den forbindelse henvises til udgangspunktet i dansk skatteret: at civilretten er styrende for skatteretten.

Det er således den praktiske hovedregel, at civilretten er styrende, for hvilket faktum der skal lægges 156ilg rund for skatteretten,jf. Således bl.a. Søren Mørup i TfS 2002.665 og Jakob Bundgaards Skatteret & civilret, 2006, side 187.

Dette udgangspunkt gælder tillige i forhold til spørgsmålet om opnåelse af ejendomsret til aktier og derfor også spørgsmålet om pensionsplanerens retskrav på de i sagerne udbetalte refusioner af inde-holdt udbytteskat.

Der er således ikke grundlag for at anlægge en anden bedømmelse i skatteretlig henseende – med an-dre ord skal pensionsplanerne også i skatteretlig henseende anses for ejere af de omhandlede aktier, der civilretligt er overdraget til dem.

**12.3.2    Generelt om realitetsgrundsætningen**

Som anført ovenfor er det almindelige udgangspunkt, at den skatteretlige kvalifikation af faktum styres af den civilretlige kvalifikation af faktum.

Dette udgangspunkt kan – i særlige tilfælde – fraviges. Det antages således i store dele af teorien og i praksis, at der gælder en generalklausul om skatterettens realitet – ofte benævnt realitetsgrund-sætningen.

Realitetsgrundsætningen anvendes, i tilfælde hvor der er en klar uoverensstemmelse mellem den indre realitet og den ydre formelle fremtoning.

Realitetsgrundsætningen sikrer, at beskatningen ved skatteudnyttelser knyttes til realøkonomien og realindholdet i de dispositioner, som beskatningen skal ske i forhold til, snarere end til disposi-tionernes formelle iklædning.

Realitetsgrundsætningen formuleredes første gang af Jan Pedersen, der om realitetsgrundsætnings indhold har anført følgende i Skatteretten 1, 9. udgave, 2019, side 124ff:

*"Generalklausulens formål er at virke bestemmende for den retlige afgræns-
ning mellem skattetænkning og skatteunddragelse. Generalklausulen er ulov-
bestemt, men dannet af domstolens retsskabende virksomhed.*

*Dens hovedindhold er kravet om, at beskatningen ved skatteudnyttelser knyt-
tes til realøkonomien og realindholdet i de dispositioner, som beskatningen
skal ske i forhold til snarere end til dispositionernes formelle iklædning.*

*Generalklausulen anvendes ved en klar uoverensstemmelse mellem den indre
realitet og den ydre formelle fremtoning. I det praktiske retsliv vil realitetsbe-
dømmelsen naturligvis ofte kunne give anledning til tvivl.*

*Dette skyldes, at realitetsgrundsætningen snarere er et udtryk for en særlig
retlig metode til imødegåelse af skatteudnyttelse end en afgrænset retsregel
til brug for løsning af enkeltspørgsmål.*

*Realitetsgrundsætningens anvendelsesområde kan følgelig alene fastlægges
på grundlag af praksis.*

*Da grundsætningen anvendes på skatterettens mange og forskellige problem-
stillinger er det selvsagt vanskeligt at sammenfatte praksis i andet end pro-
grammæssige erklæringer.*

*[...]*

*Generalklausulen kan avendes til at tilsidesætte tomme og kunstige skattebe-
tingede dispositioner, således at beskatningen i stedet foretages i forhold til
den modstående realitet. Generalklausulen er dog ikke en arbitrær norm, som
kan anvendes til en beskatning efter forgodtbefindende.*

*Klausulen forudsætter en indiskutabel konstatering af, at almindelige og nor-
male forretningsmæssige dispositioner er tilsidesat til fordel for tomme og
skattebetingede dispositioner således, at dispositionernes form står i modsæt-
ning til deres reelle indhold."*

Til belysning af realitetsgrundsætningens indhold skal også henvises til det af Jan Pedersen anførte i
TfS 2000, 142, hvoraf følgende bl.a. fremgår:

*"Det er kendetegnende, at den skatteretlige retsanvendelse ikke retter sig
mod det økonomiske indhold af skatteydernes dispositioner. Derimod retter
beskatningen sig mod den civilretlige kvalifikation af disse dispositioner. Den
omstændighed, at en skatteyder har modtaget et beløb under nærmere an-
givne omstændigheder, har ikke selvstændig interesse for den skatteretlige
retsanvendelse. Først når dispositionen er kvalificeret i skatteretlig henseen-
de som løn, salg, gave, lån, køb, erhvervs- udøvelse osv., kan skattelovgivningen
anvendes på de således rubricerede civilretlige begivenheder. Selvom ind-
komstbeskatningen retter sig mod privatøkonomiske pengestrømme, hvoraf
nærmere angivne andele søges inddraget til samfundet, formår indkomstskat-
tesystemet alene at løse denne opgave ved hjælp af en forudgående civilretlig
kvalificering. Nogen skatteretlig sondring mellem formalitet og realitet i skat-
teydernes dispositioner er derfor ikke i almindelighed fornøden.*

*Det må imidlertid haves for øje, at skatteudnyttelse netop indebærer et mis-brug af den civilretlige styring. Gennem omgåelser eller måske endda pro-forma tilrettelægges dispositionerne på en sådan måde, at de i formen frem-træder på en i skatteretlig henseende fordelagtig måde, men dog således, at dispositionens faktiske og reelle indhold afviger herfra.*

*En række domstolsafgørelser illustrerer et sådant skisma mel- lem formalitet og realitet. F.eks. den berømte Havnemølledom, UfR 1960, s. 535 H, hvor den selskabsskatteretlige dobbeltbeskatning var søgt undgået ved, at en virksom-hedsgren var løftet ud af selskabet og overført til et interessentskab, som var stiftet til lejligheden af aktionærerne. Som udgangspunkt kan en sådan spalt-ning ikke kritiseres, men bedømmelsen må dog blive en anden, når udskillel-sen sker således, at den fysiske drift af interessentskabet fortsat varetages af selskabet, der samtidig bærer enhver risiko. Formålet med udskillelsen var da også alene at overføre en del af selskabets indkomst til interessentskabet. I driftsmæssig og realøkonomisk henseende var status quo, og udskillelsen havde ingen realitet. Ved Højesterets dom blev den overførte indkomst derfor anset som maskeret udbytte, idet indkomsten reelt var optjent af selskabet og derefter udloddet.*

*Kendetegnende for en del af skatteudnyttelserne er således, at den civilretlige form benyttes som en kulisse med henblik på at styre beskatningen i en for-delagtig retning. Dispositionerne karakteriseres ved en kunstig og usædvanlig form, idet skatteudnytteren alene ønsker at opnå de heraf følgende skatte-mæssige fordele, men ikke de tilsvarende civilretlige følger. Afståelser maske-res som langvarige lån eller brugsaftaler på en sådan måde, at "overdrage-ren" reelt opgiver sin ejendomsret, låneaftaler med tilhørende rentefradrag oprettes, uden at låntager er pålagt en reel økonomisk byrde etc.*

*Hovedindholdet i realitetsgrundsætningen er derfor, at beskatningen under visse betingelser kan rettes mod den faktiske økonomiske realitet på bekost-ning af den modstående civilretlige formalitet. Herved frigøres beskatningen fra den civilretlige styring, idet lovlige og retskraftige dispositioner frakendes skattemæssig betydning.*

*Realitetsgrundsætningen indebærer ikke hjemmelsmæssige problemer, idet normen ikke foreskriver fortolkninger eller analogislutninger ud over de be-rørte skatteloves klare ordgrænse. Realitetsgrundsætningen relaterer sig deri-mod til den præjudicielle fastlæggelse af det faktum, som skattelovene skal anvendes på. Nærmere bestemt gennemføres en prøvelse af, om den hæv-dede civilretlige form har en hertil svarende realitet.*
*Dette er malende beskrevet som kravet om, at dispositionerne skal være af "kød og blod". Realitetsgrundsætningen relaterer sig således til det faktumbe-stemmelsen snarere end lovfortolkningen.*

*Det må naturligvis præciseres, at realitetsgrundsætningen ikke indebærer en total formløshed, hvor "målet helliger midlet". Nogen arbitrær og uhjemlet beskatning giver grundsætningen ikke mulighed for. Dette sikres ved kravet om, at den civilretlige styring alene kan tilsidesættes, såfremt den hævdede form slet ikke svarer til de realøkonomiske realiteter.*

> *Grundet realitetsgrundsætningens natur er det dog – desværre – ikke muligt*
> *at angive mere konkrete og klare rammer for grundsætningens anvendelses-*
> *område."*

### 12.3.3 Realitetsgrundsætningen i retspraksis

Som anført er realitetsgrundsætningen ikke en fri adgang for skattemyndighederne til frit af gen-
nemføre en beskatning – der er således grænser for realitetsgrundsætningens anvendelse.

Til belysning af anvendelsen af realitetsgrundsætningen henvises i det følgende til en række afgø-
relser fra praksis.

De fremhævede afgørelser illustrerer netop, at realitetsgrundsætningen <u>ikke</u> er en arbitrær norm,
der kan anvendes til beskatning efter forgodtbefindende.

Fra praksis skal <u>for det første</u> henvises til Højesterets dom af den 30. oktober 2003, der er offentlig-
gjort i <u>TfS 2003, 889 H</u>.

Det i sagen omhandlede selskabet – Over-Hold ApS – købet et underskudselskab og besluttede ef-
terfølgende at omdanne selskabet til anpartsselskab og i samme forbindelse udvide anpartskapita-
len med kr. 120 mio.

Kapitaludvidelsen skete via et lån i selskabets moderselskab, og kapitaludvidelsen blev straks vide-
reudlånt til et andet koncernforbundet selskab, der anvendte beløbet til køb af aktier.

Alle transaktioner fandt sted samme dag.

Det erhvervede anpartsselskab modtog den samme rentebetaling, som selskabet ydede for lånet
hos moderselskabet.

Selskabet gjorde gældende, at den valgte fremgangsmåde var begrundet i et ønske om at etablere
en ordning, hvorved anpartsselskabet kunne udnytte adgangen til at fremføre tidligere års under-
skud til modregning i renteindtægter efter dagældende bestemmelser i ligningsloven

Landsskatteretten stadfæstede de stedlige skattemyndigheders nægtelse af retten til fradrag for
renter. Landsskatteretten lagde i den forbindelse til grund, at lånet ikke var forbundet med en reel
risiko for selskaberne, samt at selskabet ikke havde haft fri dispositionsret over låneprovenuet. Det
blev endvidere tillagt vægt, at selskabet ikke havde opnået indtægter ved dispositionerne, og at
derefter

Landsskatterettens opfattelse ikke var nogen forretningsmæssig begrundelse for at placere rente-
indtægten i det danske underskudsselskab Over-Trading A/S.

Vestre Landsret stadfæstede Landsskatterettens afgørelse. I den forbindelse lagde landsretten til
grund, at lånet ikke var forbundet med en reel risiko for selskaberne, samt at selskabet ikke havde
haft fri dispositionsret over låneprovenuet.

Det var endvidere blevet tillagt vægt, at selskabet ikke havde opnået indtægter ved dispositio-
nerne. Ved den påankede afgørelse var lånoptagelsen derfor ikke blevet tillagt skattemæssig betyd-
ning.

Højesteret lagde derimod vægt på, at fremgangsmåden til udnyttelse af adgangen til underskuds-fremførsel, der kunne have været etableret, uden at der var blevet ydet lån mellem de koncernfor-bundne selskaber, måtte karakteriseres som en <u>lovlig</u> udnyttelse af den udtrykkelige bestemmelse for finansielle underskudsselskaber i ligningslovens dagældende § 15, stk. 7, nr. 3.

Af Højesterets begrundelse fremgår følgende:

> *"Højesterets bemærkninger.*
>
> *Over-Hold ApS modtog ved låneoptagelsen hos Cirrus AB et provenu på 120 mio. kr. og anvendte det til en kontant kapital- forhøjelse i Over-Trading ApS, der var et finansielt underskuds- selskab, med henblik på indtjening i dette sel- skab. Over-Trading ApS udlånte beløbet til Bonnier Information Services A/S, som anvendte det til anskaffelse af aktier i A/S Børsen Holding.*
>
> *Den valgte fremgangsmåde var begrundet i et ønske om at etablere en ord- ning, som gjorde det muligt for Over-Trading ApS at udnytte den adgang til at fremføre tidligere års under- skud til modregning i renteindtægter, som be- stod efter de dagældende bestemmelser i ligningslovens § 15, stk. 1, jf. stk. 5 og stk. 7, nr. 3. En sådan ordning, der kunne have været etableret, uden at der blev ydet lån mellem de koncernforbundne selskaber, må karakteriseres som en lovlig udnyttelse af den udtrykkelige undtagelse for finansielle underskuds- selskaber i ligningslovens § 15, stk. 7, nr. 3.*
>
> *De omstændigheder, der er påberåbt af Skatteministeriet, giver på den an- førte baggrund ikke grundlag for at anse lånet fra Cirrus AB til Over-Hold ApS for at være uden realitet eller for at fastslå, at der er sket en vilkårlig forvrid- ning af selskabernes indkomstgrundlag. Højesteret tager herefter Over-Hold ApS' påstand til følge."*

Højesterets gav derfor selskabet medhold i dets påstand om rentefradrag.

Fra praksis skal <u>for det andet</u> endvidere henvises til Højesterets dom af den 7. december 2006, der er offentliggjort i SKM2006.749 H.

Sagen vedrørte spørgsmålet om, hvorvidt der var tale om et skattefrit salg af aktier til det udste- dende selskab eller reelt om en aktieoverdragelse til tredjemand, således at avancen var skatteplig- tig efter aktieavancebeskatningsloven § 2, i en situation hvor det udstedende selskab ikke finansie- rede tilbagekøbet med fri reserver, der var opsparet i selskabet, men ved et samtidigt kapitalind- skud.

Det omhandlede anpartsselskab, Finwill ApS, havde i februar 1999 erhvervet 50 pct. af aktiekapita- len (nominelt kr. 750.000) i et aktieselskab, Circuit Electric A/S. I april 1999 købte Circuit Electric A/S samtlige aktier tilhørende Finwill ApS. Accept af denne retshandel blev givet den 9. april 1999. Samme dato afholdtes ekstraordinær generalforsamling i Circuit Electric A/S. Her blev det besluttet at gennemføre en nedsættelse af aktiekapitalen med nominelt kr. 750.000, idet der samtidig gen- nemførtes en kapitalforhøjelse med nominelt kr. 750.000. De nye aktier tegne- des af selskabet He- deselskabet Miljø og Energi A/S.

Det fulgte af aktieselskabsloven, at der kunne gennemføres en samtidig kapitalnedsættelse og kapi- talforhøjelse, jf. lovens § 46, stk. 1, 1. pkt., og at en grænse på 10 pct. For erhvervelse af egne aktier

kunne overskrides, såfremt aktierne erhvervedes med henblik på en kapitalnedsættelse, jf. lovens § 48 B, nr. 1. Derfor går modellen under betegnelsen 'elevatormodellen'.

Skattemyndighederne anså imidlertid den overdragelse af aktier, der havde fundet sted fra Finwill ApS til Circuit Electric A/S, som værende sket direkte til Hedeselskabet Miljø og Energi A/S, hvorfor denne avance, der var blevet konstateret hos Finwill ApS, blev anset for at være skattepligtig i henhold til aktieavancebeskatningslovens § 2, stk. 1. Begrundelsen herfor var, at overførslen af aktier fra Finwill ApS til Hedeselskabet Miljø og Energi A/S var "camoufleret" som en kapitalforhøjelse og nedsættelse. Heroverfor anførte Finwill ApS, at der ikke havde været tale om en pro forma-retshandel, og at betalinger faktisk var sket i overensstemmelse med de trufne beslutninger.

Landsskatteretten lagde efter en samlet vurdering til grund, at der reelt var sket en overdragelse af aktierne fra anpartsselskabet direkte til Hedeselskabet Miljø og Energi A/S, hvorfor avancen heraf var skattepligtig for anpartsselskabet efter reglerne i aktieavancebeskatningsloven (aktieavancebeskatningslovens § 2, stk. 1). Begrundelsen herfor var, at der forelå en sådan sammenhæng mellem de fore- tagne dispositioner, at aktieafståelsen reelt måtte anses for at være sket til Hedeselskabet Miljø og Energi A/S.

Vestre Landsret stadfæstede denne afgørelse med følgende præmisser:

> "Det må lægges til grund, at A betingede sig, at overdragelse skete til selskabet alene med det formål at opnå skattefrihed. Den gennemførte model blev således foretrukket, fordi den antoges at medføre skattefrihed.
>
> Selskabet havde ikke selv midler til at købe aktierne. Overdragelsen forudsatte derfor tilvejebringelse af midler udefra. Købesummen blev tilvejebragt ved, at G1 Miljø og Energi A/S i forbindelse med tegning af en ganske tilsvarende aktiepost indbetalte købesummen til selskabet, der derefter udbetalte den til As selskab. Overdragelsen forudsatte en kapitalnedsættelse, som var betinget af en samtidig gennemført kapitalforhøjelse af samme størrelse, svarende til købesummen. Overdragelsen indebar derfor ingen ændring af aktiekapitalen eller egenkapitalens størrelse.
>
> De retlige konsekvenser for G1 Miljø og Energi A/S og selskabet må på den baggrund antages i alt væsentligt at ville have været de samme, uanset om en afståelse straks skete til G1 Miljø og Energi A/S eller til selskabet. Det samme gælder for As selskab. Der var ikke i øvrigt nogen forretningsmæssig begrundelse for, at afståelsen skete til selskabet frem for til G1 Miljø og Energi A/S.
>
> Under de anførte omstændigheder findes overdragelsen reelt at være sket til G1 Energi og Miljø A/S, der efter overdragelsen ejede selskabet 100 %, og overdragelsen til det udstedende selskab må anses for gennemført alene for at undgå skat. Det tiltrædes derfor, at overdragelsen er anset for skattepligtig.
> Overdragelsen findes således ikke – uanset at de selskabsretlige dispositioner var gyldige – at have karakter af en sådan overdragelse af aktier til det udstedende selskab, som efter ligningslovens § 16 B, stk. 1, jf. selskabsskattelovens § 13, stk. 1, nr. 2, ifølge Ligningsvejledningen 1999, S.C.1.2.4.3., kan ske skattefrit."

Landsskatteretten og Vestre Landsret anvendte således realitetsgrundsætningen.

Højesterets flertal (fem ud af syv dommere) kom imidlertid til et andet resultat. Af Højesterets dom fremgår følgende:

> "De almindelige regler om beskatning ved afståelse af aktier findes i aktieavance-beskatningsloven. Efter reglerne i den dagældende aktieavancebeskatningslov er fortjeneste skattepligtig, når den skattepligtige har erhvervet aktierne på et tids-punkt, der ligger mindre end tre år forud for afståelsen. Er aktionæren et aktiesel-skab, er fortjenesten skattefri ved en ejertid på tre år eller mere, jf. den dagæl-dende aktieavancebeskatningslovs § 4, stk. 6.
>
> I ligningslovens § 16 B er det imidlertid bestemt, at hele afståelsessummen er skattepligtig som udbytte, hvis aktionæren afstår aktier til det selskab, der har udstedt de pågældende aktier. Bestemmelsen omfatter ikke kun tilfælde, hvor ak-tionæren afhænder en del af sine aktier til det udstedende selskab, men også til-fælde, hvor aktionæren afhænder alle sine aktier til selskabet. Efter forarbejderne til bestemmelsen har den til formål at forhindre "aktionærerne i at opnå en lem-peligere beskatning ved at lade selskabet opkøbe egne aktier i stedet for på sæd-vanlig måde at foretage udlodning til aktionærerne", jf. Folketingstidende 1960-61, tillæg A, sp. 836.
>
> Efter den dagældende bestemmelse i selskabsskattelovens § 13, stk. 1, nr. 2, er aktieudbytte skattefrit, hvis det udbyttemodtagende selskab (moderselskabet) ejer mindst 25 % af aktiekapitalen i det udbyttegivende selskab (datterselskabet) i en sammenhængende periode på mindst et år, inden for hvilken periode udlod-ningstidspunktet skal ligge. Bestemmelsen har til formål at lempe den økonomi-ske dobbeltbeskatning af udloddede selskabsindkomster, jf. Folketingstidende 1975-76, tillæg A, sp. 4105.
>
> Samspillet mellem reglerne indebærer, at et moderselskabs fortjeneste ved salg af aktier i et datterselskab er skattefri ved opfyldelsen af kravet om et års ejertid, hvis aktierne afstås til datterselskabet, mens fortjenesten først er skattefri efter tre års ejertid, hvis aktierne sælges til anden side.
>
> Fem dommere – Torben Melchior, Per Sørensen, Lene Pagter Kristensen, Thomas Rørdam og Poul Dahl Jensen – udtaler herefter: Udbyttebegrebet i selskabsskatte-lovens § 13, stk. 1, nr. 2, omfatter også de afståelsessummer, der efter ligningslo-vens § 16 B, stk. 1, behandles som udbytte, jf. Meddelelser fra Skattedepartemen-tet 1982, afgørelse nr. 2. Det følger derfor af ordlyden af bestemmelserne, at Finwill ApS, der på afståelsestidspunktet den 9. april 1999 havde ejet 25 % af ak-tiekapitalen i Circuit Electric A/S i over et år, var berettiget til skattefrit at sælge alle sine aktier i Circuit Electric til dette selskab.
>
> Spørgsmålet i sagen er, om salget er skattefrit også i den foreliggende situation, hvor Circuit Electric ikke finansierede tilbagekøbet med frie reserver, der var op-sparet i selskabet, men hvor tilbagekøbet – som led i en udskiftning af selskabets aktionærkreds – blev finansieret med et samtidigt kapitalindskud, der fremkom ved, at Hedeselskabet Miljø og Energi A/S som indtrædende aktionær tegnede nye aktier i selskabet.

*Ændring af ejerforholdene i et aktieselskab kan gennemføres ved, at en aktionær sælger aktier direkte til en anden eller en ny aktionær. Det følger imidlertid af aktieselskabslovens § 44 a, stk. 1, nr. 2, og § 48 b, nr. 1, at ændring af ejerforholdene også kan gennemføres ved en kapitalnedsættelse, der kan kombineres med en samtidig kapitalforhøjelse, jf. lovens § 46. Det må lægges til grund, at de dispositioner, der er foretaget i forbindelse med Finwills udtræden som aktionær og Hedeselskabet Miljø og Energis indtræden, er sket i overensstemmelse med aktieselskabslovens regler.*

*Det fremgår af forarbejderne til ligningslovens § 16 B, at bestemmelsen er affattet i overensstemmelse med § 16 A, og at dette er sket ud fra et ønske om, at der ikke skal være forskel på den skattemæssige behandling af de tilfælde, hvor en aktionær sælger aktier til det udstedende selskab, og de tilfælde, hvor et selskab indløser en del af aktiekapitalen ved udlodning til aktionærerne, jf. Folketingstidende 1960-61, tillæg B, sp. 852. Efter forarbejderne til § 16 A omfatter denne bestemmelse enhver udlodning fra selskabet, uanset om denne hidrører fra indtjent overskud, indkomstskattefri formueforøgelser eller fra den kapital, der er indskudt i selskabet, jf. Folketingstidende 1960-61, tillæg A, sp. 833. Vi finder, at det må følge heraf, at § 16 B på samme måde må omfatte enhver afståelsessum fra selskabet, uanset om den hidrører fra indtjent overskud, indkomstskattefri formueforøgelser eller – som her – fra den kapital, som er indskudt i selskabet. Sådanne afståelsessummer er derfor skattefri, når betingelserne i selskabsskattelovens § 13, stk. 1, nr. 2, er opfyldt.*

*På denne baggrund finder vi, at det forhold, at det udstedende selskab, Circuit Electric, finansierede tilbagekøbet af aktierne fra Finwill med den kapital, som Hedeselskabet Miljø og Energi samtidig indskød i Circuit Electric, ikke kan føre til, at afståelsessummen ikke er omfattet af ligningslovens § 16 B, stk. 1, med deraf følgende mulighed for skattefrihed efter selskabsskattelovens § 13, stk. 1, nr. 2.*

*Det kan efter vores opfattelse ikke føre til et andet resultat, at Circuit Electric ikke forud for kapitalforhøjelsen rådede over tilstrækkelige midler til at finansiere tilbagekøbet, idet det må lægges til grund, at Hedeselskabet Miljø og Energis tegning af nye aktier for et beløb på 17.460.000 kr. modsvaredes af reelle værdier i Circuit Electric.*

*Vi finder herefter, at der ikke er grundlag for at nægte at anerkende, at afståelsessummen ved Finwills aktieoverdragelse til Circuit Electric er udbytte omfattet af ligningslovens § 16 B, stk. 1, og dermed skattefrit efter selskabsskattelovens § 13, stk. 1, nr. 2. Som følge af det anførte stemmer vi for at tage Finwills påstand til følge.*

*Dommerne Asbjørn Jensen og Marianne Højgaard Pedersen udtalte: Som anført af landsretten var det aftalt, at Hedeselskabet Miljø og Energi skulle købe Finwills aktiepost på 50 % af den samlede aktiekapital i Circuit Electric. Det må endvidere lægges til grund, at salgssummen herfor var aftalt til 17.460.000 kr. Alene for at undgå, at salgssummen skulle være omfattet af loven om aktieavancebeskatning, blev det herefter aftalt, at virksomhedsoverdragelsen skulle gennemføres som en kapitalnedsættelse i selskabet og en samtidig kapitalforhøjelse.*

*Efter selskabsskattelovens § 13, stk. 1, nr. 2, jf. ligningslovens § 16 B, stk. 1, er en salgssum skattefri, hvis den kan anses som udbytte. Formålet med § 13, stk. 1, nr. 2, er ifølge forarbejderne udelukkende at lempe dobbeltbeskatning ved udlodning til et moderselskab af datterselskabets indkomster, og formålet med ligningslovens § 16 B, stk. 1, er ifølge forarbejderne udelukkende at forhindre, at der kan opnås en lempeligere beskatning ved et salg til selskabet end ved en udlodning af udbytte.*

*Som anført af landsretten havde Circuit Electric ikke selv midler til at købe aktierne, og transaktionerne indebar ingen ændring af aktiekapitalen eller af egenkapitalens størrelse. Den aftalte kapitalforhøjelse i Circuit Electric havde ikke til formål at tilføre selskabet kapital, men var reelt Hedeselskabet Miljø og Energis betaling for Finwills aktier. Transaktionerne blev udelukkende tilrettelagt på denne måde og ikke som et direkte salg af aktierne, for at Finwill kunne undgå at blive beskattet af avancen ved salget. Ud over skattebesparelsen var der ingen forretningsmæssig begrundelse for den anvendte fremgangsmåde.*

*Under disse omstændigheder kan salgssummen efter vores opfattelse ikke anses for omfattet af selskabsskattelovens § 13, stk. 1, nr. 2. Vi tiltræder derfor, at afståelsessummen på de 17.460.000 kr. ikke kan fritages for beskatning, men skal beskattes efter de almindelige regler om beskatning af fortjeneste ved afståelse af aktier i aktieavancebeskatningsloven.*

*Det forhold, at forslaget til en ændring af ligningslovens § 16 B i lovforslag nr. L 87 i folketingsåret 1998-99 blev trukket tilbage, kan efter vores opfattelse ikke tages som udtryk for, at lovgivningsmagten herefter har accepteret, at salg af aktier kan tilrettelægges på en måde som den foreliggende, uden at fortjenesten omfattes af de grundlæggende regler om beskatning af avancer i aktieavancebeskatningsloven.*

*Vi stemmer derfor for at stadfæste dommen. Afgørelsen træffes efter stemmeflertallet.”*

Den ovenfor refererede Højesteretsdom kan således både ses som udtryk for den store betydning, som anvendelsen af civilretlige begreber har i skatteretten, jf. herom ovenfor. Dommen kan endvidere ses som udtryk for det forhold, at realitetsgrundsætningen ikke er en arbitrær norm, der giver skattemyndighederne muligheder for at gennemføre en beskatning efter forgodtbefindende.

Til illustration af realitetsgrundsætningen skal fra praksis <u>for det tredje</u> henvises til mindretallets dissens i Højesterets dom af den 24. august 2007, der er offentliggjort i TfS 2007, 752 H.

Sagen omhandlede spørgsmålet om, hvorvidt en kommanditist havde fradrag for renteudgifter i forbindelse med et kommanditselskabs deltagelse i et ejendomsinvesteringsprojekt.

Det fremgik af udbudsmaterialet, at der var budgetteret med et negativt driftsresultat over en periode på 20 år.

Erhvervelsen af ejendommen, der var erhvervet med en tilbagekøbsret til den oprindelige ejer og til en høj pris, var bl.a. finansieret ved et "sælgerpantebrev" uden personlig hæftelse. Det var vilkårene bestemt, at gælden blev reguleret *"med ud- svingene i forhold til debitors samlede indtægter og udgifter vedrørende ejendom- men"*. Herudover skulle gælden afdrages med kr. 350.000.

Spørgsmålet var herefter, om kommanditisten havde fradrag for renterne på det pågældende lån.

Landsskatterettens flertal stadfæstede skattemyndighedernes nægtelse af fra- dragsret med følgende begrundelse:

> *"Landsskatteretten skal udtale:*
>
> *To retsmedlemmer, herunder retsformanden, skal [...] vedrørende lån optaget hos S A/S [...] tilslutte sig [...], at der ikke kan indrømmes fradrag for renteudgifter heraf. Der er tale om lån ydet på non-recourse vilkår i et arrangement uden realø- konomisk risiko for skatteyderen, og lånet er udelukkende optaget af skattemæs- sige årsager. Disse to retsmedlemmer voterer derfor for, at klageren ikke indrøm- mes fradrag for renteudgifter af gæld til S A/S.*
>
> *Et retsmedlem skal bemærke, at K/S K's påtagelse af gælds- og renteforpligtelser ikke kan anses for at have reelt indhold [...]."*

Landsskatterettens afgørelse blev efterfølgende stadfæstet af Østre Landsret ved dom af den 19. ja- nuar 20007. Af landsrettens begrundelse fremgår følgende:

> *"Gældsbrevet var uden personlig hæftelse, men med nærmere angiven sikkerhed udstedt til sælgeren af den pågældende udlejningsejendom. Det indgik i et sam- menhængende kompleks af aftaler. Der er ikke fremkommet oplysninger, som kan afsvække den tilvejebragte formodning om, at købsprisen for ejendommen langt oversteg handelsværdien, hvorved bemærkes, at Skatteministeriet ikke har forholdt sig til afskrivningsgrundlaget. I betragtning af samtlige vilkår for over- dragelsen, sikkerhedsstillelsen og gældsopskrivningen er det ikke godtgjort, at kreditor nogensinde skulle modtage betaling svarende til fordringens pålydende. For øvrigt var investeringen efter udbudsmaterialet underskudsgivende og kunne kun give nettofordel efter skat.*
>
> *Betalingsforpligtelsen i henhold til gældsbrevet var på det samlede aftalegrund- lag forud begrænset til en årlig ydelse på 1.296 kr. pr. anpart. Der skulle ikke be- tales mere, fordi sælgeren mod sin nærmere fastsatte rådighedsadgang havde påtaget sig udgiftsrisikoen, og fordi aktualisering af den personlige hæftelse for kreditforeningslånet henset til sikkerheden og den aftalte berigtigelse af betalin- gerne var hypotetisk.*
>
> *Efter en samlet bedømmelse af arrangementet finder landsretten, at A ikke har haft nogen reel risiko for at skulle tilbagebetale og forrente sine andele af kre- ditsaldoen ifølge gældsbrevet. De posterede renteudgifter er herefter ikke fradragsberettigede. Den principale og den subsidiære påstand kan derfor ikke ta- ges til følge.*
>
> *Da han ikke har godtgjort, at arrangementet bortset fra gældsbrevet var reelt, kan de posterede udgifter ikke fradrages som løbende ydelse. Den mere subsi- diære påstand kan ej heller tages til følge.*
>
> *Herefter frifindes Skatteministeriet"*

Landsretten henså således særligt til fraværet af personlig hæftelse og købsprisen, der oversteg handelsværdien, samt til, at det ikke – i lyset af de særlige vilkår for sælgerpantebrevet – var godtgjort, at kreditor ville modtage betaling svarende til fordringens pålydende.

Retten henså endvidere til, at investeringen var underskudsgivende og kun kunne give en nettofordel efter skat. Under henvisning til fraværet af reel mulighed for tilbagebetaling og forrentning af lånet fandt retten, at renteudgifterne ikke var fradragsberettigede.

Landsretten kunne heller ikke tiltræde kommanditistens anbringende, hvorefter der skulle være selvstændig hjemmel til fradraget efter bestemmelsen om renteperiodisering i virksomhedsskattelovens § 6, stk. 2. Under hensyn til fraværet af realitet fandt retten heller ikke, at der kunne indrømmes fradrag for løbende ydelser. Skatteministeriet blev herefter i det hele frifundet.

Højesteret delte sig imidlertid med stemmerne tre-to. Højesterets flertal fandt ligesom landsretten ikke, at der var godtgjort, at der forelå en reel gældsforpligtelse, hvorfor hverken de betalte eller i øvrigt udgiftsposterede renter var fradragsberettigede.

I nærværende sammenhæng er det imidlertid Højesterets mindretals begrundelse, der er interessant. Af mindretallets begrundelse fremgår følgende:

> " *Dommerne Lene Pagter Kristensen og Niels Grubbe udtaler:*
>
> *Det er ubestridt, at K pr. 31. december 1992 ved en civilretligt gyldig overdragelse erhvervede ejendommen fra S, og skatte- myndighederne har anerkendt, at overdragelsen også lægges til grund i skattemæssig henseende, således at selskabet som ejer havde mulighed for at foretage skattemæssige afskrivninger på ejendommen. Det er endvidere ubestridt, at K drev erhvervsmæssig virksomhed med udlejning af ejendommen og som led heri med skattemæssig virkning oppebar lejeindtægter og afholdt sædvanlige ejendomsudgifter og renter på kreditforeningsgælden.*
>
> *Sagen angår således alene spørgsmålet, om rentefradrag skal nægtes, under henvisning til at gældsbrevet ikke i skattemæssig henseende var udtryk for en reel skyld til S.*
>
> *Gældsbrevet blev oprettet som led i berigtigelsen af købet og skulle navnlig dække restkøbesummen samt K's løbende driftsunderskud vedrørende ejendommen.*
>
> *S havde selv erhvervet ejendommen pr. 1. maj 1990 ved et køb i almindelig fri handel mellem uafhængige parter for en kontant købesum på 27,2 mio. kr. Videresalget til K 2½ år senere skete til en pris, der svarede til anskaffelsessummen, 27,9 mio. kr., med tillæg af projekt- og salgsokkostninger, i alt 30,4 mio. kr. Ejendommen var da fuldt udlejet, og lejen var noget større end ved købet. Der blev endvidere ved videresalget – men ikke ved erhvervelsen – stillet en 10-årig garanti for den aktuelle nettoleje med en årlig akkumuleret forhøjelse på 3 % svarende til den aftalte lejeregulering. Den garanterede nettoleje på 1.765.000 kr. gav K et årligt afkast, der før renter og skat udgjorde 5,8 % af anskaffelsessummen på 30,4 mio. kr. i det første år og steg med 3 % årligt. På denne baggrund finder vi, at det ikke er sandsynliggjort, at købsprisen oversteg handelsværdien. Dette gælder, uanset de foreliggende – summariske – oplysninger om afhændelsen af ejendommen i 2003, og uanset den offentlige ejendomsvurdering, S' opfattelse af markedssituationen og det statistiske materiale om kontantpriser for forretningsejendomme.*

*Forpligtelsen i henhold til gældsbrevet var sikret bl.a. ved håndpant i et ejerpantebrev på 6 mio. kr. med sikkerhed i ejendommen efter kreditforeningslånet og ved transport i lejeindtægterne. Disse goder udgjorde reelle aktiver for K, som således – ud over hæftelse for gælden – ved sikkerhedsstillelsen påtog sig en formueopofrelse. Selvom projektet var tilrettelagt*

*med henblik på at eliminere risiko for tab, havde K således en risiko, men på grund af kommanditselskabets vedtægter og låneaftalens bestemmelse om begrænset hæftelse (non-recourse vilkår) indebar dette ikke en risiko for, at kommanditisterne led tab ud over deres pligt til at foretage indskud og løbende indbetalinger. Denne risikobegrænsning for kommanditisterne er ikke i sig selv til hinder for, at de kan få ret til fradrag for renter på lånet.*

*Vi finder – i modsætning til flertallet – at K uanset sikkerhedsstillelsen for gældsbrevet og S' købe- og forkøbsret havde reel adgang til at råde retligt og faktisk over ejendommen.*

*Vi finder endvidere – i modsætning til flertallet – at K havde reel mulighed for gevinst ved afhændelse af ejendommen. Denne mulighed bestod også i tilfælde af S' udnyttelse af køberetten, såfremt nettolejeindtægten steg med mere end de forudsatte 3 % årligt, eller rentebyrden blev mindsket ved om- prioritering af kreditforeningslånet eller lånet hos S.*

*Selvom projektet var etableret med henblik på en 10-årig projektperiode, var K ikke bundet til denne periode, men kunne afvikle gælden til S forinden eller afhænde ejendommen før periodens udløb. Hvis S ikke gjorde køberetten gældende i løbet af 10-års perioden, kunne K beholde ejendommen, og alt efter udviklingen i leje- og renteniveauet var dette efter vores opfattelse ikke kun en teoretisk mulighed.*

*Under disse omstændigheder finder vi ikke grundlag for at fastslå, at realiteten i de indgåede aftaler alene var, at kommanditisterne købte sig til et midlertidigt formelt gældsforhold med henblik på at opnå bl.a. det omstridte rentefradrag, og dermed heller ikke for at fastslå, at det af K udstedte gældsbrev ikke i skattemæssig henseende var udtryk for en reel skyld til S. Herefter er A berettiget til rentefradrag.*

*Efter virksomhedsskattelovens § 6, stk. 2, fordeles fradrag for renteudgifter mv. over den periode, renteudgifterne vedrører. Denne bestemmelse fraviger de almindelige regler i ligningslovens § 5, stk. 1 og 2, om periodisering af rentefradrag, men den kan efter sin ordlyd ikke antages at fravige bestemmelsen i ligningslovens dagældende § 5, stk. 7 (nu stk. 8), hvorefter rentefradraget i visse tilfælde begrænses til betalte renter. Denne forståelse har også støtte i bemærkningerne til § 6, stk. 2, i lovforslaget til virksomhedsskatteloven (Folketingstidende 1985/86, Tillæg A, sp. 2629).*
*Det er ubestridt, at bestemmelsen i ligningslovens dagældende § 5, stk. 7, 1. pkt., isoleret set i det foreliggende tilfælde vil føre til en begrænsning af rentefradraget til de beløb, som A har nedlagt subsidiær påstand om. Vi finder, at A ikke er undtaget fra denne begrænsning som følge af bestemmelsen i 2. pkt. om betaling eller sikkerhedsstillelse for forfalden gæld. Heller ikke 3. pkt. finder anvendelse, allerede fordi S ikke tilhører nogen af de kategorier af kreditorer, som denne bestemmelse an går.*

*Vi stemmer herefter for at tage A's subsidiære påstand til følge."*

Højesterets mindretals begrundelse er således udtryk for, at den skatteretlige realitetsgrundsætning ikke kan anvendes til at tilsidesætte enhver uoverensstemmelse mellem form og indhold, idet mindretallet kan siges at have opretholdt formaliteten i sagen, jf. herved mindretallets bemærkning om, at der var ikke grundlag for at fastslå, at realiteten i de indgåede aftaler alene var, at kommanditisterne købte sig til et midlertidigt for-

melt gældsforhold med henblik på at opnå bl.a. det omstridte rentefradrag, hvorfor der ikke var grundlag for at fastslå, at gældsbrevet ikke i skattemæssig henseende var udtryk for en reel skyld.

Tilsvarende skal der <u>for det fjerde</u> henvises til mindretallets dissens i Højesterets dom af den 25. november 1999, der er offentliggjort TfS 1999, 950 H.

Sagen omhandlede spørgsmålet om, hvorvidt et selskab (J.S. Ejendoms- og Investeringsselskab A/S (tidligere Jysk Sengetøjslager A/S), der var en del af Jysk Sengetøjslager-koncernen, havde ret til fradrag for provisions-betalinger til selskabet Hobby Hall A/S, som selskabet var sambeskattet med.

Ved aftale af den 25. august 1989 blev det mellem Jysk Sengetøjslager A/S og Hobby Hall A/S aftalt, at Hobby Hall A/S skulle forestå det samlede indkøb til Jysk Sengetøjslager A/S, og at der betaltes en provision fra Jysk Sengetøjslager A/S til Hobby Hall A/S som vederlag for det udførte arbejde. Provisionen aftaltes til 5 pct. Af indkøbet.

Aftalen blev senere af revisor suppleret med oplysning om, at Hobby Hall A/S foretog de samlede indkøb til koncernen, herunder leverancer til udenlandske datterselskaber og samarbejdspartnere.

Fastlæggelsen af varesortimentet skete i samarbejde mellem indkøberne og ansatte i det klagende selskab. Varekontrollen blev foretaget af indkøberne, og Hobby Hall A/S afholdt de hermed forbundne udgifter.

Dette gjaldt bl.a. løn, gager og rejse-, kørsels-, lokale- og administrationsomkostninger. Udover Jysk Senge-tøjslager A/S' hovedaktionær var tillige ansat en direktør og fire-fem indkøbere i Hobby Hall A/S.

Indkøbsvirksomheden udøvedes fra lejede lokaler i Silkeborg.

Indkøbsfunktionen skete i Jysk Sengetøjslager A/S' navn og for Jysk Sengetøjslager A/S' regning og risiko.

De indkøbte varer leveredes og faktureredes direkte til Jysk Sengetøjslager A/S, ligesom Jysk Sengetøjslager A/S viderefakturerede til udenlandske datterselskaber for eventuelle leverancer.

Hobby Hall A/S modtog en provision på 5 pct. Af Jysk Sengetøjslager A/S' samlede indkøb.

I perioden fra den 1. september 1989 til den 31. august 1990 betalte Jysk Sengetøjslager A/S en provision til Hobby Hall A/S på kr. 21.884.788.

De stedlige skattemyndigheder nægtede imidlertid Jysk Sengetøjslager A/S fradrag for størstedelen af den betalte provision og forhøjede ansættelsen med kr. 18.468.059, idet de til indkøbsfunktionen afholdte ud-gifter efter skattemyndighedernes opfattelse kunne skønnes til at udgøre kr. 3 mio., mens resten af provi-sionen blev anset som et ikke-fradragsberettiget tilskud.

Landsskatteretten stadfæstede skattemyndighedernes afgørelse, idet Landsskatteretten var af den opfat-telse, at den foretagne overdragelse af indkøbsfunktionen ikke kunne anerkendes skattemæssigt

Herved henså Landsskatteretten til, at der for Hobby Hall A/S ikke bestod nogen erhvervsmæssig risiko, idet selskabet handlede i Jysk Sengetøjslager A/S' navn og for dette selskabs regning og risiko.

Ordningen fandtes efter Landsskatterettens opfattelse derfor ikke at være forretningsmæssig begrundet, og i den forbindelse henviste Landsskatteretten til selskabets revisors skrivelse af den 28. august 1992, hvoraf fremgik, at Hobby Hall A/S' funktion alene var at foretage indkøb til Jysk Sengetøjslager A/S, idet sidst-nævnte selskab foretog faktureringer til datterselskaber mv. Ordningen fandtes herefter alene at være etableret for at overføre indkomster til Hobby Hall A/S, hvorfor Landsskatteretten stadfæstede skattemyn-dighedernes afgørelse.

Vestre Landsret stadfæstede ved dom af den 11. december 1997 Landsskatterettens afgørelse i sagen med den begrundelse, at de aftalte vilkår mellem Hobby Hall A/S og moderselskabet ikke kunne anses for sæd-vanlige forretningsmæssige vilkår.

Ligesom Vestre Landsret fandt Højesterets flertal også, at der ikke var grundlag for at anerkende opsplitnin-gen af indkøbsfunktionen. Af flertallet fandt således, at aftalen afveg fra normale, forretningsmæssigt be-grundede funktionsopdelinger, at den ordning måtte tilsidesættes i skattemæssig henseende.

I nærværende sag er det imidlertid Højesterets mindretals begrundelse, der er interessant.

Mindretallet anerkendte i princippet den selskabsretlige konstruktion, om end den ydede provision ikke kunne anerkendes i størrelsesmæssig henseende. Af mindretallets begrundelse fremgår følgende:

> "Dommerne Walsøe og Jytte Scharling udtaler:
>
> Den af Hobby Hall udførte indkøbsfunktion kan som anført ikke anses for en sædvanlig agenturvirksomhed, men har karakter af løbende udførelse af indkøbsopgaver for det interessefor- bundne J.S. Ejendoms- og Investeringsselskab.

> *På grundlag af oplysningerne om Jysk Sengetøjslager-koncernens art og størrelse samt de afgivne forklaringer må det efter vores opfattelse lægges til grund, at overførslen af indkøbsfunktionen til et selvstændigt selskab inden for koncernen også tjente forretningsmæssige hensyn. Vi finder herefter, at der ikke er grundlag for skattemæssigt helt at se bort fra aftalen af 25. august 1989.*

> *Aftalen er imidlertid indgået mellem interesseforbundne parter, og af de grunde, der er anført af landsretten, tiltræder vi, at det må anses for usandsynligt, at appellanten ville overlade indkøbsopgaver på tilsvarende vilkår til en udenforstående virksomhed.*

> *Hobby Hall afholdt udgifterne til personale, lokaler, kørsel og administration, og Hobby Hall's udførelse af indkøbsfunktionerne ville med hensyn til kvalitet, priser m.v. være af en vis betydning for appellantens indtjening. På denne baggrund må det antages, at det også ville være normalt forretningsmæssigt begrundet at tilsige en koncernforbundet virksomhed en fortjeneste for udførelsen af indkøbsfunktionerne for appellanten.*

> *Under hensyn til Hobby Hall's omkostninger ved indkøbsvirksomheden og den særdeles begrænsede økonomiske risiko overstiger den aftalte provision på 5% af omsætningen imidlertid i betydelig grad, hvad der kunne opnås mellem uafhængige parter.*

> *På denne baggrund stemmer vi for at tage parternes subsidiære påstande om sagens hjemvisning til fornyet behandling ved ligningsmyndighederne til følge."*

Som det ses, anerkendte Højesterets mindretal i princippet opsplitningen af indkøbsfunktionen – dvs. den foretagne selskabsretlige konstruktion.

Højesterets dom illustrer endvidere det faktum, at realitetsgrundsætningen ikke finder anvendelse ved blot enhver uoverensstemmelse.

Endvidere kan der <u>for det femte</u> henvises til Vestre Landsrets dom af den 27. juni 2002, der er offentliggjort TfS 2002, 760 V.

Sagen drejede sig om, hvorvidt en leasingvirksomhed, som blev drevet af et leasingselskab, ophørte, før eller senest samtidig med at samtlige aktier i leasingselskabet pr. 1. september 1992 blev overdraget af Aktivbanken A/S til sagsøgeren, Bilka Lavprisvarehus A/S, der herefter blev sambeskattet med leasingselskabet, og om leasingselskabet på dette tidspunkt havde afhændet samtlige sine driftsmidler, med den konsekvens at selskabets afskrivningssaldo vedrørende driftsmidlerne skulle fradrages skattemæssigt i regnskabsåret 1992 (skatteåret 1993/1994) efter den dagældende afskrivningslovs § 6.

Aktivbanken, der var eneaktionær i et leasingselskab, havde afhændet aktierne i leasingselskabet til Bilka.

Leasingselskabet havde en stor uudnyttet afskrivningssaldo, og købsprisen var fastsat som leasingselskabets egenkapital med et tillæg på kr. 49 mio., der blev beregnet på grundlag af en forventet skattemæssig værdi af leasingaktiverne.

Leasingselskabet havde ved overdragelsen intet personale, og der blev ikke indgået flere kontrakter.

Landsskatteretten stadfæstede skattemyndighedernes afgørelse med følgende begrundelse:

> *"Landsskatteretten skal udtale*

> *Ud fra en samlet vurdering af kontraktmaterialet og de gennemførte dispositioner i forbindelse med Bilkas overtagelse af Leasingselskabet finder Landsskatteretten i*

*overensstemmelse med skattemyndighedernes synspunkt at måtte lægge til grund, at samtlige driftsmidler i Leasingselskabet – uanset det formelle grundlag – reelt må anses for overdraget, inden Bilka overtog selskabet, og at hele den hidtidige erhvervsmæssige aktivitet dermed var ophørt på dette tidspunkt.*

*Landsskatteretten har herved henset til de fra skattemyndighedernes side fremførte anbringender til støtte for synspunktet, idet retten særlig har lagt vægt på, at der efter Bilkas overtagelse af Leasingselskabet ingen faktisk aktivitet har været i dette, ligesom der i kraft af de indgåede aftaler ikke har været nogen økonomisk risiko eller nogen mulighed for yderligere indtægtserhvervelse forbundet med leasingaktiviteten.*

*Da retten er enig med Kammeradvokaten i, at der ikke har bestået nogen interessemodsætning mellem Bilka og Aktivbanken for så vidt angår den fortsatte formelle placering af en leasingaktivitet i Leasingselskabet med henblik på at kunne udnytte selskabets afskrivningsgrundlag skattemæssigt, og da retten endvidere kan tiltræde det af Kammeradvokaten anførte vedrørende realitetsgrundsætningen, finder retten, at den af skattemyndighederne foretagne omkvalifikation af de indgåede aftaler har været berettiget. Da retten endelig er enig i de foretagne ændringer af skatteansættelserne under de anførte forudsætninger, stadfæstes de påklagede ansættelser"*

Skatteministeriet gjorde gældende, at selskabets leasingaktiviteter i skattemæssig henseende blev afstået samtidig med salget af selskabet, idet aktiviteterne efter dette tidspunkt savnede realitet. Tab ved afhændelse af driftsmidlerne skulle derfor fratrækkes samme skatteår. Da leasingselskabets sambeskatning med det købende selskab først blev etableret det efterfølgende skatteår, kunne det konstaterede underskud efter Skatteministeriets anbringende ikke anvendes i sambeskatning med det købende selskab.

Skatteministeriet anførte til støtte for anbringendet om fravær af realitet, at der havde foreligget et interessefællesskab mellem det sælgende og det købende selskab på grundlag af sammenfaldende skattemæssige interesser, samt endvidere, at der var indgået aftaler, der eliminerede tabsrisiko og gevinstmulighed knyttet til leasingaktiverne.

Det blev hermed gjort gældende, at det sælgende selskab i realiteten havde frakøbt leasingaktiverne, således at leasingaktiviteterne forblev hos sælgeren efter overdragelsen af aktierne i selskabet.

Landsretten lagde til grund, at salget af selskabet var skattemæssigt betinget, og at der efter salget ikke foregik nogen reel aktivitet i leasingselskabet.

Landsretten lagde imidlertid vægt på, at der fortsat blev drevet leasingvirksomhed på grundlag af leasingkontrakterne, herunder med de aktiver, som leasingselskabet fortsat i hvert fald formelt ejede.

En fælles skattemæssig interesse, driftsrisikoens forbliven hos sælgeren samt det forhold, at sælgeren efter salget fortsat over for leasingtagerne fremstod som ejer af leasingaktiviteterne, kunne ikke begrunde, at det havde været hensigten at ændre ved ejerforholdet til leasingaktiverne.

Ved landsrettens dom blev Skatteministeriet herefter dømt til at anerkende arrangementets realitet.

Fra praksis skal der <u>for det sjette</u> henvises til Højesterets dom af den 10. juni 1997, der er offentliggjort TfS 1997, 506 H.

Sagen omhandlede en hovedaktionærs optagelse af lån i et behersket skattelyselskab.

Den i sagen omhandlede skatteyder, der i årene 1980-92 var bosiddende i Belgien, var alene skattepligtig i Danmark af erhvervsindtægter og erhvervsformue.

Skatteyderen foretog for 1985 fradrag for renter af lån i sin skattepligtige indkomst og for 1986 fradrag for gæld i sin skattepligtige formue som følge af et lån på kr. 4 mio. ydet af et af ham stiftet selskab på Jersey til hans personligt drevne virksom- hed i Danmark.

Lånet på kr. 4 mio. blev ydet af et af skatteyderen stiftet selskab på Jersey den 13. september 1985 til skat-teyderens personligt drevne virksomhed i Danmark, Ejendomscenteret, som indfriede dette etårige finans-lån den 15. september 1986. Som långiver havde skatteyderen underskrevet for Jersey-selskabet ifølge fuldmagt, og som låntager havde Ejendomscenteret v/skatteyderen underskrevet.

Skatteyderen havde fra selskabet modtaget uigenkaldelig fuldmagt til at foretage alle dispositioner vedrø-rende selskabets værdipapirer, og det omhandlede lånedokument var underskrevet af skatteyderen for lån-giveren ifølge fuldmagt og af skatteyderen som låntager for virksomheden.

Skattemyndighederne godkendte ikke disse fradrag, med den begrundelse at skatteyderen i realiteten både var kreditor og debitor i låneforholdet. Lånets formelle eksistens blev ikke anfægtet.

Skatteyderen påklagede skattemyndighedernes afgørelse til Landsskatteretten, som stadfæstede de fore-tagne ansættelser.

Skatteyderen indbragte herefter sagen for landsretten, hvor skatteyderen dels nedlagde påstand om, at Skatteministeriet blev tilpligtet at anerkende, at skatteyderens skattepligtige formue i Danmark for indkom-ståret 1985 blev reduceret med kr. 4 mio., dels nedlagde påstand om, at Skatteministeriet blev tilpligtet at anerkende, at skatteyderen i sin skattepligtige indkomst i Danmark for indkomståret 1985 var berettiget til at fradrage renter på kr. 126.000 og for indkomståret 1986 var berettiget til at fradrage renter på kr. 229.556.

Skatteyderen gjorde under sagen gældende, at Jersey-selskabet var et lovligt etableret og bestående sel-skab efter lovgivningen på Jersey. Selskabet skulle som følge heraf anerkendes i Danmark som et selvstæn-digt skattesubjekt. Lånet af den 10. september 1985 på kr. 4 mio. var indgået mellem to selvstændige rets-subjekter med Jersey-selskabet som kreditor og skatteyderen som debitor, og lånet skulle derfor anerken-des i skatteretlig henseende, idet lånet var indgået på sædvanlige forretningsmæssige og uanfægtelige vil-kår. Skatteyderen havde ikke bestemmende indflydelse i Jersey-selskabet, der havde en selvstændig besty-relse, som skatteyderen end ikke var medlem af.

Endelig gjorde skatteyderen gældende, at lånevilkårene var sædvanlige og almindelige markedsvilkår. Der var ingen sammenblanding af parternes interesser i forbindelse med lånet, som også blev indfriet rettidigt.

Landsretten lagde til grund, at hovedformålet med selskabets eksistens og overdragelsen af pantebrevene har været at opnå skattemæssige fordele.

Landsretten lagde endvidere til grund, at skatteyderen i den relevante periode havde været enerådende i selskabet på Jersey (Zartok Ltd.)., som havde sit udspring i Danmark, hvorfra selskabet også blev drevet. Skatteyderen havde efter landsrettens opfattelse ikke dokumenteret eller på anden måde sandsynliggjort nogen forretningsmæssig begrundelse for driften og eksistensen af Zartok Ltd. El- ler for det lån, som dette selskab ydede til sagsøgers i Danmark personligt drevne virksomhed, Ejendomscentret Nordbo Huse.

Derfor fandt landsretten, at skatteyderens lånoptagelse på kr. 4 mio. hos selskabet på Jersey burde fraken-des skattemæssig betydning

Højesteret fandt derimod, at optagne lån hos selskabet på Jersey havde den fornødne realitet og derfor burde anerkendes, og Højesteret statuerede, at den aftalte rentesats svarede til armslængdevilkår.

Af Højesterets – kortfattede – begrundelse fremgår følgende:
> *"Sagen angår alene det lån, som Tage S. Nielsens personlige firma, Ejendomscentret*
> *Nordbo Huse, i september 1985 optog hos Zartok Ltd. Zartok Ltd. Var et på Jersey lov-*

*ligt oprettet og bestående selskab, og lånet, som afløste danske banklån, blev ydet på almindelige markedsvilkår.*

*Højesteret finder, at låneoptagelsen havde karakter af en sædvanlig forretningsmæssig disposition til finansiering af virksomhedens drift. Der er derfor ikke grundlag for at frakende lånet skattemæssig betydning.*

*Højesteret tager herefter appellantens påstand til følge."*

Fra praksis skal der <u>for det syvende</u> henvises til Højesterets dom af den 16. april 1997, der er offentliggjort i TfS 1997, 392 H.

Sagen omhandlede et dansk selskab, der havde foretaget en del af sin eksport gennem en behersket anstalt i Liechtenstein til en pris svarende til blot 50 pct. Af faktureringsprisen ved salg direkte fra moderselskab.

Det var skattemyndighedernes opfattelse, at der forelå en mellemfakturering uden selvstændig økonomisk realitet, hvorfor anstaltens indkomst blev tilbageført til det danske moderselskab.

Landsskatteretten stadfæstede skattemyndighedernes afgørelse. I den forbindelse lagde Landsskatteretten til grund, at der ved salget af de omhandlede varer gennem selskabet i Liechtenstein var foregået en underfakturering på ca. 50 pct., hvilket fremgik af, at de faktisk opnåede priser ved videresalget til firmaerne i Holland og Tyskland var omtrentlig de dobbelte af de til firmaet i Liechtenstein fakturerede priser.

Landsskatteretten lagde endvidere vægt på, at selskabet i Liechtenstein var uden ansatte, lokaler og erhvervsmæssig aktivitet, hvorfor selskabet efter Landsskatterettens opfattelse måtte anses for et i skattemæssig henseende ikke-eksisterende selskab.

Vestre Landsrets flertal gav sagsøgeren medhold, idet flertallet lagde til grund, at salget gennem selskabet i Liechtenstein skete, til priser der ikke væsentligt afveg, fra de priser der blev anvendt ved salg til andre udenlandske aftagere. Uanset om disse priser var ca. 50 pct. Lavere, end de priser der anvendtes ved salg til danske kunder, og uanset om der var tale om priser ved salg til mellemhandlere, fandtes der herefter ikke at være grundlag for at statuere, at der er sket en indkomstoverførsel til selskabet i Liechtenstein, som ikke skulle respekteres af skattemyndighederne.

Højesterets flertal stadfæstede landsrettens afgørelse, idet Højesterets flertal lagde til grund, at ejeren af det danske selskab gennem selskabet i Liechtenstein i et ikke nærmere oplyst omfang drev virksomhed i form af videresalg af de om- handlede produkter til bl.a. Sverige.

Højesterets flertal lagde endvidere til grund, at salget til selskabet i Liechtenstein som mellemhandler skete, til priser der ikke væsentligt afveg fra de priser, der blev anvendt i forhold til andre udenlandske aftagere. Derfor fandt Højesterets flertal, at det var betænkeligt at anse det for godtgjort, at salget til selskabet i Liechtenstein var sket på sådanne vilkår, at der herved forelå en overførsel af indkomst, der rettelig tilkom det danske moderselskab.

Højesterets flertal statuerede således, at det foretagne mellemsalg havde den fornødne realitet, og statuerede ovenikøbet, at den fastsatte mellemfaktureringspris svarede til armslængdeprisen, dvs. værdien ved salg til tredjemand.

### 12.3.4 Realitetsgrundsætningen i den juridiske litteratur

Som anført ovenfor har realitetsgrundsætningen også været indgående behandlet i den juridiske litteratur.

I sin tid blev realitetsgrundsætningen formuleret af professor Jan Pedersen i doktordisputatsen "Skatteudnyttelse" fra 1989.

I sin doktorafhandling lagde Jan Pedersen til grund, at <u>civilretten i udgangspunktet er styrende for skatteret-</u><u>ten</u>.

I udgangspunktet retter den skatteretlige retsanvendelse sig således <u>ikke</u> mod det økonomiske indhold af skatteydernes dispositioner – men mod den civilretlige kvalifikation af disse dispositioner.

Med andre ord har den omstændighed, at en skatteyder eksempelvis har modtaget et beløb under nærmere angivne omstændigheder, ikke selvstændig interesse for den skatteretlige retsanvendelse. Først når dispositionen er kvalificeret i civilretlig henseende som løn, salg, gave, lån, køb, erhvervsudøvelse osv., kan skattelovgivningen anvendes på de således rubricerede civilretlige begivenheder.

Den skatteretlige kvalificering forudsætter således en forudgående civilretlig kvalificering. Derfor er der i udgangspunktet ikke behov for en skatteretlig sondring mellem formalitet og realitet i skatteydernes dispositioner.

Imidlertid er der risiko for misbrug af ovennævnte civilretlige styring.

Gennem omgåelser eller måske endda proforma kan dispositionerne tilrettelægges, på en sådan måde at i de i formen fremtræder på en i skatteretlig henseende fordelagtig måde, men dog således at dispositionernes faktiske og reelle indhold afviger herfra.

Kendetegnende for en del af skatteudnyttelserne er således, at den civilretlige form benyttes som en kulisse med henblik på at styre beskatningen i en fordelagtig retning.

Dispositionerne karakteriseres ved en kunstig og usædvanlig form, idet skatteud- nytteren alene ønsker at opnå de heraf følgende skattemæssige fordele, men ikke de tilsvarende civilretlige følger. Afståelser maskeres som langvarige lån eller brugsaftaler, på en sådan måde at "overdrageren" reelt opgiver sin ejendomsret, låneaftaler med tilhørende rentefradrag oprettes, uden at låntager er pålagt en reel økonomisk byrde etc.

Hovedindholdet i realitetsgrundsætningen er derfor, at beskatningen under visse betingelser kan rettes mod den faktiske økonomiske realitet på bekostning af den modstående civilretlige formalitet.

Det er meget væsentligt at holde sig for øje, at realitetsgrundsætningen <u>ikke</u> er en arbitrær norm, der giver skattemyndighederne mulighed for at gennemføre beskatning efter forgodtbefindende.

Det antages således, at ovennævnte civilretlige styring alene kan tilsidesættes, såfremt den hævdede form <u>slet ikke svarer til de realøkonomiske realiteter</u>, idet det dog ikke er muligt at angive mere konkrete og klare rammer for grundsætningens anvendelsesområde. Jf. således Jan Pedersen i TfS 2000, 142, hvor følgende endvidere anføres:

> "I sin tid blev realitetsgrundsætningen formuleret som et resultat af domstolenes retsskabende virksomhed.
>
> Det blev fremhævet, at etableringen af praksis opfyldte helt essentielle skattepolitiske behov, og at en passivitet mod skatte- udnyttelse indebar en trussel mod selve indkomstbeskatningen og dermed hele samfundet.
>
> Domstolene påtog sig herved et betydeligt retspolitisk ansvar, som opnåede tilslutning fra brede kredse – også blandt skatteydere.
>
> Den forløbne retsudvikling har forøget og forstærket dokumentationen for selve eksistensen og egenarten af det retlige princip, som realitetsgrundsætningen er udtryk for.

*Den konkrete retsanvendelse vil altid være vanskelig, idet den indebærer en afvejning af rent normative begreber.*

*De enkelte afgørelser og domme kan derfor give anledning til diskussion pro et contra. Afgørende er imidlertid, at navnlig*

*Højesteret foretager en ihærdig overvågning til sikring af, at realitetsgrundsætningen ikke misbruges til gennemførelse af en uhjemlet beskatning. Herved sikres ikke blot, at beskatning sker på lovligt grundlag, men tillige sikres den grundlæggende aftalefrihed.*

*Højesteret har herved fortsat sit retspolitiske ansvar og medvirket til, at retsstillingen ud fra en overordnet bedømmelse fortsat må anses for ret og rimelig."*

### 12.3.5 Realitetsgrundsætningen anvendt på pensionsplanernes sager

Som anført har realitetsgrundsætningen ikke karakter af en fri adgang for skattemyndighederne til en skatteretlig omkvalificering af et givent faktum.

Det følger således af den ovenfor citerede praksis fra Højesteret, at realitetsgrundsætningen ikke blot kan misbruges til gennemførelse af en uhjemlet beskatning, idet beskatningen ifølge realitetsgrundsætningen – som anført af Jan Pedersen – fortsat skal indebære rimelige resultater.

I nærværende sag gøres det gældende, at man ikke med hjemmel i realitetsgrundsætningen kan bortcensurere pensionsplanernes ejerskab til de omhandlede aktier.

Der findes således ikke det i realitetsgrundsætningen forudsatte misforhold mellem pensionsplanernes civilretlige ejerskab og pensionsplanernes skatteretlige ejerskab til de omhandlede aktieposter.

Der er således ikke grundlag for at anlægge en anden bedømmelse i skatteretlig henseende – med andre ord skal pensionsplanerne også i skatteretlig henseende anses for ejere af de omhandlede aktier, der civilretligt er overdraget til dem.

Derfor var pensionsplanerne også de skatteretlige ejere af det udbytte, der blev udbetalt til pensionsplanerne, og som de bagvedliggende selskaber har indeholdt udbytteskatter af. Som følge heraf tilkommer de omhandlede refusioner af udbytteskatter også pensionsplanerne.

### 12.3.5.1 Dokumentation for forbindelsen til pensionsplanens økonomi

Den fornødne *forbindelse til pensionsplanerne*, der dokumenterer, at aktietransaktionerne mv. har passeret pensionsplanernes *økonomi*, er i førersagerne ligesom i denne sag dokumenteret ved fremlæggelse af custody statements og de af Schaffelhuber Müller & Kollegen S.à r.l. udarbejdede bogføringer.

Aktietransaktionerne, modtagelsen af udbyttet og udbytterefusionen er alle registreret direkte på pensionsplanernes konti (kontant- og værdipapirkontiene) hos deres respektive custodians.

Skattestyrelsen bekræfter selv i de civile sager for High Court i London, at de har udbetalt refusionsbeløbene til tre tax agents, der har overført følgende beløb til Solo Capitals kontaktkonto i Barclays Bank (omregnet til danske kroner):

- Fra Syntax til Solo Capital: kr. 2.746 mia.
- Fra Goal til Solo Capital: kr. 2.79 mia.
- Fra Acupay til Solo Capital kr. 2.961 mia.

Disse beløb er alle pensionsplanernes penge i henhold til ansøgningerne om refusion.

Da pensionsplanerne endnu ikke havde eksisteret særligt længe, da SØIK foranledigede beslaglæggelsen af samtlige konti, der tilhørte de fire custodians, og Solo blev overført til PWC's administration, var der endnu ingen af pensionsplanerne, der gennemførte aktietransaktioner i 2014 og 2015, der havde haft lejlighed til at trække penge ud fra Solo-gruppen.

De begunstigede personer var/er også alle stadig for unge til at have modtaget pensionsudbetalinger fra pensionsplanerne.

Havde Skattestyrelsen og Skatteankestyrelsen accepteret en pensionsplan, som havde handlet aktier i 2012 – som fx The Sander Gerber Pension Plan – som førersag, kunne vi have dokumenteret udbetalinger fra Solo-gruppen til amerikanske banker. Denne pensionsplans transaktioner lå langt nok tilbage i tiden til at have nået at overføre penge ud af det, som Skattestyrelsen gerne vil betegne som et "lukket system".

At samtlige realiserede gevinster stadig befandt sig på kontoen i Solo-gruppen, betyder dog ikke, at transaktionerne ikke havde nogen forbindelse til pensionsplanernes økonomi.

### 12.3.5.2 Realitetsgrundsætningen – aftaler med uafhængige parter på markedsvilkår

Mens Skatteankestyrelsen ikke tvivler på, at køb og salg af aktier, forwardkontrakterne og aktieudlånene blev indgået mellem uafhængige parter, er den manglende indbetaling af den i custody agreement, punkt 5.1, nævnte indbetaling til custodian for Skatteankestyrelsen et tegn på den manglende uafhængighed af pensionsplanerne i forhold til custodian.

Depotaftalen, som pensionsplanerne underskrev med Solo-gruppens custodians, indeholdt et standardkrav om at indbetale en margin på USD 500.000, inden aktiehandlen kunne starte. Pensionsplanerne blev dog informeret om, at denne betingelse var indføjet med henblik på fremtidige transaktioner, der skulle foregå under MIFID II-reglerne. MIFID II var dog endnu ikke trådt i kraft i 2014. De pågældende custodians lod derfor pensionsplanerne vente med at indbetale den forlangte margin, til efter den (de) første handel (handler) var gennemført, såfremt pensionsplanen ville købe aktierne den sidste dag inden udbyttets ex-dato. Denne risiko kunne de respektive custodians løbe, idet custodian allerede ved modtagelse af nettoudbyttet kunne tage den oprindeligt forlangte "initial margin".

At custodian ikke straks forlangte den forudsete margin, betyder dog ikke, at pensionsplanerne ikke var uafhængige af deres custodian. Fortjenesten, som custodian havde på transaktionerne, var stor nok til, at denne som uafhængig tjenesteyder var villig til at løbe den finansielle risiko i ganske få dage.

### 12.3.5.3 Realitetsgrundsætningen – handler reelt gennemført på pensionsplanernes vegne, herunder rådet

Skatteankestyrelsens fremfører i styrelsens indstilling i førersagerne ikke mindre end to argumenter for deres standpunkt, at handlerne ikke skulle være gennemført af eller på vegne af pensionsplanerne:

1    Der er ikke fremlagt dokumentation for overførsel af midler til pensionsplanen fra custodian eller andre aktører involveret i aktietransaktionerne mv
2    Den lange række af fremlagte aftaler, kontoudtog, handelsnotaer mv. med custodian som den agerende i transaktionerne skulle –sagens omstændigheder taget i betragtning – ikke være tilstrækkeligt til at dokumentere, at custodian har handlet på pensionsplanernes vegne.

### 12.3.5.3.1 Overførsler fra custodian

Hvem pensionsplanerne har betalt hvor meget for at muliggøre transaktionerne, er uden relevans for spørgsmålet om, hvorvidt pensionsplanerne erhvervede ejerskab til aktierne.

Idet pensionsplanerne ikke selv rådede over den nødvendige kapital til at finansiere transaktionerne, løb clearing-agenten og custodian naturligvis en relativt stor risiko for at måtte springe ind og betale for aktierne, hvis pensionsplanen ikke kunne skaffe en aktielåntager i tide. Denne risiko tog clearing-agenten og custodian sig naturligvis godt betalt for.

Personerne, der formidlede pensionsplanerne som kunder til Solo-gruppen, lod sig ligeledes betale en "Introduction" eller "Arrangement fee".

Pensionsplanerne var fra begyndelsen af klar over, at dette var nødvendige forretningsmæssige transaktionsomkostninger, som de måtte betale, efter at de havde realiseret gevinsten fra selve transaktionerne som præsenteret i annex 1.

Overførslerne blev gennemført elektronisk hvorfor pensionsplanerne ikke kan fremlægge dokumentation herfor. De er dog heller ikke nødvendige for at erhverve ejerskab.

I henhold til Skattestyrelsens egne stævninger indgivet til High Court i London er Skattestyrelsen enig i, at der er foretaget betalinger fra Solo Capitals konto i Barclays Bank i ganske betydeligt omfang til diverse modtagere. Skattestyrelsen er- kender derved, at der er betalt tjenesteydere fra Solo Capitals konto på vegne af pensionsplanerne, som var ejere af midlerne på Solo Capitals konto.

Hvilket beløb, der først blev faktureret af Solo Capital til pensionsplanerne for tjenesteydelser og derefter betalt af Solo Capital selv til andre tjenesteydere, og hvilke beløb, pensionsplanerne selv betalte til andre tjenesteydere, kan på nuværende tidspunkt ikke dokumenteres ud fra stævningerne i London.

Det fremgår dog, at følgende personer og virksomheder har modtaget følgende beløb fra Solo Capitals konto i Barclays Bank til deres respektive konti i Varengold Bank:

| Modtager | Beløb modtaget fra Solo Capital I henhold til stævningerne I London | Omregning til DKK | TOTAL |
|----------|-------------------------------------------------------------------|-------------------|-------|
| Ganymede Cayman | 200.624.137 EUR<br><br>57.319.077 GBP<br><br>5.308.011 USD | 1.496.644.478 DKK<br><br>459.131.688 DKK<br><br>35.356.626 DKK | 2,2 mia. DKK |

| | | | |
|---|---|---|---|
| Colbrook Limited (Net "Coolbrook") | 8.666.662, 93 EUR | 64,6 mio. DKK | 64,6 mio. DKK |
| T&S Capital | 2.000.000 EUR | 14,9 mio. DKK | 14,9 mio. DKK |
| Elysium Global Ltd (Virgin islands) | 222.100.000 EUR  14.999.983 GBP | Ca. 1,8 mia. DKK | 1,8 mia. DKK |
| Ampersand Capital Limited | 13.763.641,37 EUR | 102.675.967 DKK | 102,7 mio. DKK |
| Elysium Global Dubai Ltd | 2.211.193 EUR  1.574.970 USD  800.000 GBP | 16.493.976 DKK  10.539.397,29 DKK  6.463.998,36 DKK | 33,5 mio. DKK |
| Sanjay Shah | 11.100.000 USD  4.500.000 EUR | 74.294.828,64 DKK  33.566.549,87 DKK | 108 mio. DKK |
| Trillium Capital Sarl | 60.500.000 EUR | Ca. 451,3 mio. DKK | 451,3 mio. DKK |

Fra Barclays Bank blev der i henhold til stævningerne også foretaget følgende betalinger til andre konti:

| Modtager | Beløb modtaget fra Solo Capital I henhold til stævningerne I London | Omregning DKK | TOTAL DKK |
|---|---|---|---|
| Elysium Global Ltd (Virgin Islands) (or) Elysium Global Dubai Ltd | 110.000.000 EUR <br><br> 22.000.000 GBP <br><br> 96.000.000 USD | 820.495.951,55 DKK <br><br> 177.836.721 DKK <br><br> 642.623.757 DKK | 1,7 mia. DKK |
| Ganymede Cayman | 9.000.000 EUR | 67.139.806,23 DKK | 212,6 mio. DKK |

| | 18.000.000 GBP | 145.482.618,47 DKK | |
|---|---|---|---|
| Sanjay Shah | 9.818.000 EUR<br><br>2.493.000 GBP<br><br>151.000 USD | 73.242.085,70 DKK<br><br>20.148.270 DKK<br><br>1.010.489,16 DKK | 94,4 mio. DKK |
| Edo Barac | 60.000 GBP<br><br>1.554.375 EUR | 480.606 DKK<br><br>11.595.548 DKK | 12 mio. DKK |
| Jaswinder Bains | 3,245 mio. GBP | 26 mio. DKK | 26 mio. DKK |
| Treefrog Capital Limited | 13.545.774 EUR<br><br>2.000.500 USD | 101.050.692 DKK<br><br>13.325.317 | 114 mio. DKK |
| Darren Lui | 274.191 GBP | 2-196.298 DKK | 2,2 mio. DKK |
| Rajan Shah | 6.596.000 GBP | 53,3 mio. DKK | 53,3 mio. DKK |
| Hooloomooloo | 24.180.000 JPY<br><br>950.000 GBP | 1.524.657 DKK<br><br>7.609.595 DKK | 9,1 mio. DKK |
| Solo Capital Limited | 1.152.700 GBP | | 9,3 mio. DKK |
| Agrius Capital Ltd | 531.000 GBP<br><br>17.000 EUR | 4.253.364,49 DKK<br><br>126.819,02 DKK | 4,4 mio. DKK |
| Aesa Sarl | 2.150.333 EUR | 16 mio. DKK | 16 mio. DKK |
| Anupe Dhorajiwala | 1.500.000 EUR | 11.190.027,63 DKK | 12 mio. DKK |
| Old Park Lane Capital Ltd | 206.099 GBP | 1.650.874,14 DKK | 1,7 mio. DKK |
| Telesto Markets LLP | 320.000 EUR<br><br>672.522 USD | 2.387.181,52 DKK<br><br>4.479.664,58 DKK | 7 mio. DKK |

### 12.3.5.3.2 Custodians handlinger på pensionsplanernes vegne

Den fremlagte dokumentation viser netop, at custodian ikke har handlet på vegne af pensionsplanerne før de af pensionsplanerne selv indgåede aktiehandler skulle afvikles. Det er heller ikke en custodians opgave. En custodian bliver først rigtigt aktiv, når pensionsplanerne allerede er blevet ejere af de danske aktier, ved at deres ordrer til køb af danske aktier bliver matchet ved brokeren med salgsordrer.

Custodians "handler" heller ikke "på vegne" af pensionsplanerne. De udfører ordrer modtaget fra pensionsplanerne: ordrer til at afvikle de aktiekøb, som pensionsplanerne selv har udført.

Sådan som systemerne til afvikling af aktiehandler fungerer, kan afviklingen af en aktiehandel ikke stoppes længere, så snart en købsordre er blevet matchet med en salgsordre. Enhver clearer/custodian, der autoriseres af en tilsynsmyndighed i EU, skal lade sit computersystem til afvikling af aktiehandlerne godkende af til- synsmyndigheder. Dette sikrer, at handlerne afvikles korrekt, og at der ikke kan gribes manuelt ind i afviklingsprocessen.

Afviklingen sættes ikke i gang af handelsnotaen, således som det påstås af Skattestyrelsen i styrelsens sammenfattende indlæg. Afviklingen sættes i gang af et eget elektronisk signal (afviklingsinstruktionen) automatisk udløst af handelssystemet, når købs- og slagsordre er blevet matchet.

### 12.4 I øvrigt ikke grundlag for at tilsidesætte pensionsplanens skattemæssige ejerskab

Pensionsplanens skattemæssige ejerskab kan desuden ikke tilsidesættes, med den begrundelse at pensionsplanen skulle have ejet flere aktier, end der var til rådighed på markedet, eller at der er blevet udbetalt mere i refusion end modtaget fra de danske selskaber.

At pensionsplanen kunne eje de store aktieposter, er en naturlig konsekvens af, at ejerskab erhverves allerede med aftalen om køb af aktier. Short selling vil have denne for enhver køber af danske aktier usynlige konsekvens, at ingen ved, om de køber en aktie af en long owner eller en short seller. Heller ikke hvis man køber tre aktier i Tryg A/S hos sin egen bank. Især købet af aktier gennem en bank, der har tilladelse til at handle som "market maker", er risikoen stor for, at man køber en aktie, som banken slet ikke har – at banken handler som udækket short seller, sådan som det er ønsket af EU og Finanstilsynet for at øge likviditeten i danske aktier.

At udbetalingen af refusion KAN overstige indbetalingen, kan være en konsekvens enten af short selling eller simpelthen af at aktionærer med at skattestatus sælger til aktionærer med en anden skattestatus på udbyttedatoen med en settlement dato efter record day.

Det bestrides dog, at Danmark skulle have udbetalt mere i refusion end modtaget fra de danske selskaber.

Skatteankestyrelsen anerkender i førersagerne konsekvenserne af short selling som præsenteret af pensionsplanernes repræsentanter, og at dette kan medføre, at der i visse situationer kan skabes flere ejere af danske aktier end svarende til det antal aktier, som selskaberne har udstedt, men at dette heller ikke fører til et andet resultat

(…)

### ENDELIG KONKLUSION

På baggrund af ovennævnte gøres det sammenfattende gældende, at der ikke er grundlag for at tilbagekalde de oprindelige afgørelser om refusion af udbytteskatter.

Skattestyrelsens anbringender i nærværende sag er bygget på antagelser opstået flere år efter afgørelserne om refusion af udbytteskat.

Den bevistvivl, som Skattestyrelsen har søgt at opstille, må i vidt omfang tilskrives Skattestyrelsens egen, mangelfulde sagsoplysning. Som anført ovenfor er der tale om udokumenterede antagelser om pensionsplanernes manglende ejerskab, som Skattestyrelsen ikke har ført noget egentligt bevis for. Dertil kommer, at Skattestyrelsen reelt ikke har ønsket at bidrage til oplysningen af sagerne, men har forsømt at indhente en lang række relevante oplysninger.

I nærværende sag skal det lægges til grund, at pensionsplanen var den skatteretligt retmæssige ejer af de i sagen omtvistede aktieposter og udbyttebetalinger, og at pensionsplanen derfor også havde ret til de omhandlede udbytterefusioner, som den også modtog.

Pensionsplanen har fremlagt et meget omfattende materiale til støtte for realiteten i de omhandlede transaktioner – både i relation til aktiehandlerne, aktielånene og de omhandlede forwards.

Den fremlagte dokumentation skal selvsagt ses i lyset af, at fremskaffelsen som anført bl.a. er besværliggjort af det forhold, at oplysningerne er søgt fremskaffet flere år efter de oprindelige refusionsanmodninger, at en række oplysninger lægger på de hos custodians beslaglagte harddiske osv.

Ikke desto mindre har pensionsplanen fremlagt den tilstrækkelige dokumentation for de omhandlede aktiehandler, herunder handelsnotaer, custody statements og DCA'ere.

Det er efter omstændighederne ikke blot urealistisk at stille krav om yderligere dokumentation – det er også urimelig. Særlig når henses til at Skattestyrelsen selv har forsømt at indhente en række af oplysningerne.

Tilsvarende har pensionsplanen også ved det fremlagte DCA'ere hidrørende fra custodians i tilstrækkelig grad dokumenteret modtagelsen af nettoudbytterne.

DCA'ere er som anført den eneste mulige dokumentation for modtagelsen af nettoudbytterne.

Som anført er det både urealistisk og urimeligt at stille krav om dokumentation af pengestrømmene af udbytterne fra aktieudstedende selskab til aktionær. Det er jo umuligt at identificere hvilken del af de under market claim processen modtagne nettoudbytter, der hidrørte fra oprindelige udbytter udloddet af det aktieudstedende selskab, og hvor stor en del af nettoudbytterne der hidrørte fra kompensationsbetaling fra en short seller.

Der kan som anført heller ikke komme pensionsplanen til skade, at lovgiver i Danmark ikke har formået at tage hensyn til short sellings særlige natur, der bl.a. med- fører det tilsigtede fænomen, at der kan være udbydes et større antal aktier end udstedt, samt det deraf afledte dobbelte ejerskab

Landsskatteretten skal således lægge til grund, at pensionsplanen var den skatte- retligt retmæssige ejer af de i sagen omtvistede aktieposter og udbyttebetalinger, og at pensionsplanen derfor også havde ret til de omhandlede udbytterefusioner, som den også modtog."

## Landsskatterettens afgørelse

Det fremgår bl.a. af kildeskattelovens § 69 b, stk. 1, at har nogen, der er skattepligtige efter § 2 eller selskabsskattelovens § 2, modtaget udbytte, royalty eller renter, hvori der efter §§ 65-65 d er indeholdt kildeskat, som overstiger den endelige skat efter en dobbeltbeskatningsoverenskomst, tilbagebetales beløbet inden 6 måneder fra told- og skatteforvaltningens modtagelse af anmodning om tilbagebetaling.

Af dobbeltbeskatningsoverenskomsten mellem USA og Danmark fremgår af artikel 10, stk. 3, litra c, at udbytte fra et selskab hjemmehørende i Danmark ikke beskattes i Danmark, såfremt den retmæssige

ejer er en pensionskasse, som omtalt i artikel 22, stk. 2, litra e, der er hjemmehørende i USA. Det er en forudsætning, at sådant udbytte ikke hidrører fra udøvelse af virksomhed af pensionskassen eller gennem et forbundet foretagende.

Af dobbeltbeskatningsoverenskomstens artikel 22, stk. 2, litra e, fremgår, at en person, der er hjemmehørende i en kontraherende stat, alene skal være berettiget til alle fordele efter denne overenskomst, hvis denne person er en juridisk person, hvad enten fritaget for beskatning eller ikke, der er organiseret efter lovgivningen i en kontraherende stat med det formål at yde pension eller lignende ydelser efter en fastsat ordning til arbejdstagere, herunder selvstændige erhvervsdrivende. Det er en forudsætning, at mere end 50 pct. af denne persons begunstigede, medlemmer eller deltagere er fysiske personer, som er hjemmehørende i en af de kontraherende stater.

Refusion af udbytteskat er således betinget af, at Pensionsplanen har ejet aktier, og at Pensionsplanen har modtaget udbytte af disse aktier, hvor der i forbindelse med udbetalingen af udbyttet er indeholdt udbytteskat.

Landsskatteretten finder, at det påhviler Pensionsplanen at bevise, at disse betingelser er opfyldt, og at Pensionsplanen på den baggrund var berettiget til refusion af udbytteskat.

Landsskatteretten finder ikke, at denne bevisbyrde er løftet.

Landsskatteretten har herved lagt vægt på, at Pensionsplanen er en nystiftet pensionskasse, der ikke har økonomi til at foretage de påståede aktiekøb, og at det ikke er dokumenteret, at Pensionsplanen har købt og været ejer af de omhandlede påståede aktier eller har modtaget udbytte af aktierne. Den dokumentation, der er fremlagt vedrørende transaktioner ved køb og salg af aktier, aktieudlån og indgåelse af forwards, er alene fremlæggelse af en række aftaler m.v., der ikke dokumenterer Pensionsplanens ejerskab til de omhandlede påståede aktier. Der ses således ikke at være den fornødne forbindelse til Pensionsplanen, der dokumenterer, at der har været aktietransaktioner m.v., der har passeret Pensionsplanens økonomi. Der er ikke fremlagt dokumentation for, at Pensionsplanen har indbetalt startkapital til custodian, og der er ikke fremlagt dokumentation for øvrige overførsler af midler til Pensionsplanen fra custodian eller andre aktører involveret i de påståede aktietransaktioner m.v. Der er alene fremlagt en lang række konstruerede aftaler, kontoudtog, handelsnotaer m.v. med custodian som den agerende i de påståede transaktioner, hvilket uanset det fremlagte ikke dokumenterer, at custodian har handlet aktier på Pensionsplanens vegne. Der er herved særligt lagt vægt på den fortløbende nummerering på Credit Advices i sagskomplekset, hvilket tyder på en systematisk tilrettelæggelse af de påståede handler med henblik på uberettiget at opnå refusion af udbytteskat. Der henvises endvidere til Landsskatterettens afgørelse af 19. december 2019, SKM 2019.650 LSR.

Det forhold, at der er fremlagt Tax Opinion af 27. juni 2012, kan ikke føre til et andet resultat, idet betingelserne for udbytterefusion ikke er opfyldt i den konkrete sag.

Da Pensionsplanen ikke er anset for at have ejet aktier eller modtaget udbytte som angivet i forbindelse med anmodningen om udbytterefusion, finder Landsskatteretten, at SKAT har udbetalt refusionen på et urigtigt grundlag på baggrund af Pensionsplanens ansøgning. SKAT var derfor berettiget til at annullere de oprindelige afgørelser om udbetaling af udbytterefusion. Repræsentantens bemærkninger om bevisbyrde og den omstændighed, at SKAT har anvendt ordet "tilbagekaldelse", kan ikke føre til et andet resultat.

Landsskatteretten stadfæster den påklagede afgørelse.

Eline Ringgaard Kjeldsen
Kontorchef

Oliver Asbjørn Evers
Sagsbehandler

**Vejledende medholdsvurdering**

Skatteankestyrelsen skal komme med en udtalelse om, i hvilket omfang der er givet medhold i klagen.

Medholdsvurderingen har betydning for, i hvilken grad klageren kan få omkostningsgodtgørelse af udgifter til rådgivning under klagesagen. Medholdsvurderingen er kun vejledende. Ansøgning om omkostningsgodtgørelse skal sendes til Skattestyrelsen, som træffer afgørelsen.


Skatteankestyrelsen udtaler følgende:


Der er ikke givet medhold i de påklagede forhold.


**Afgørelsen sendes til**

The Proper Pacific LLC 401k Plan, 31W 21 ST Street Apt 2N, NY 10010 New York, USA

TVC ADVOKATFIRMA P/S, Søren Frichs Vej 42A, 8230 Åbyhøj

Advokatfirmaet Poul Schmith, Kammeradvokaten I/S, Vester Farimagsgade 23, 1606 København V

Skattestyrelsen